## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CC1 LIMITED PARTNERSHIP, HORIZON INTERNATIONAL SHIPPING, INC., LINDE GAS PUERTO RICO, INC., X-PRESS FREIGHT FORWARDERS, INC., RONA DISTRIBUTORS, INC., FERRMAX, INC., LA ROSA DEL MONTE EXPRESS INC. and LA ROSA DEL MONTE EXPRESS INC. on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HORIZON LINES, INC., HORIZON LINES, LLC, HORIZON LOGISTICS, LLC, HORIZON LINES OF PUERTO RICO, INC., SEA STAR LINE, LLC, CROWLEY MARITIME CORPORATION, CROWLEY LINER SERVICES, INC., TRAILER BRIDGE, INC., PETER BACI, ALEXANDER G. CHISHOLM, R. KEVIN GILL, GREGORY GLOVA and GABRIEL SERRA,<br><br>Defendants. | CIVIL NO. 08-1467 (DRD) (08-1525, 08-1553, 08-1555, 08-1617, 08-1626, 08-1618, 08-1665); 08-1569 (DRD); MDL NO. 08-1960<br><br>**FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, on behalf of themselves and a class of all those similarly situated, bring this action for damages and injunctive relief under the antitrust laws of the United States against defendants, demanding a trial by jury and complaining and alleging as follows:

### NATURE OF THE CASE

1.      Defendants and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the market for coastal water freight transportation services between the United States and Puerto Rico ("Puerto Rican cabotage") beginning at least as early as May 2002 and continuing until at least April 2008, by agreeing to allocate customers, rig bids to customers, and fix the prices of rates, surcharges and other fees

charged to customers in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Because of defendants' and their co-conspirators' unlawful conduct, plaintiffs and other class members paid artificially inflated prices for Puerto Rican cabotage and, as a result, have suffered antitrust injury to their businesses or property.

2.    Four individual defendants, executives of the entity defendants during the relevant time, have pled guilty to participating in this conspiracy, and one individual defendant has pled guilty to attempting to cover up the existence of the conspiracy by destroying records and documents.

## JURISDICTION AND VENUE

3.    This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiffs and the members of the class by reason of their violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

4.    This action is also instituted to secure injunctive relief against defendants to prevent them from committing further violations of Sections 1 and 3 of the Sherman Act.

5.    Subject matter jurisdiction is conferred upon this Court by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and by 28 U.S.C. §§ 1331 and 1337.

6.    Venue is proper in this district under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d).  From at least as early as May 2002 and continuing until at least April 2008, one or more of the defendants resided, maintained offices, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this District.

7.    This Court has personal jurisdiction over each defendant because, among other things, each: (a) transacted business throughout the United States, including in this District; (b) participated in cabotage in the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in an illegal scheme and conspiracy in violation of Sections 1 and 3 of the Sherman Act that was directed at and had the intended effect of causing injury

to persons residing in, located in, or doing business throughout the United States, including in this District.

**PARTIES**

**Plaintiffs**

8.      Plaintiff C C 1 Limited Partnership has been at all relevant times a Florida limited partnership with its principal place of business in Bayamón, Puerto Rico.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

9.      Plaintiff Horizon International Shipping, Inc. has been at all relevant times a Florida corporation with its principal place of business in Medley, Florida.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

10.      Plaintiff Linde Gas Puerto Rico, Inc. has been at all relevant times a Puerto Rico corporation with its principal place of business in Cataño, Puerto Rico.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

11.      Plaintiff X-Press Freight Forwarders, Inc. has been at all relevant times a Puerto Rico corporation with its principal place of business in Carolina, Puerto Rico.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint,

higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

12.     Plaintiff Rona Distributors, Inc. has been at all relevant times a Puerto Rico corporation with its principal place of business in Carolina, Puerto Rico.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

13.     Plaintiff Ferrmax, Inc. has been at all relevant times a Puerto Rico corporation with its principal place of business in Bayamon, Puerto Rico.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

14.     Plaintiff La Rosa del Monte Express Inc. has been at all relevant times a Puerto Rico corporation with its principal place of business in Carr. PR-2, K 19.7, Bo. Candelaria, Toa Baja PR.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been, and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

15.     Plaintiff La Rosa del Monte Express Inc. has been at all relevant times a private corporation of New York with its principal place of business in 1133-35, Tiffany St., Bronx, New York 10459-2398, U.S.A.  During the relevant time, it purchased Puerto Rican cabotage directly from one or more of the defendants.  The prices it paid for Puerto Rican cabotage to defendants were, as a result of the conspiracy alleged in this complaint, higher than they otherwise would have been,

and, as a result of the conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations pleaded.

**Defendants**

16.     Defendant Horizon Lines, Inc. ("Horizon Inc.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.   Its stock is traded on the New York Stock Exchange.  It has operated as a holding company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC; (ii) Horizon Logistics Holdings, LLC; and (iii) Horizon Lines of Puerto Rico, Inc.

17.     Defendant Horizon Lines, LLC ("Horizon LLC") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It is as an ocean carriage containership operating subsidiary of Horizon Inc.  Horizon LLC operates a fleet of 21 U.S.-flag containerships and five port terminals linking the continental United States with Puerto Rico, Hawaii, Alaska, Guam and Micronesia.

18.     Defendant Horizon Logistics Holdings, LLC ("Horizon Logistics") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It is as an ocean carriage management operating subsidiary of Horizon Inc.

19.     Defendant Horizon Lines of Puerto Rico, Inc. ("Horizon Puerto Rico") is a Delaware corporation with its principal place of business in San Juan, Puerto Rico.

20.     Horizon Inc., Horizon LLC, Horizon Logistics and Horizon Puerto Rico are collectively referenced in this complaint as "Horizon."  Horizon is the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total U.S. maritime container shipments from the continental United States to Puerto Rico, Hawaii, Alaska, Guam and Micronesia, and approximately 35 percent of the Puerto Rican cabotage market. Horizon marketed and sold Puerto Rican cabotage in the United States and in this district from at least as early as May 2002 and continuing until at least April 2008.

21.     On April 17, 2008, Horizon Inc. issued a press release revealing that it was served with search warrants and a grand jury subpoena in connection with an investigation by the Antitrust

Division of the United States Department of Justice ("DOJ") into the pricing practices of ocean carriers operating in the Puerto Rico trade. Horizon Inc. also discussed the subpoena in its 10-Q filing dated April 25, 2008. Horizon Inc. issued another press release on May 28, 2008 announcing that it placed six employees involved in Puerto Rico trade on administrative leave as a result of its review of issues raised by the DOJ's investigation. A subsequent October 1, 2008 press release confirmed that three former employees agreed to plead guilty for their participation in the conspiracy.

22.     Defendant Gabriel Serra ("Serra") is an individual residing at Calle Washington #2, Condado Princess Apt. 1003, San Juan, Puerto Rico. During the relevant period, Serra was the Senior Vice President and General Manager for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican cabotage.

23.     On October 20, 2008, Serra pled guilty in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Sections 1 and 3 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

24.     Defendant R. Kevin Gill ("Gill") is an individual residing at 7522 Seton House Lane, Charlotte, North Carolina. From at least as early as May 2002 until December 2005, Gill was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican cabotage. From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible for marketing Horizon's Puerto Rican cabotage services.

25.     On October 20, 2008, Gill pled guilty in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Sections 1 and 3 of the Sherman Act to suppress and

eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

26.     Defendant Gregory Glova ("Glova") is an individual residing at 3230 India Wilkes Place, Charlotte, North Carolina.  From December 2005 until at least April 2008, Glova was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican cabotage.

27.     On October 20, 2008, Glova pled guilty in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Sections 1 and 3 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

28.     Defendant Sea Star Line, LLC ("Sea Star") is a Delaware corporation with its principal place of business in Jacksonville, Florida.  Sea Star is privately held by SaltChuk Resources, Inc. and Taino Star, Inc.  Sea Star provides integrated transportation services to and from the United States, Puerto Rico, the U.S. Virgin Islands and the eastern Caribbean islands of Antigua, St. Kitts, St. Maarten and Tortola.  Sea Star accounts for approximately 21 percent of the Puerto Rican cabotage market.  Sea Star marketed and sold Puerto Rican cabotage in the United States and this district from at least as early as May 2002 and continuing until at least as late as April 2008.

29.     On May 7, 2008, Sea Star disseminated a press release stating that it was cooperating with the DOJ's investigation and that it had placed a number of employees on indefinite administrative leave for violations of company policy.  Sea Star issued a statement on October 1, 2008 confirming that two former employees agreed to plead guilty for their involvement in the conspiracy and that those two employees had been relieved of their responsibilities on May 5, 2008.

30.     Defendant Peter Baci ("Baci") is an individual residing at 4021 Retford Drive, Jacksonville, Florida.  During the relevant period, Baci was the Senior Vice President of Yield Management for Sea Star and was responsible for determining Sea Star's pricing for Puerto Rican cabotage.

31.     On October 20, 2008, Baci pled guilty in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Sections 1 and 3 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

32.     Defendant Alexander G. Chisholm ("Chisholm") is an individual residing at 2705 Dahlonega Drive, Jacksonville, Florida.  During the relevant period, Chisholm was the Assistant Vice President of Yield Management for Sea Star.

33.     On October 20, 2008, Chisholm pled guilty in the United States District Court for the Middle District of Florida to a criminal information stating that, after he became aware of an investigation by a grand jury sitting in the Middle District of Florida, assisted by the DOJ and the Federal Bureau of Investigation ("F.B.I."), into possible federal antitrust offenses in Puerto Rican cabotage, on April 17, 2008, Chisholm corruptly altered, destroyed, and concealed records and documents and attempted to do so with the intent to impair the availability of the records and documents for use in the investigation.

34.     Defendant Crowley Maritime Corporation ("Crowley Maritime") is a privately owned Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida.

35.     Defendant Crowley Liner Services, Inc. ("Crowley Liner") is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida. Crowley Liner is a wholly-owned subsidiary of Crowley Maritime.  Crowley Liner has operated a

fleet of 35 vessels and provides scheduled marine transportation services between the continental United States and ports in the Caribbean and Central America, including ports in Puerto Rico. Crowley Liner has operated at least nine large, multi-deck "rolls-on/rolls-off" ("ro/ro") barges that ship goods to and from Puerto Rico.

36.     Crowley Maritime and Crowley Liner are collectively referenced in this complaint as Crowley.  Crowley has been in the business of liner services, logistics, energy support, project management, ocean towing and transportation, petroleum and chemical transportation, fuel sales and distribution, ship assist and escort, salvage and emergency response, vessel construction and naval architecture, and ship management.  Crowley accounts for approximately 31 percent of the Puerto Rican cabotage market.  Crowley marketed and sold cabotage in the United States and in this district from at least as early as May 2002 and continuing until at least April 2008.

37.     According to news reports, Crowley's Jacksonville office was raided by the F.B.I. on or about April 18, 2008, in conjunction with the FBI's investigation of anticompetitive conduct in the Puerto Rican Cabotage market.

38.     Defendant Trailer Bridge, Inc. ("Trailer Bridge") is a Delaware corporation with its principal place of business in Jacksonville, Florida.  Its stock is publicly traded on the NASDAQ global market.  Trailer Bridge offers integrated freight shipping services between the continental United States and Puerto Rico.  It has been serving Puerto Rico since 1992 and has accounted for approximately 14 percent of the Puerto Rican cabotage market.  Trailer Bridge marketed and sold Puerto Rican cabotage in the United States and in this district from at least as early as May 2002 and continuing until at least April 2008.

39.     On May 15, 2008, Trailer Bridge filed its Form 10-Q in which it admitted that it had been served with a subpoena from the DOJ seeking documents and information relating to a grand jury investigation of pricing practices among Puerto Rico ocean carriers.  Its August 14, 2008 Form 10-Q further stated that Trailer Bridge made several document submissions in response to the subpoena.

**Agents**

9

40.     Whenever in this complaint reference is made to any act, deed or transaction of any defendant corporation or limited liability company, the allegation means that the corporation or limited liability company engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability company's business or affairs.

41.     At all relevant times, each defendant was an agent of each of the remaining defendants and, in performing the acts alleged in this complaint, was acting within the course and scope of such agency.  Each defendant ratified or authorized the wrongful acts of each of the other defendants. Defendants are individually and collectively sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

**Co-Conspirators**

42.     Various other persons, firms, limited liability companies, corporations and other entities not named as defendants in this complaint have participated as co-conspirators with defendants in the violations alleged herein, and have aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## INTERSTATE TRADE AND COMMERCE

43.     The activities of the defendants and their co-conspirators that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce, including trade and commerce to, from, and within this District.

44.     From at least as early as May 2002 and continuing until at least April 2008, defendants and their co-conspirators marketed and sold substantial quantities of Puerto Rican cabotage in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States and Puerto Rico.

45.     The market for Puerto Rican cabotage is estimated to be worth many hundreds of millions of dollars annually.

46.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to market and sell Puerto Rican cabotage.

## FACTUAL ALLEGATIONS

**The Market**

47.     Ocean transport is a highly effective method for moving large quantities of non-perishable goods and raw materials.  The major commodities shipped through domestic ocean shipping include manufactured goods, farm products, coal, crude petroleum, refined petroleum products and chemicals.

48.     The domestic ocean trade involved in this action is Puerto Rican cabotage, the noncontiguous trade between the continental United States and Puerto Rico.

**The Jones Act**

49.     The Merchant Marine Act of 1920, 46 U.S.C. § 100, *et seq.*, commonly referenced as the Jones Act, grants an exclusive privilege to certain U.S. flag vessels to engage in ocean shipping of merchandise or goods to or from U.S. territories, possessions, or non-contiguous states.  This law is restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade.

50.     The purpose of the Jones Act is to protect American shipping companies.  Its restriction on the carriage of domestic ocean cargoes to U.S.-made, U.S.-flagged, predominately U.S.-crewed, and U.S.-owned ships, combined with the relatively small size of these trade routes, results in oligopolistic markets where only a very small number of carriers serve any route.

51.     The Jones Act provides no immunity to defendants for collusion, customer allocation, bid rigging or price fixing (subject to certain inapplicable exemptions), and the conspiracy alleged in this complaint is illegal under Sections 1 and 3 of the Sherman Act.

**A Highly Concentrated Oligopoly**

52.     At all relevant times, Puerto Rican cabotage has been an oligopoly controlled by the four defendants: Horizon; Sea Star; Crowley; and Trailer Bridge.

11

53.     This high degree of concentration facilitated the anti-competitive conduct that is alleged here, because it is relatively easy for a limited group of four sellers to reach agreement on customer allocation, bid rigging and prices, and to monitor adherence to such illegal agreement.

**A Fungible Service**

54.     Domestic ocean shipping services within any trade route are highly fungible because carriers offer essentially the same service: transportation of cargo from a specified origin to a destination within a certain time frame.

55.     Absent the alleged conspiracy, purchasers of Puerto Rican cabotage would decide which carrier to use based on price, and the four defendant carriers would largely compete on price.

**Lack of Available Substitutes**

56.     There are few or no viable economic substitutes for Puerto Rican cabotage.  Shipping heavy, bulky goods via air freight is prohibitively expensive.  There are no road or rail routes between Puerto Rico and the mainland United States.

57.     The lack of viable economic substitutes facilitated the conspiracy that is the subject of this action because it enabled the defendants to set supra-competitive prices without fear that customers would switch to other alternatives.

**High Entry Barriers**

58.     There are substantial barriers to entry into the Puerto Rican cabotage market, including:  (a) insulation from foreign-flagged, foreign-built, predominately foreign-crewed, and foreign-refurbished vessels; (b) entrenched market positions of the incumbent defendant shipping companies; (c) a large capital investment and long delivery lead times in building a new container ship in the United States; (d) the substantial investment in infrastructure needed to handle container ships; (e) constraints on port space in San Juan, Puerto Rico; (f) high fixed costs relative to variable costs; and (g) the need to develop a broad base of customer relationships to realize economies of scale.

59.     These substantial barriers to entry facilitated the conspiracy that is the subject of this action because they enabled the defendants to set supra-competitive prices without fear that new entrants would come into the market and undercut those prices.

**Inelastic Demand**

60.     Demand for Puerto Rican cabotage is inelastic.

61.     Inelastic demand for Puerto Rican cabotage meant that it was profitable for the cartel that is the subject of this action to allocate customers, rig bids and increase prices.

**Pricing Components**

62.     Charges for cargo transported by ocean carriage are measured in revenue tons.  A revenue ton is the greater of (a) the cubic measure, or (b) the weight of the shipment as packed, both calculated under the metric system.  Other bill of lading charges include receiving charges, bunker fuel charges, intermodal charges, security fees, terminal handling fees, port surcharges, hazard fees, and currency factors.

**Anti-Competitive Behavior**

63.     Beginning at least as early as May 2002 and continuing until at least April 2008, defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage.

64.     Prior to April 2002, Puerto Rican cabotage had overcapacity.  Despite a nearly 14% increase in the number of containers shipped on Puerto Rican trade routes from 1994 through approximately 2003, freight rates for shipping between the U.S. mainland and Puerto Rico declined by 30% due to excess supply.

65.     In early 2002, one of the biggest shipping lines to and from Puerto Rico, Navieras NPR ("Navieras"), began selling its assets in its bankruptcy proceeding.  In or about May 2002, defendants launched their conspiracy in the immediate aftermath of this sale of Navieras's assets.

66.     From May 2002 through April 2008, capacity for Puerto Rican cabotage remained flat, but since approximately 2003, rates, surcharges and fees have increased dramatically and nearly simultaneously across defendant suppliers.

67.     Since at least early 2006, the Puerto Rican economy has experienced an economic downturn, and, throughout 2007, it was in a recession.  As a result of these economic conditions,

13

there was a significant and substantial softening of consumer demand and a corresponding decrease in the volume of goods transported to Puerto Rico from the U.S. mainland.  Despite weak economic conditions, softening demand and increasing overcapacity, defendants Horizon, Sea Star, Crowley and Trailer Bridge increased their rates by approximately 9%—directly contrary to what should occur in a competitive market.

68.     Defendant shipping lines also increased rates to supra-competitive levels by, among other things, agreeing to carry each other's shipping containers when demand outstripped one defendant shipping line's capacity.  Absent this agreement, defendant shipping lines would have bid against each other for such business.

69.     For example, before Navieras filed its bankruptcy petition, it had provided shipping services out of ports in Houston, Texas and Elizabeth, New Jersey.  After Sea Star acquired Navieras's vessels in Navieras's bankruptcy proceeding, Sea Star discontinued the service out of Houston and Elizabeth.  Instead, Sea Star shipped containers on Horizon vessels out of those two ports.

70.     By May 2003, defendants Horizon, Sea Star, Crowley and Trailer Bridge had harmonized their bunker fuel surcharge at approximately $225 per container, even though fuel cost a percentage of operating cost (per shipped-unit) and fuel efficiency varied across these defendants.  Despite defendants' differing cost structures, defendants Horizon, Sea Star, Crowley and Trailer Bridge all provide similar services and their increased surcharges were not driven by legitimate economic considerations.

71.     In mid-March 2005, defendants Horizon, Sea Star, Crowley and Trailer Bridge imposed bunker fuel surcharges of approximately $280 per container effective during the first week of April 2005.  In mid-April 2005, each increased the bunker fuel surcharge to approximately $310 per container.

72.     At the end of June 2005, defendants Horizon, Sea Star, Crowley and Trailer Bridge increased the bunker fuel surcharge to approximately $340 per container effective mid-July, and then they increased the surcharge to approximately $375 per container, effective mid-September.

14

73.    At the end of July 2006, defendants Crowley and Trailer Bridge increased their bunker fuel surcharge by approximately $15 per container, effective the end of July and beginning of September, respectively, and defendants Horizon and Sea Star imposed approximately $15 increases in August, effective at the beginning of September 2006.

74.    Effective in mid-May 2007, each of defendants Horizon, Sea Star, Crowley and Trailer Bridge increased bunker fuel surcharges by approximately $25 per container.

75.    Since 2002, defendants Horizon, Sea Star, Crowley and Trailer Bridge have changed bunker fuel surcharges, often with only a few days' notice, and the fuel surcharges to plaintiffs have been increased nearly simultaneously in almost the same amounts by each of Horizon, Sea Star, Crowley and Trailer Bridge.

76.    The increases in the bunker fuel surcharges cannot be explained by increases in the cost of bunker fuel.  In fact, the imposition of a bunker fuel surcharge per container or per vehicle bears little relation to increases in the costs of fuel because any increase in the cost of fuel consumed is largely independent of the number of containers or vehicles transported.

77.    Instead, the imposition of bunker fuel surcharges increases resulted in profits for defendant shipping lines that increased as their bunker fuel surcharges increased.

78.    Defendant Trailer Bridge reported that rates, including surcharges and fees, increased 5% in 2006 even though its container volume for Puerto Rican cabotage decreased between 8% and 12%.  Nonetheless, Trailer Bridge reported earnings of $1.9 million in the third quarter of 2006, an increase from the prior year.  In 2007, Trailer Bridge reported the best quarterly financial results in its history.

79.    Defendants Horizon, Sea Star, Crowley and Trailer Bridge not only insulated themselves from rising fuel costs, but, through their bunker fuel surcharges, increased profit margins in a declining market, directly contrary to what would occur in a competitive market.

80.    Effective at the beginning of April 2003, each of defendants Horizon, Sea Star, Crowley and Trailer Bridge imposed a security fee per container, where they had not done so

previously, except for Trailer Bridge.  The simultaneous imposition of a security fee cannot be explained by increases in costs.

81.     Similarly, effective in February and March 2003, each of defendants Horizon, Sea Star and Trailer Bridge imposed an approximately $40 per container terminal handling charge, where they had not done so previously, except for Sea Star.  The imposition of the terminal handling charge cannot be explained by increases in costs.

82.      Horizon, Sea Star, Crowley and Trailer Bridge have participated in trade association activities that fostered the conspiracy that is the subject of this action.  Horizon, Sea Star, Crowley and Trailer Bridge have all been members of the Maritime Cabotage Task Force ("MCTF"), which was founded on September 27, 1995, to protect the U.S. maritime cabotage laws.  The MCTF's Board of Directors has included Chuck Raymond and Robert Zuckerman of Horizon and Michael Roberts of Crowley.

83.     Defendants had ready access to industry data that facilitated efficiently monitoring the conspiracy.  The Port Import Export Reporting Service ("PIERS") collects and distributes, for a fee, data for the maritime industry, including container size and quantity, cargo quantity and unit of measure, and cargo weight and volume.  This type of information allowed defendants to monitor their conspiracy and to verify that it was working.

84.     In forming and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

        a.      agreeing to allocate customers of Puerto Rican cabotage;

        b.      rigging bids to customers for Puerto Rican cabotage;

        c.      fixing rates, surcharges and other fees for Puerto Rican cabotage;

        d.      marketing and selling Puerto Rican cabotage at agreed-upon prices;

        e.      exchanging information on customers, bids, rates, surcharges, fees, volumes and capacity; and

        f.      implementing and monitoring the arrangements among cartel members.

85.     Defendants engaged in the above conduct to facilitate their unlawful agreements concerning customer allocation, bid rigging, price fixing and other anticompetitive conduct concerning Puerto Rican cabotage.

**Antitrust Injury**

86.     As a direct and proximate result of defendants' conspiracy, plaintiffs and the members of the class have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.

87.     Defendants' conspiracy injured plaintiffs and class members in a substantially similar manner by eliminating, suppressing and reducing price competition in Puerto Rican cabotage, which had the effect of raising, maintaining or otherwise stabilizing prices for Puerto Rican cabotage at a supra-competitive level.

88.     Because prices for Puerto Rican cabotage were fixed at, maintained at, or increased to a level above where they otherwise would have been in a competitive market, from at least as early as May 2002 continuing until at least April 2008, plaintiffs and class members paid higher prices for Puerto Rican cabotage than they would have paid had the defendants and their co-conspirators not conspired to violate the antitrust laws.

89.     Paying supra-competitive prices—that is, overcharges—that result from an unlawful conspiracy to allocate customers, rig bids and fix prices is the type of injury the antitrust laws were designed to prevent.

## GOVERNMENT ANTITRUST INVESTIGATION

90.     On April 17, 2008, it was publicly disclosed that the DOJ was conducting an investigation into the domestic noncontiguous trade ocean shipping industry, and specifically Puerto Rican cabotage.

91.     On or about April 17, 2008, the F.B.I. executed search warrants on the premises of each of defendants Horizon, Sea Star, and Crowley regarding Puerto Rican cabotage.

92.     To obtain search warrants, as it did against defendants Horizon, Sea Star, and Crowley, the United States must demonstrate to a Magistrate Judge probable cause, recounted in a

sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant.  That is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

93.    On October 20, 2008, defendants Baci, Gill, Glova and Serra pled guilty to criminal informations stating, among other things, that each of them, for the purpose of forming and carrying out the charged conspiracy relating to Puerto Rican cabotage, combined and conspired with co-conspirators to:

(a)    "participate[ ] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

(b)    agree[ ] during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c)    agree[ ] during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d)    agree[ ] during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e)    s[ell] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f)    accept[ ] payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g)    authorize[ ] or consent[ ] to the participation of subordinate employees in the conspiracy; and

(h)     conceal[ ] the conspiracy and conspiratorial contacts through

various means, including private e-mail accounts[.]"

## **FRAUDULENT CONCEALMENT**

94.     Throughout the relevant time, defendants and their co-conspirators have affirmatively and wrongfully concealed their unlawful conduct from plaintiffs and the class.

95.     Plaintiffs and members of the class had no actual or constructive knowledge until April 17, 2008 of the illegal contract, combination or conspiracy that is the subject of this complaint or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.

96.     Plaintiffs and members of the class did not discover and could not have discovered through the exercise of reasonable diligence, which they in fact exercised, the existence of the conspiracy that is the subject matter of this complaint until April 17, 2008, when it was publicly disclosed that the DOJ was investigating Puerto Rican cabotage for antitrust violations, because the defendants and their co-conspirators actively and wrongfully concealed the existence of their conspiracy.

97.     Because defendants' conspiracy was actively concealed and kept secret by defendants and their co-conspirators, plaintiffs and class members were unaware of defendants' unlawful conduct that is the subject of this complaint and did not know that they were paying artificially high prices for Puerto Rican cabotage.

98.     Defendants Baci, Gill, Glova and Serra have pled guilty to "conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts." Defendant Chisholm has pled guilty to "corruptly alter[ing], destroy[ing], and conceal[ing] records and documents" relevant to the grand jury's investigation of antitrust violations in the Puerto Rican cabotage industry.

99.     The affirmative acts of defendants alleged in this complaint, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

100.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

101.    Defendants met and communicated secretly concerning customers, bid rigging, rates, surcharges and other fees so as to avoid detection.

102.    By its very nature, defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended upon its self-concealing nature.

103.    In 2004, Trailer Bridge's CEO John McCown stated in an interview that customer decisions were driven by "[p]rice in an all-inclusive sense, which starts with the freight rate," implying that defendants could not anti-competitively rig bids or set and increase rates, surcharges or fees, and therefore were not doing so.

104.    During the relevant time, Puerto Rican cabotage carriers repeatedly attributed rate and bunker fuel surcharges to oil price increases. These statements were a pretext to conceal defendants' conspiracy to allocate customers, rig bids, and fix rates, surcharges and fees.

105.    From 2002 through April 2008, defendants submitted bids in such a manner as to prevent plaintiffs and members of the class from learning or suspecting that defendants were unlawfully restraining trade.

106.    Defendants' purported reasons for rate and surcharge increases and inability to influence prices for Puerto Rican cabotage were materially false and misleading and made for the purpose of concealing defendants' anti-competitive scheme.

107.    Plaintiffs and members of the class reasonably relied on the materially false or misleading explanations by defendants for the rate and surcharge increases and inability to influence prices of Puerto Rican cabotage, which lulled plaintiffs and members of the class into believing that the price increases were the normal result of competitive market forces rather than the product of anti-competitive efforts by defendants.

108.    Defendants' public statements about the reasons for the price increases were designed to, and did, cause plaintiffs and class members to accept the increases without undertaking further inquiry. Even if such an inquiry had been undertaken, it would have proven futile because plaintiffs

and class members did not have access to contemporaneous information that would have allowed them to evaluate whether defendants' claimed justifications for the price increases were valid.

109.    At the time, plaintiffs and members of the class considered defendants' articulated reasons for their price increases to be both normal and legitimate, and, accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of defendants' increases in rates, bunker fuel surcharges or fees.

110.    Plaintiffs and class members could not have discovered the alleged conspiracy at a date earlier than April 17, 2008, by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to avoid detection of, and wrongfully conceal, their conspiracy.

111.    It was not until April 17, 2008, the date on which it was publicly disclosed that the DOJ was investigating Puerto Rican cabotage for antitrust violations, that plaintiffs and members of the class became aware, or could have become aware with the exercise of reasonable diligence, of defendants' anti-competitive conduct regarding Puerto Rican cabotage.

112.    The conspiracy that is the subject of this action was fraudulently and wrongfully concealed by defendants by various means and methods, including, but not limited to: (a) secret meetings; (b) misrepresentations to their Puerto Rican cabotage customers concerning the reasons for increases in rates, surcharges and other fees; and (c) surreptitious communications among defendants by the use of the telephone or in-person meetings and through private e-mail accounts in order to limit the existence of written records, minimize access to any written records, and conceal from non-conspirators the existence and nature of their discussions regarding customer allocation, bid rigging, and price fixing.

113.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by defendants and their co-conspirators until April 17, 2008, plaintiffs and class members had no knowledge of the conspiracy that is the subject of this action nor of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

114.    None of the facts or information available to plaintiffs and class members prior to April 17, 2008, if investigated with reasonable diligence, could or would have led, nor did lead, to the discovery of the conspiracy that is the subject of this action.

115.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been equitably tolled as to any claims of plaintiffs or members of the class arising from defendants' anti-competitive conduct that is the subject matter of this complaint.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons (excluding governmental entities, defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased Puerto Rican cabotage directly from any of the defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from at least May 1, 2002, until April 17, 2008.

117.    Plaintiffs believe that there are hundreds or thousands of class members, the exact number and their identities being known by defendants.

118.    The class is so numerous and geographically dispersed that joinder of all members is impracticable.

119.    Plaintiffs are members of the class.  Plaintiffs' claims are typical of the claims of the class members, and plaintiffs will fairly and adequately protect the interests of the members of the class.

120.    Plaintiffs are direct purchasers of Puerto Rican cabotage, and their interests are coincident with, and not antagonistic to, those of the other members of the class.  In addition, plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

121.    There are questions of law and fact common to the class which predominate over any questions affecting only individual members of the class, including legal and factual issues relating to

liability and damages.  The questions common to the class relate to the existence of the conspiracy alleged, the type and common pattern of injury sustained as a result thereof, the appropriate remedies, and the affirmative defense of the statute of limitations including, but not limited to:

a.   whether defendants and their co-conspirators engaged in a combination or conspiracy to allocate customers, rig bids, and fix the prices of rates, surcharges and other fees for Puerto Rican cabotage;

b.   the identity of the participants in the conspiracy;

c.   the duration of the conspiracy that is the subject of this complaint and the nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

d.   whether the conspiracy that is the subject of this action violated Sections 1 and 3 of the Sherman Act;

e.   whether the conduct of defendants and their co-conspirators, as alleged in this complaint, caused injury to the businesses and property of plaintiffs and other members of the class;

f.   the effect of defendants' conspiracy on the prices of Puerto Rican cabotage during the time from at least May 1, 2002, until April 17, 2008;

g.   the appropriate measure of damages sustained by plaintiffs and other members of the class;

h.   whether plaintiffs and members of the class are entitled to equitable relief, including injunctive relief, and, if so, the nature and extent of such equitable relief; and

i.   whether defendants undertook actions to wrongfully conceal the unlawful conspiracy that is the subject of this action.

122.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications.

123.    Defendants have acted, and refused to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

124.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The class is readily definable and is one for which records should exist in the files of defendants and their co-conspirators.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIMS

## Unlawful Price Setting in Violation of Sherman Act § 1, 15 U.S.C. § 1

125.    Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 123 of this complaint.

126.    Beginning at least as early as May 2002 and continuing until April, 17 2008, defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.    Defendants' unlawful conduct resulted in artificially high, supra-competitive prices charged by defendants and their co-conspirators to plaintiffs and the members of the class for Puerto Rican cabotage.

24

128.     Plaintiffs and members of the class paid more for Puerto Rican cabotage than they would have paid in a competitive market unfettered by defendants' and their co-conspirators' unlawful anti-competitive activity.

129.     Plaintiffs seek to recover for these overcharge damages.

### Unlawful Price Setting in Violation of Sherman Act § 3, 15 U.S.C. § 3

130.     Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 123 of this complaint.

131.     Beginning at least as early as May 2002 and continuing until April, 17 2008, defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican cabotage in violation of section 3 of the Sherman Act, 15 U.S.C. § 3.

132.     Defendants' unlawful conduct resulted in artificially high, supra-competitive prices charged by defendants and their co-conspirators to plaintiffs and the members of the class for Puerto Rican cabotage.

133.     Plaintiffs and members of the class paid more for Puerto Rican cabotage than they would have paid in a competitive market unfettered by defendants' and their co-conspirators' unlawful anti-competitive activity.

134.     Plaintiffs seek to recover for these overcharge damages.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all issues asserted in this complaint so triable.

### RELIEF SOUGHT

**WHEREFORE**, plaintiffs seek judgment that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      The contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

C.      Judgment be entered for plaintiffs and members of the class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiffs and the class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)     continuing, maintaining or renewing the contract, combination or conspiracy that is the subject of this action, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)     communicating with, or causing to be communicated to, any other person engaged in the manufacture, distribution or sale of any product, except to the extent necessary in connection with a *bona fide* sales transaction between the parties to such communications; and

E.      Plaintiffs and members of the class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: December 5, 2008

Respectfully submitted,

By:     /s/ John Nevares & Associates, PSC
        John F. Nevares (PR 130502)
        P.O. Box 13667
        San Juan, Puerto Rico 00908-3667
        Tel. (787) 793-4906
        Fax (787) 721-8820
        Email:  jfnevares@nevareslaw.com.

*Interim Liaison Counsel for Plaintiffs*

Nestor M. Mendez-Gomez
**Pietrantoni Mendez & Alvarez LLP**
Banco Popular Center, 19th Floor
209 Munoz Rivera Ave.
San Juan, PR 00918
Tel: (787) 274-1212
Fax: (787) 274-1470
nmendez@pmalaw.com

Camilo K. Salas, III
**Salas & Co., L.C.**
650 Pydras, Suite 1650
New Orleans, LA 70130
(Orleans Parish)
Tel: (504) 799-3080
Fax: (504) 799-3085
csalas@salaslaw.com

Linda P. Nussbaum
**Kaplan Fox & Kilsheimer, LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (2120 687-7714
lnussbaum@kaplanfox.com

Vincent J. Esades
**Heins Mills & Olson, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com

Hollis Salzman
**Labaton Sucharow, LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
hsalzman@labaton.com

Joe R. Whatley Jr.
**Whatley Drake & Kallas, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com

Daniel E. Becnel, Jr.
**Becnel Law Firm, LLC**
106 W. Seventh St.
P.O. Box Drawer H
Reserve, LA 70084
Tel: (985) 535-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

***Proposed Interim Lead Class Counsel***