## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: PUERTO RICAN CABOTAGE ANTITRUST LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS<br><br>_____ | Master Docket No. 08-md-1960 (DRD) |

## MOTION OF HORIZON LINES, INC., HORIZON LINES, LLC, HORIZON LOGISTICS, LLC, AND HORIZON LINES OF PUERTO RICO, INC. IN TO DISMISS PLAINTIFFS' FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics, LLC, and Horizon Lines of Puerto Rico, Inc., (collectively "Horizon"), respectfully move this Court for entry of an order dismissing Plaintiffs' First Consolidated Amended Class Action Complaint ("Complaint") for failure to state a claim upon which relief may be granted. Horizon submits the following Memorandum of Law in support of this Motion.

### Introduction

In *Bell Atlantic Corporation v. Twombly*, the Supreme Court declared that a complaint alleging a violation of Section 1 of the Sherman Act cannot survive a motion to dismiss based merely upon "bare assertion[s] of conspiracy" or "allegation[s] of parallel conduct." 127 S. Ct. 1955, 1966 (2007). The Supreme Court recognized that parallel pricing often reflects natural competitive behavior, and therefore held that a complaint describing "merely parallel conduct that could just as well be independent action" must be dismissed. *Id.* To survive a motion to

dismiss following *Twombly*, therefore, a plaintiff must allege "enough factual matter…to suggest that an agreement was made." *Id.* at 1965.

The Complaint suffers from the same critical flaws noted by the Supreme Court in *Twombly*. The Complaint baldly alleges that "defendants and their co-conspirators" entered into a "continuing agreement…to restrict competition," but it does not allege any specific facts regarding the formation or effectuation of the alleged conspiracy. The Complaint does not even allege which plaintiffs purchased shipping services from Horizon, or the prices paid for those services. The Complaint contains no specific factual allegations establishing the existence of a conspiracy in violation of the Sherman Act and therefore fails to state a claim under *Twombly*.

The Complaint's allegations of parallel conduct also do not permit the inference of conspiracy. The Complaint alleges that Horizon and the other defendants "increased their rates by approximately 9%" since 2006, Complaint ¶ 67; imposed surcharges or raised surcharges "nearly simultaneously," Complaint ¶ 75; "participated in trade association activities," Complaint ¶ 82; and "had ready access to industry data," Complaint ¶ 83. These allegations do not allow the Court to infer the existence of a conspiracy.

While the Complaint refers to an investigation being conducted by the Department of Justice ("DOJ"), Complaint ¶ 90, the existence of such an investigation "carries no weight in pleading an antitrust conspiracy claim." *In re Graphics Processing Units ("GPU") Antitrust Litig.*, No. C06-07417, 2007 WL 2875686, at *12 (N.D. Cal. Sept. 27, 2007). Moreover, this Court should not infer a conspiracy as to Horizon based on the plea agreements of certain individual employees who have been named as defendants herein, Complaint ¶ 93. *Cf. In re Air Cargo Shipping Services Antitrust Litig.*, No. 1:06-MD-06-1775-JG-VVP, Doc. 787, Mag. Report (E.D.N.Y. September 26, 2008) (guilty pleas by nine defendants and acceptance of one

defendant into the DOJ's leniency program did not provide a basis for inferring a conspiracy against any of the defendants, including those who pled guilty).

Where, as here, the factual allegations in the Complaint are insufficient to suggest that an agreement in violation of Section 1 of the Sherman Act was made, the Complaint must be dismissed for failure to satisfy the pleading standards of *Twombly*.

## Summary of Allegations

Plaintiffs allege a price fixing conspiracy in the market for coastal water freight transportation services between the United States and Puerto Rico ("Puerto Rican cabotage"). (Complaint ¶ 1.)  Plaintiffs contend in a conclusory fashion that Horizon and the other defendants agreed to allocate customers, rig bids, and fix rates, surcharges and other fees for Puerto Rican cabotage.  (Complaint ¶ 63.)  In support thereof, Plaintiffs allege that from 1994 through 2003, freight rates for shipping between the U.S. mainland and Puerto Rico declined by 30% due to excess capacity.  (Complaint ¶ 64.)  In early 2002, however, one of the biggest shipping lines to and from Puerto Rico, Navieras de Puerto Rico ("Navieras"), went bankrupt and was liquidated.  (Complaint ¶ 65.)  Plaintiffs allege that thereafter freight rates began to rise, not due to the industry's decreased capacity, but because "defendants launched their conspiracy." (Complaint ¶¶ 65-66.)  The Complaint then lists several examples of "nearly simultaneous[]" fuel surcharge increases, which in some instances were implemented months apart.  (Complaint ¶¶ 70-75.)  The Complaint acknowledges that the Defendants experienced "rising fuel costs," Complaint ¶ 79, but then alleges that rising fuel surcharges bore "little relation to increases in the costs of fuel."  (Complaint ¶ 76.)  The Complaint also summarily alleges, without further explanation, that the imposition of security fees and terminal handling charges "cannot be explained by increases in costs."  (Complaint ¶¶ 80-81.)  Plaintiffs further allege that

participation in trade associations "fostered the conspiracy," Complaint ¶ 82, and that access to industry data through Port Import Export Reporting Service ("PIERS"), an independent body that collects and distributes data for the maritime industry, "allowed defendants to monitor their conspiracy." (Complaint ¶ 83.)

Significantly, the Complaint contains no non-conclusory allegations of any meetings or communications where Horizon is alleged to have agreed to allocate customers or rig bids or fix rates, fees or surcharges.

**I.      The Supreme Court's Decision in *Twombly* Provides the Framework for Analyzing the Sufficiency of the Complaint and Compels Dismissal.**

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Twombly*, 127 S. Ct. at 1964 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). *Twombly* held that a complaint alleging a conspiracy in violation of Section 1 of the Sherman Act requires "enough factual matter…to suggest that an agreement was made." *Id.* at 1965.

Prior to *Twombly*, the Supreme Court explained that there is a there is a "basic distinction between concerted and independent action." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984). While Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies in restraint of trade, "independent action" is permissible. *Id.* According to the Supreme Court in *Fisher v. City of Berkeley*, this distinction is critical because "[e]ven where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability . . . in the absence of agreement." 475 U.S. 260, 266 (1986). Therefore, "restraint of trade without a conspiracy or combination is not unlawful under Section 1." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984).

4

In *Twombly*, the Supreme Court aligned the pleading standard of Rule 8 with these substantive principles of antitrust law.   In that case, the plaintiffs claimed that four major telecommunications companies conspired to inhibit market entry of new competitors and to refrain from competing against one another.   127 S. Ct. at 1962.   The complaint did not, however, allege facts directly showing a conspiracy.  *Id.* at 1970.   Instead, it alleged parallel conduct, along with other facts (such as concentration in the industry, participation in trade association activities, and the failure of the defendants to pursue potentially profitable economic opportunities) that, plaintiffs claimed, would support a reasonable inference of conspiracy.  *Id.* at 1971-73.

The Supreme Court held that the allegations in the complaint failed to state a claim. According to the Court, mere parallel conduct "does not suggest conspiracy." *Id.* at 1966. Because plaintiffs must ultimately prove the existence of an antitrust conspiracy that "rule[s] out the possibility that the defendants were acting independently," *id.* (citing *Matsushista Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)), *Twombly* held that, at the pleading stage, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.   The Court explained:

> [L]awful parallel conduct fails to bespeak unlawful agreement.  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id.* at 1965-1966.

Ultimately, the Supreme Court concluded that the plaintiffs in *Twombly* did not include in their complaint "enough *facts* to state a claim to relief that is plausible on its face." *Id.* at 1974

(emphasis added).  The Court stated that "[b]ecause the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Id.*

Here, Plaintiffs have failed to meet the mandates of *Twombly*.  Accordingly, this Court should grant Horizon's motion to dismiss.

## II.      Plaintiffs' Complaint Should Be Dismissed Because It Is Devoid of Any Specific Allegations Regarding Any Conspiratorial Activities of Horizon.

Plaintiffs' Complaint is replete with conclusory allegations about "Defendants" generally, without alleging any facts regarding the alleged price-fixing activities of Horizon.  (*See, e.g.* Complaint ¶ 63 (alleging that "defendants…engaged in a continuing agreement…in restraint of trade.")).

As discussed in greater detail above, to survive a motion to dismiss in light of *Twombly*, Plaintiffs must allege, as to each defendant individually, facts establishing the "who, what, where, when, how or why."  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, No. 07-4115, 2008 WL 5273309, *6 (6th Cir. Dec. 22, 2008) (affirming dismissal of Section 1 claim because "Plaintiffs only offer[ed] bare allegations without any reference to the who, what, where, when, how or why."); *Kendall*, 518 F.3d at 1048 (affirming dismissal of antitrust conspiracy claim under *Twombly* where complaint made conclusory allegations of agreement but failed to "answer the basic questions: who, did what, to whom (or with whom), where, and when?").

For example, in *In re Elevator Antitrust Litig.*, the Second Circuit affirmed the dismissal of a complaint that "enumerate[ed] basically every type of conspiratorial activity that one could imagine ... in entirely general terms without any specification of any particular activity by any particular defendant."  502 F.3d 47, 50 (2d Cir. 2007).  In fact, the complaint's list of allegations was "nothing more than a list of theoretical possibilities, which one could postulate without

knowing any facts whatever." *Id.*  The court held that "conclusory allegation[s] of agreement at some unidentified point [did] not supply facts adequate to show illegality." *Id.* (citing *Twombly*, 127 S. Ct. at 1966).

Many courts have followed suit, dismissing Sherman Act claims for failure to allege any specific facts establishing each defendant's participation in the alleged conspiracy. *See In re Parcel Tanker Shipping Serv. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008) (dismissing antitrust complaint because it merely "allege[d] general conspiratorial activity without reference to specific actions by a particular defendant at a particular time"); *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing complaint where it "include[d] several conclusory allegations that the defendants agreed to increase late fees, but it provide[d] no details as to when, where, or by whom this alleged agreement was reached."); *In re Travel Agent Comm'n Litig.*, No. 1:03 CV 30000, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007) (dismissing Section 1 claim against particular defendant where complaint "failed to allege any specific action taken by [that defendant]").

Thus, it is well established that the mere repeated reference to "Defendants" throughout the Complaint, without any specific allegations as to each defendant, is insufficient under *Twombly*.

## III.   The Complaint Should Be Dismissed Because It Contains No Allegations From Which this Court Can Infer the Existence of an Illegal Conspiracy.

The Complaint is not only devoid of any allegations establishing the existence of Horizon's participation in an agreement to restrain trade, but it also fails to allege any facts from which the existence of such an agreement can be plausibly inferred.

A.      **Plaintiffs' Allegations of Rising Rates Do Not Support the Inference of a Conspiracy to Raise Puerto Rican Cabotage Rates.**

The Complaint asserts that one component of Defendants' alleged conspiracy is an agreement to raise freight rates for Puerto Rican cabotage.  (Complaint ¶ 63.)  The Complaint summarily asserts the existence of a conspiracy to fix such rates based solely on alleged increased market prices for such services.  Plaintiffs do not allege any details concerning the alleged agreement that supposedly caused these rate increases.  As such, they ask the Court to infer the existence of a conspiracy based on allegations that rates increased "dramatically" after 2003, Complaint ¶66, and that Defendants "increased their rates by approximately 9%" since 2006, Complaint ¶ 67.  However, the Complaint does not allege which Defendants raised shipping rates at what times, or by how much and as to which customers.  The Complaint also does not allege that Defendants raised rates in parallel.  It does not allege the rates paid by each of the named Plaintiffs, let alone that those rates increased over the class period or that these increases could only have resulted from a conspiracy.  The Complaint simply alleges that over the course of five years, average shipping rates rose.  This Court cannot infer a conspiracy based solely on these facts.

*Twombly* cautions against inferring the existence of a conspiracy from price increases alone.  127 S. Ct. at 1964 (stating that parallel price increases are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").  As such, "rising prices do not themselves permit an inference of a collusive market dynamic." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).  *See also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007) ("a price increase…without more, does not suggest anticompetitive behavior."); *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 402-403 (2d Cir. 2002) ("anticompetitive conduct cannot be

established through an increase in prices alone"). This is because "[n]umerous valid business reasons, many of which actually may heighten competition, might justify increased prices." *Person v. Google, Inc.*, No. C 06-7297 JF (RS), 2007 WL 1831111, *4 (N.D. Cal. June 25, 2007).

In this instance, the Complaint itself shows that the alleged rate increases were perfectly consistent with natural market forces. The Complaint states that the alleged 9% rate increase followed the withdrawal from the market of Navieras, "one of the biggest shipping lines to and from Puerto Rico." (Complaint ¶ 65.) Before Navieras' bankruptcy, the market had significant "excess supply." (Complaint ¶ 64.) It should come as no surprise, therefore, that once Navieras declared bankruptcy, rates would naturally tend to rise. Plaintiffs' allegations of an increase in rates, without more, do not provide a proper basis for inferring an illegal conspiracy.

### B. Plaintiffs' Allegations Regarding the Imposition of Fees and Surcharges Do Not Support the Inference of a Conspiracy.

A second component of the alleged conspiracy is an agreement to fix fees and surcharges imposed on Puerto Rican cabotage. Once again, the Complaint's allegations are deficient. The Complaint merely alleges that the Defendants "simultaneously" raised bunker fuel surcharges, Complaint ¶¶ 70-75, and "simultaneously" imposed a security fee and terminal handling charge, Complaint ¶¶ 80-81. The Complaint further alleges that these surcharges and fees were not related to increases in costs, and that certain surcharges were profitable. (Complaint ¶¶ 70, 76-77, 80-81.) None of these allegations allow the Court to infer the existence of a conspiracy. First, *Twombly* held that allegations of "conscious parallelism," which is the most one can make of the allegations in the Complaint, are insufficient to withstand a motion to dismiss. Second, allegations that surcharges were profitable or unrelated to actual costs do not permit the inference of collusion.

      1.      **Pursuant to *Twombly*, a Price-Fixing Agreement May Not Be Inferred From the Parallel Imposition of Fees and Surcharges.**

*Twombly* makes clear that mere allegations of parallel pricing are not sufficient to withstand a motion to dismiss. *Twombly*, 127 S. Ct. at 1966 ("Without more, parallel conduct does not suggest conspiracy"). *See also In re Elevator Antitrust Litig.*, 502 F.3d at 52 ("similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy"); *Williamson Oil, Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299-1301 (11th Cir. 2003) (affirming summary judgment notwithstanding evidence of parallel pricing).

In fact, conscious parallelism is "a perfectly legal phenomenon commonly associated with oligopolist industries." *Williamson Oil Co.,* 346 F.3d at 1291; *see also* Complaint ¶ 52-53 (describing the market for Puerto Rican cabotage as "a highly concentrated oligopoly"). As the Eighth Circuit has stated:

> According to accepted economic theory, oligopolies are characterized by interdependent behavior because each seller is a big enough player to affect the market by price cuts; as a result, in raising or lowering prices or output, each seller must take into account his competitors' responses to his action. In an oligopoly, price rises are not sustainable as long as one major seller continues to undercut the price leader and steal his customers. When one seller raises his price, no buyers will buy his product unless the other sellers follow the price leader and raise their prices. The other oligopolists know that if they keep their prices low, the brave price leader will simply cut his prices and the battle will resume. On the other hand, if they raise their prices in turn, all sellers will receive higher prices and end up with more money in their pockets. …[I]nterdependent pricing that occurs *with no actual agreement* does not violate the Sherman Act, for the very good reason that we cannot order sellers to make their decisions without taking into account the reactions of their competitors.

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1041-1042 (8th Cir. 2000) (internal citations omitted) (emphasis in original).

As such, similarities in pricing often "simply reflect ordinary forces of competition at work." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). This is

because "competitive market forces will tend to drive the prices of like goods to the same level." *In re GPU Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007).

Moreover, even if a defendant raised prices hoping that its competitors will follow, it is still not indicative of an agreement to fix prices:

> There is no agreement, however, merely because an oligopolist charges an inflated price knowing (or even hoping) that other oligopolists will match his high price. Such is bald conscious parallelism and, as the Supreme Court has stated, "parallel conduct, even conduct consciously undertaken," does not itself state an antitrust conspiracy.

*Digital Music*, No. 06 MDL No. 1780 LAP, 2008 WL 4531821, at *7 (S.D.N.Y. Oct. 9, 2008). *See also In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) ("[a] section 1 violation cannot…be inferred from parallel pricing alone, nor from an industry's follow-the-leader pricing strategy"); *In re Late Fee and Over-Limit Fee Litig.*, 528 F.Supp.2d at 963 ("[I]t would have been entirely rational for each defendant independently to decide to increase late fees as a way to raise revenue, "expecting [its] neighbors to do the same thing."")

Notably, however, the Complaint does not even allege identical or simultaneous surcharge and fee increases. Instead, it alleges that Defendants increased surcharges "*nearly simultaneously in almost the same* amounts." (Complaint ¶ 75) (emphasis added). For example, the Complaint alleges that in July 2006, Crowley announced an increase in their bunker fuel surcharges, effective that month. (Complaint ¶ 73.) The Complaint itself establishes that Horizon did not immediately follow suit. Instead, Horizon did not announce a surcharge increase until August, and that increase did not go into effect until September, months after Crowley's increase. (*Id.*) The Complaint does not allege any fact establishing that this increase was the result of an agreement, as opposed to rational, independent business judgment.

Similarly, the Complaint alleges that for some unknown period of time, Trailer Bridge alone charged a security fee.  (Complaint ¶ 80.)  It was not until April 2003 that Horizon implemented this fee.  (*Id.*)  The Complaint also alleges that for some unknown period of time, Sea Star alone imposed a container terminal handling charge.  (Complaint ¶ 81.)  According to the Complaint, it was not until February or March of 2003 that Horizon began charging such a fee.  (*Id.*)  Again, the Complaint fails to allege any facts establishing that the implementation of these surcharges were not merely the product of independent business judgment.

Thus, not only does *Twombly* prohibit the inference of conspiracy based on mere allegations of parallel conduct, but the allegations in the Complaint itself are consistent with lawful unilateral decision-making by each defendant.

### 2. Allegations that Surcharges Were Profitable or Unrelated to Actual Costs Do Not Permit the Inference of Collusion.

In another futile attempt to satisfy the requirements of *Twombly*, the Complaint alleges that the fuel surcharges imposed by Defendants were not linked to "increases in the cost of bunker fuel," Complaint ¶ 76, and "resulted in profits for defendant shipping lines," Complaint ¶ 77.

These allegations are similar to those rejected by the Eleventh Circuit in the *Williamson Oil* case.  There, the plaintiffs argued that the court could infer the existence of a price-fixing conspiracy because, following a large tobacco industry settlement, Phillip Morris, Inc. ("PM") purportedly raised prices higher than necessary to offset its settlement costs, even though it had the ability to gain market share by adopting a smaller price increase than its competitors.  346 F.3d at 1294.  The Eleventh Circuit rejected this argument, stating that:

> PM could have attempted to increase its profits by either of two means: instituting a smaller price increase in an effort to gain market share from competitors or, more directly, simply increasing prices to the maximum extent the market would

bear. …   PM can readily point to sound economic reasons for taking the most surefire, direct route to the recoupment of its losses. …*This plainly was not an uncompetitive decision*.

*Id.* at 1314-15 (emphasis added).

Many courts have similarly rejected the argument that the existence of a price-fixing conspiracy can be inferred from surcharge increases that do not correlate with rising costs.  For example, in *In re Late Fee and Over-Limit Fee Litig.*, the court reasoned that increasing late fees without corresponding increases in costs simply allowed credit card companies to recapture revenue lost from other sources, and therefore did not permit the inference of conspiracy.  528 F. Supp. 2d at 966; *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Co.*, 971 F.2d 37, 52-53 (7th Cir. 1992) (holding that price increases during a period of low demand were not indicative of an agreement to fix prices, even where only a portion of the price increases was attributable to costs).  Moreover, "[p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-135 (3d Cir. 1999) (rejecting argument that industry participants acted against their economic self-interest in following price increases of industry leader).

Although the Complaint summarily alleges that Horizon's increased prices did not correlate with increased costs, its own allegations are once again contradictory.  The Complaint alleges that "increases in bunker fuel surcharges cannot be explained by increases in the cost of bunker fuel," Complaint ¶ 76, but then alleges that the defendants raised surcharges in an effort to "insulate[] themselves from rising fuel costs," Complaint ¶ 79.  Clearly, there is nothing illegal about an attempt to recoup rising fuel costs, and there is nothing illegal about making a

profit.  Again, these allegations provide no basis for this Court to infer the existence of a price-fixing conspiracy.

###### C.   Allegations Of Agreements Among Defendants To Carry Each Other's Shipping Containers Are Insufficient Under *Twombly.*

The Complaint further alleges that Defendants "agree[d] to carry each other's shipping containers," and that "absent this agreement, defendant shipping lines would have bid against each other for such business."  (Complaint ¶¶ 68-69.)

However, agreements among competitors to contract for services are commonplace and often pro-competitive.  As the Seventh Circuit has noted, "There is nothing suspicious about a firm's occasionally buying from a competitor to supply a customer whom the firm for one reason or another can't at the moment supply."  *In re High Fructose Corn Syrup*, 295 F.3d 651, 659 (7th Cir. 2002).  For example, in *United States v. Stolt-Nielsen S.A.*, 524 F. Supp. 2d 586, 609 (E.D. Pa. 2007), the court considered the legality of "sublet, relet and co-service" agreements between competing chemical parcel tanker carriers.  *Id.*  The court held that "contact with competitors" to discuss such agreements was "lawful" and did not constitute participation in an illegal conspiracy.  *Id.*

Carriers in the Puerto Rico trade lane similarly use agreements to provide each other with additional capacity.  Contrary to the allegations in the Complaint, these agreements benefit customers. They allow carriers to compete for cargo that they otherwise could not carry because it moves via ports that they do not serve directly or on days or times that do not match their own sailing schedules or when they do not have available capacity or when their own vessels are out of service for repair and maintenance.  From the customer's point of view, this is pro-competitive because it allows multiple carriers to compete for the customer's business whereas without such arrangements there would be fewer options.  Because these agreements permit the

carriers to compete more effectively against each other for this cargo, these agreements provide no basis from which to infer the existence of a conspiracy to restrain competition.

**D.     Allegations that Horizon Participated in a Trade Association Do No Suggest the Existence of a Price-Fixing Agreement.**

Plaintiffs ask this Court to infer the existence of a conspiracy because Horizon participated in "trade association activities," including the Maritime Cabotage Task Force. (Complaint ¶ 82.)

Participation in a trade association, which may provide a supposed "opportunity to conspire," is never sufficient to give rise to an inference of conspiracy.  *Twombly*, 127 S. Ct. at 1970, 1971 n.12; *Williamson Oil*, 346 F.3d at 1319 ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy."); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *9 ("Plaintiffs' assertion of an opportunity to conspire, without more, does not suggest there was an agreement" to restrain trade).

For example, in *In re Citric Acid Litigation*, the plaintiffs argued that the defendants used trade association meetings as a mechanism for negotiating illegal agreements with competitors. 191 F.3d 1090, 1097 (9th Cir. 1999).  The plaintiffs further alleged that the association fostered such agreements by gathering information about pricing in the industry.  *Id.* at 1098.  The Ninth Circuit concluded, however, that such activities were "standard fare" for trade associations.  *Id.* To infer the existence of a conspiracy based on these allegations would "allow an inference of conspiracy whenever a trade association took almost any action."  *Id.*  Furthermore, as the Supreme Court has recognized, "trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services. *Id.* (citing *Maple Flooring Mfrs.*

*Ass'n v. United States*, 268 U.S. 563, 567 (1925)).   Therefore, the court refused to infer the existence of a conspiracy.

In fact, without more, "[a]ttendance at industry trade shows and events is *presumed legitimate* and is not a basis from which to infer a conspiracy."  *In re GPU Antitrust Litig.*, 527 F. Supp. 2d at 1023 (emphasis added).  As the Seventh Circuit has stated:

> [M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws.... There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member.

*Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987).

Moreover, the only specific trade association activity alleged in the Complaint is that Horizon is a member of the Maritime Cabotage Task Force ("MCTF"), which was founded "to protect the U.S. maritime cabotage laws."  (Complaint ¶ 82.)  Pursuant to the *Noerr-Pennington* doctrine, which grants antitrust immunity to concerted efforts to apply to the government for redress, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (holding that efforts by a union and a group of large mining companies to induce the Secretary of Labor to set minimum wages at a level adverse to small mining companies was entitled to antitrust immunity); *see also Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (holding that a publicity campaign organized by railroad companies intending to pass legislation inhibiting competition from trucking companies was immune from antitrust laws).

Because allegations that Horizon participated in trade association activities are equally consistent with competitive behavior, there is no basis from which to infer the existence of a conspiracy.

### E.   Allegations that Horizon Had Access to Publicly-Available Data Also Do Not Satisfy *Twombly*.

The Complaint also alleges that defendants "had ready access to industry data" because the Port Import Export Reporting Service ("PIERS") collected and distributed data regarding "container size and quantity, cargo quantity and unit of measure, and cargo weight and volume." (Complaint ¶ 83.)   The Complaint's mere allegation of access to such industry data, which is available as a subscription service to the general public, is far from sufficient to support their claims.   The Complaint also summarily alleges that this collection and distribution of information through PIERS "allowed the defendants to monitor their conspiracy and to verify that it was working," Complaint ¶ 82, but fails to plead any specific facts as to how Horizon or any other defendant used PIERS data to monitor the alleged conspiracy absent the publication of pricing information.

Courts routinely hold that even where competitors exchange pricing information, behavior far more suggestive of conspiracy than the mere "access to industry data" alleged by the Complaint, this exchange is not sufficient to infer the existence of a conspiracy.  *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (stating that the exchange of information among competitors "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.").

Moreover, the Complaint fails to explain how Horizon used PIERS to "monitor" any alleged price-fixing conspiracy given that PIERS did not collect or disseminate data regarding prices, rates, fees or surcharges.  For example, the Complaint fails to allege facts to explain how knowing "container size and quantity" of the other Defendants' shipments enabled Horizon in any way to monitor whether the other Defendants were fixing rates, fuel surcharges or terminal and security fees.

As in *Williamson Oil*, these allegations do not support the existence of a conspiracy because courts are far less likely to presume the existence of an agreement to fix prices based upon exchanges of non-price information.  In *Williamson Oil*, the plaintiffs similarly asked the Eleventh Circuit to infer the existence of a conspiracy because the tobacco companies shared sales information, but did not share information regarding their prices.  346 F.3d at 1313.  As that court plainly stated, "it is far less indicative of a price fixing conspiracy to exchange information relating to sales as opposed to prices."  *Id.*  Furthermore the court reasoned that:

> [I]t plainly was economically beneficial for each individual [defendant] to keep tabs on the commercial activities of its competitors, so the receipt of information concerning their sales does not tend to exclude the possibility of independent action or to establish anticompetitive collusion.

*Id.*  The court therefore concluded that the sharing of information was pro-competitive, and that it was not sufficient to infer the existence of a conspiracy.  *Id.*  Similarly, there is no basis to infer the existence of a conspiracy based on the PIERS data, which does not relate to pricing.

## IV.   The Plea Agreements Involving Certain Individual Defendants Does Not Relieve Plaintiffs of Their Burden to Adequately Allege Facts Establishing An Agreement to Fix Prices as to Other Defendants.

Plaintiffs' last argument is that the guilty pleas by some individuals provide a basis for inferring a conspiracy against other defendants, including Horizon.  An admission of guilt by certain individuals, however, does nothing to relieve Plaintiffs of their burden to allege as to the

each defendant "enough factual matter…to suggest that an agreement was made." *Twombly*, 127 S. Ct. at 1965. *See also In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) (stating that a plaintiff must "undertake his own reasonable inquiry and frame his complaint with allegations of his own design").

In *In re Elevator Antitrust Litigation*, the plaintiffs asserted that their conspiracy claims were rendered plausible because their complaint included specific factual allegations regarding the guilt of certain defendants. 502 F.2d at 51. The plaintiffs alleged, for example, that certain defendants had "admitted wrongdoing" and that "extraordinary fines [had] been levied by the European Commission against defendants and their affiliates for various antitrust violations." *Id.* at 51 n.6. The court held that notwithstanding such allegations, the plaintiffs had provided "an insufficient factual basis" to state a Sherman Act claim. *Id.* at 52.

The plaintiffs in *In re Air Cargo Shipping Services Antitrust Litigation* asked the court to infer the existence of a conspiracy because nine of the defendants had pled guilty and one of the defendants had applied for, and had been accepted into, the DOJ's leniency program for involvement in antitrust violations. No. 1:06-MD-06-1775-JG-VVP, Doc. 787, Mag. Report (E.D.N.Y. September 26, 2008). The plaintiffs argued that the pleas and the defendant's application for leniency "underscore[d] the plausibility of the alleged conspiracy." *Id.* at *18. The magistrate judge, however, disagreed. *Id.* The plaintiffs' allegations provided "no detail about the admitted anticompetitive activities" and no detail regarding the conduct reported to the DOJ. *Id.* Therefore, the court held that "general allegations" that one defendant had applied for leniency "[did] not provide a basis from which to…implicate[]" the remaining twenty-nine named defendants. *Id.* Moreover, the magistrate judge recommended dismissal of the Sherman

Act counts even as to the nine defendants who pled guilty in the parallel criminal proceeding, given the absence of specific factual allegations regarding those defendants. *Id.*

The plea agreements in this case similarly provided Plaintiffs with no additional facts to implicate Horizon. The Complaint includes the list of charges to which the four individual defendants pled guilty, Complaint ¶ 93, but that list of charges reads no differently than the lists of conclusory conspiracy allegations found insufficient under *Twombly*. *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (dismissing a complaint containing a list of allegations that was "entirely general in terms without any specification of any particular activities by any particular defendant").

Moreover, there have been no findings by any judicial body of any law violated by any of the defendants, including the individual defendants. *Haring v. Prosise*, 462 U.S. 306, 316 (1983) (holding that "no issue was 'actually litigated'" in a proceeding in which the defendant pled guilty and noting that "a defendant's decision to plead guilty may have any number of other motivations," including shock, avoidance of financial and emotional cost, and hope for a lesser sentence); *Thore v. Howe*, 466 F.3d 173, 185 (1st Cir. 2006) (accord); *BCCI Holdings (Luxembourg), S.A., v. Clifford*, 964 F. Supp. 468, 477 (D.D.C. 1997) ("entry of the…defendants' guilty plea did not, and does not, constitute actual litigation of the issues presented"); Wright, Federal Practice & Procedure § 4474.1 (Westlaw 2008) ("The plea-based conviction does not actually adjudicate the fact issues necessary to establish guilt").

Beyond the inadequacy of the pleadings, Section 5(a) of the Clayton Act expressly limits the evidentiary inferences that can be made in civil proceedings from a defendant's plea agreement. Section 5(a) declares that a judgment "to the effect that *a defendant* has violated [the antitrust laws] shall be prima facie evidence against *such defendant* in any action or

proceeding brought by any other party against *such defendant*." 15 U.S.C. § 16(a) (emphasis added).  Section 5(a), in other words, explicitly limits any inferences that may be drawn to the party making the plea.  The guilty pleas of certain individual defendants, therefore, have no implication for Horizon.

### Conclusion

To adequately plead a conspiracy in violation of the Sherman Act, *Twombly* firmly established that plaintiffs cannot rest on "bare assertion[s] of conspiracy" or the existence of parallel conduct.  127 S. Ct. at 1966.  Instead, the Complaint must allege "enough *factual matter*...to suggest that an agreement was made." *Id.* at 1965.  Here, the Complaint asserts the existence of an illegal agreement, but does not provide any factual allegations in support thereof.  It does not specifically allege a single communication among the defendants.  It does not allege where, when, or how the conspiracy began.  It does not allege that Horizon attended meetings in connection with the conspiracy, nor does it describe when and where such meetings occurred, or who was in attendance.  The Complaint does not describe each defendant's role in the alleged conspiracy.  Allegations such as these are plainly inadequate under *Twombly*, which mandates dismissal of the Complaint.


DATED:  January 20, 2009        Respectfully submitted,

HORIZON LINES, INC., HORIZON LINES, LLC,
HORIZON LINES LOGISTICS, LLC, AND
HORIZON LINES OF PUERTO RICO, INC.


By: /s/ Salvador J. Antonetti-Stutts

Salvador J. Antonetti-Stutts
USDC-PR No. 215002
O'NEILL & BORGES
American International Plaza, Suite 800
250 Muñoz Rivera Avenue

San Juan, PR 00918-1813
Telephone: (787) 282-5748
Facsimile: (787) 753-8944
E-Mail: salvador.antonetti@oneillborges.com

Richard J. Rappaport, Esq.
Amy B. Manning, Esq.
Tammy L. Adkins, Esq.
McGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
Telephone: (312) 849-8100
Facsimile: (312) 849-3690

John M. Nannes
Tiffany Rider
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

**Attorneys for Defendants Horizon Lines, Inc., Horizon Lines, LLC, Horizon Lines Logistics, LLC, and Horizon Lines of Puerto Rico, Inc.**