## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: PUERTO RICAN CABOTAGE ANTITRUST LITIGATION | MDL Docket No. 3:08-md-1960 (DRD) |
| | ALL CASES |

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS AND
## IN COMPLIANCE WITH ORDER ISSUED AT DOCKET NO. 266

Direct Purchaser Plaintiffs, CC1 Limited Partnership, Horizon International Shipping, Inc., Linde Gas Puerto Rico, Inc., Rona Distributors, Inc., Ferrmax, Inc. and La Rosa Del Monte Express, Inc., (together "Plaintiffs") respectfully submit this memorandum in opposition to the five motions to dismiss filed collectively by Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics, Horizon Lines of Puerto Rico, Inc.; Sea Star Line, LLC; Crowley Maritime Corporation, Crowley Liner Services, Inc.; Trailer Bridge, Inc.; and R. Kevin Gill (together "Defendants"),[1] and to state in further detail the well-founded reasons that support that the Second Consolidated Amended Complaint ("Complaint") complies with the threshold under *Bell Atlantic Corp. Et al. v. Twombly et al.*, 550 U.S. 544 (2007). For the reasons set forth below, Defendants' motions should be denied.

---

[1] Motion of Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics, LLC, and Horizon Lines of Puerto Rico to Dismiss Plaintiffs' First Consolidated Amended Class Action Complaint and Memorandum of Law in Support Thereof; Defendant Sea Star Line, LLC's Motion to Dismiss Plaintiffs' First Consolidated Amended Class Action Complaint and Incorporated Memorandum of Law; Defendants Crowley Maritime Corporation and Crowley Liner Services, Inc.'s Motion and Memorandum of Law in Support of Motion to Dismiss Plaintiffs' First Consolidated Amended Class Action Complaint; Defendant Trailer Bridge, Inc.'s Motion to Dismiss Plaintiffs' First Consolidated Amended Complaint and Incorporated Memorandum of Law; and Defendant R. Kevin Gill's Motion to Dismiss Plaintiffs' First Consolidated Amended Class Action Complaint (collectively referred to as "Motions to Dismiss").

## TABLE OF CONTENTS

I.     INTRODUCTION ………………………………………………..     2

II.    STATEMENT OF FACTS …………………………………………     5

       A.  The Puerto Rican Cabotage Market Was Conducive To Collusion ……     5

       B.  The Perfect Storm: An Antitrust Conspiracy Begins ………………...     7

       C.  The Conspiracy Sinks: The Criminal Indictment And Guilty Pleas …...     10

III.   ARGUMENT …………………………………………………….     11

       A.  *Twombly* Did Not Heighten The Pleading Standards Under *Rule*
           12(b)(6) ……………………………………………………     11

       B.  The Guilty Pleas Of Certain Defendants To The Very Same Illegal
           Conspiracy Alleged Herein Easily Satisfies *Twombly* ………………...     15

              1.   The Guilty Pleas Entered in Parallel Criminal Proceedings are
                   Admissions by Defendants' Own Employees that the
                   Conspiracy Alleged in the Complaint Existed ……………….     16

              2.   The Case Law Cited by Defendants does not Support
                   Dismissal ………………………………………………..     22

       C.  Plaintiffs' Allegations Demonstrate The Plausibility Of A Preceding
           Agreement Even Absent The Guilty Pleas ……………………………..     26

              1.   Plaintiffs' Detailed Allegations About the Puerto Rican
                   Cabotage Market Strongly Support the Inference of
                   Conspiracy ……………………………………………     26

              2.   Courts have Recognized that Market Behavior Analogous to
                   the Puerto Rican Cabotage Market Behavior Supports an
                   Inference of Conspiracy, Even Absent Guilty Pleas …………     28

              3.   Defendants' Attempt to Offer an Alternative Parallel Pricing
                   Justification for the Market Behavior here is Unavailing …….     32

       D.  Defendants' Guilty Pleas Coupled With Plaintiffs' Circumstantial
           Allegations "As A Whole" Are Overwhelming ………………………..     33

**INTRODUCTION**

It is uncontroverted, based on the guilty pleas and admissions of the five individual Defendants in this action, as well as press releases and pleadings filed by the United States Department of Justice ("DOJ") in the Florida criminal proceedings[2] that these Defendants have conspired and agreed to, *inter alia*, allocate customers, rig bids and fix the prices of rates, fee and surcharges in violation of the Sherman Act.

In April 2008, the Defendants' massive scheme began to publicly unravel. On April 17, 2008, it was disclosed that the Defendants were the subject of an ongoing DOJ criminal antitrust investigation involving the domestic noncontiguous trade ocean shipping industry, and specifically Puerto Rican cabotage. (Second Consolidated Amended Class Action Complaint, ¶ 70.)[3] On October 1, 2008, the DOJ charged four of the individual Defendants in this action (Baci, Gill, Glova, and Serra) with criminal conspiracy to suppress and eliminate competition in the Puerto Rican cabotage trade by rigging bids, fixing prices, and allocating customers. (SCAC, ¶ 72.) A fifth individual Defendant (Chisholm) was charged with altering, destroying, and concealing records and documents in an attempt to impair their availability for a criminal investigation, in violation of 18 U.S.C. § 1512(c)(1). (SCAC, ¶ 73.) *All five have pled guilty*, and Baci, the only one to be sentenced thus far has received a prison term of 48 months, *the longest prison sentence for an antitrust violation in U.S. history*. (SCAC, ¶ 90.) The remaining four individual Defendants, senior employees of corporate Defendants Horizon and Sea Star, await sentencing.

---

[2] See LIST CRIMINAL DOCKETS.

[3] All references to the Second Consolidated Amended Class Action Complaint will be denoted as "(SCAC, ¶ __)" followed by the paragraph number(s).

On February 3, 2009, the federal government intervened in this civil litigation, and at a hearing in open court expressly advised that its criminal investigation is ongoing. A sentencing memorandum filed by the DOJ in the Baci criminal proceeding states that additional indictments are expected, and that Baci is cooperating with the DOJ.[4]

In spite of all of this, Defendants argued in their motions that Plaintiffs' Complaint is "implausible" under *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). Contrary to Defendants' argument, however, *Twombly* created no new heightened pleading standard for price fixing cases. Indeed, the Supreme Court, in *Twombly*, reaffirmed that the pleading standard under Fed. R. Civ. P. 8 has not changed when ruling on a defendant's motion to dismiss. Thus, to succeed here Defendants would have to persuade this Court that Plaintiffs' conspiracy allegations are "implausible" as defined in *Twombly*. This they cannot do.

*Twombly* is readily distinguishable from this case in which there is a DOJ investigation and criminal guilty pleas. Here Plaintiffs have made direct and specific allegations of the Defendants' unlawful conspiracy to suppress and eliminate competition in the market for Puerto Rican cabotage by allocating customers, rigging bids to customers, and fixing the prices of rates, surcharges and other fees charged to customers. Further, nothing in *Twombly* precludes circumstantial allegations from being considered in an antitrust complaint; nor did *Twombly* require that in a conspiracy case, where by definition defendants met, talked and dealt in secret among themselves to harm plaintiffs, that plaintiffs must specifically plead the who, what, when, where, and how of the secret meetings and communications during the conspiracy. In short, *Twombly* reaffirmed that cases brought under the Sherman Act can be properly pleaded by either sufficient allegations of an actual agreement, or allegations of parallel action placed in a context

---

[4]   See Memorandum of the United States in Aid of Sentencing regarding Baci, dated January 23, 2009, pp. 8-9, attached as **Exhibit 4** to the Second Consolidated Amended Complaint; see also Peter Baci's Sentencing Memorandum, dated January 26, 2009, attached as **Exhibit 3** to the Second Consolidated Amended Complaint.

plausibly suggesting such an agreement. Here, in addition to the guilty pleas, there is undoubtedly more than enough factual heft in the Complaint to cross the line "between the factually neutral and the factually suggestive." *Twombly*, 127 S.Ct. at 1966 n.5.

The individual Defendants, each of whom had pricing authority at the corporate Defendants for which they worked, pled guilty to their roles in the conspiracy to eliminate competition among the corporate Defendants and raise prices for the movement of goods in the Puerto Rico shipping lane, which began at least as early as May 2002 and continued until at least April 2008. The Memorandum of the United States in Aid of Sentencing regarding Baci and Peter Baci's Sentencing Memorandum, as set forth in paragraphs 88 and 89 of the Complaint, make clear that all of the shipping company Defendants participated in the conspiracy. The five guilty pleas provide direct evidence that the conspiracy alleged in the Complaint took place. The detailed allegations far exceed the dismissal standards established in *Twombly*. Indeed, cases such as this one, in which guilty pleas have already been entered in parallel criminal proceedings, have been uniformly held to be viable under *Twombly*. To require more would have this Honorable Court close its eyes to the guilty pleas that Defendants' high-ranking officers have admitted to and allow Defendants to continue to reap the benefits of their illegal acts.

Even without the guilty pleas, the allegations in the Complaint include more than sufficient factual detail about market and pricing behavior as well as statements of the Defendants to make the claimed conspiracy plausible and, thus, withstand a *Twombly* challenge. Here, the Complaint alleges irregular market behavior that resulted in historically unprecedented high prices for Puerto Rican cabotage. The conduct and market described in the Complaint (SCAC, ¶¶ 109-32) are not only highly suggestive but the type of conduct resulting from cartel

operation.  Throughout the class period, while reaping the profits of their drastic and coordinated run-up in fees and charges, Defendants were also meeting and collaborating regularly. (SCAC, ¶ 96.)  Defendants' collusion prevented price declines and caused prices to rise roughly in unison during periods where regular market forces should have yielded a different result.  As described in the Complaint, the market for Puerto Rican cabotage was conducive to collusion and Defendants did collude, as the Baci guilty plea clearly admits.

While Plaintiffs' allegations of cartel behavior in the Puerto Rican cabotage market, standing alone, are sufficient to defeat the pending motions to dismiss, those allegations are also made in conjunction with the guilty pleas and ongoing criminal investigation. Together, these allegations compel a swift denial of Defendants' motions—clearly made to continue to reap of the anticompetitive prices and fees they agreed to and delay this case.  The fact that key employees of the corporate Defendants have pled guilty to a wide-ranging antitrust conspiracy among the corporate Defendants—and that one of them was already sentenced to serve a 48-month jail term—involving the same market and actors as are pled in the Complaint, shuts the door entirely on Defendants' motions, and accordingly, these motions should be denied.

I.    **STATEMENT OF FACTS**

A.    **The Puerto Rican Cabotage Market was Conducive to Collusion**

The domestic ocean trade at issue, Puerto Rican cabotage, is the noncontiguous ocean shipping trade between the mainland United States and Puerto Rico.  (SCAC, ¶ 54.)  Ocean transport is a highly effective method for moving large quantities of non-perishable goods and raw materials.   The major commodities shipped through this mode of transport include manufactured goods, farm products, coal, crude petroleum, refined petroleum products and chemicals.  (SCAC, ¶ 53.)  Given Puerto Rico's geographic location, there are no viable

5

economic substitutes for Puerto Rican cabotage. Shipping heavy, bulky goods via air freight is prohibitively expensive, and there are no road or rail routes between Puerto Rico and the mainland United States. (SCAC, ¶ 60.)

Moreover, there are substantial barriers to entry into the Puerto Rican cabotage market. (SCAC, ¶ 62.) First, Puerto Rico is subject to the provisions of the Merchant Marine Act of 1920, 46 U.S.C. § 100 *et seq.*, commonly known as the Jones Act, which grants an exclusive privilege to certain U.S.-flagged vessels to engage in ocean shipping of merchandise to or from U.S. territories, possessions, or non-contiguous states. This law is restrictive: in an effort to protect American shipping companies, it prohibits other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade. Indeed, the Jones Act's restriction on the carriage of domestic ocean cargoes to U.S.-made, U.S.-flagged, predominately U.S.-crewed, and U.S.-owned ships, combined with the relatively small size of these trade routes, often results in an oligopolistic market in which only a very small number of carriers serve a particular route. Such is the case in the Puerto Rican cabotage market. (SCAC, ¶ 51.)

The Puerto Rican cabotage market is an oligopoly that, during the relevant period alleged in the Complaint, was exclusively controlled by Defendants Horizon, Sea Star, Crowley and Trailer Bridge. This high degree of concentration facilitated the Defendants' anti-competitive scheme because it was relatively easy for such a limited group of sellers to reach agreement on customer allocation, bid rigging and prices, and to monitor adherence to their conspiracy agreement. And since the demand for Puerto Rican cabotage is inelastic, it was profitable for the cartel to allocate customers, rig bids and increase prices. (SCAC, ¶ 64.)

Additional barriers to entry that make it virtually impossible for would-be competitors to enter the Puerto Rican cabotage market include: (1) the entrenched market positions of the incumbent Defendant shipping companies; (2) the large capital investment required and long delivery lead times needed to build a new container ship in the U.S.; (3) the substantial investment in infrastructure needed to handle container ships; (4) the constraints on port space in San Juan; (5) the high fixed costs relative to variable costs; and (6) the need to develop a broad base of customer relationships to realize economies of scale. These substantial barriers to entry facilitated the conspiracy, as they enabled the Defendants to set supra-competitive prices without fear that new entrants would come into the market and undercut those prices. (SCAC, ¶ 62.)

Domestic ocean shipping services within any trade route are highly fungible because carriers offer essentially the same service: transportation of cargo from a specified origin to a destination within a certain time frame. Absent the conspiracy, then, purchasers of Puerto Rican cabotage could decide which carrier to use based on price, and the four Defendant carriers would largely have to compete on price. Because of the Defendants' conspiracy, however, they in fact did not compete based on price, and the purchasers of Puerto Rican cabotage lacked the ability to base their purchasing decisions on fairly-set, competitive prices, as required by the antitrust laws. (SCAC, ¶ 59.)

**B.      The Perfect Storm: An Antitrust Conspiracy Begins**

The Defendants' conspiracy was conceived and implemented in order to take advantage of a significant shift in the Puerto Rican cabotage market. In 2001, Navieras NPR -- the largest operator in the Puerto Rican cabotage market at the time -- filed for bankruptcy and thereafter ceased operations. As a result of Navieras' exit, the market for shipping services between the

mainland United States and Puerto Rico became even more consolidated.  That significant market shift created the conditions that gave rise to the conspiracy.  (SCAC, ¶ 109.)

The Defendants launched their conspiracy in or about May 2002, shortly following Navieras' exit from the market.  As confessed by Defendant Baci, the Senior Vice President of Yield Management for Sea Star, Defendant Leonard Shapiro (a principal in Defendant Saltchuk) "hatched the idea of collusion with the other carriers."[5]  As one of the principals of Saltchuk, Shapiro wielded and used his significant authority to intimidate Sea Star employees, including Baci.  After Shapiro and Defendant Serra of Horizon reached an agreement regarding the conspiracy -- which involved, *inter alia*, bid rigging, customer allocation, and price fixing -- Shapiro ordered Baci to work with Defendant Gill, the Marketing and Pricing Director for Horizon and later Defendant Glova, Gill's replacement, in implementing the agreement. Defendant Baci maintained contemporaneous notes regarding many items involving the conspiracy, including meetings and travel, as well as an enormous cache of e-mails that substantiate his and the remaining Defendants' involvement in the conspiracy, including Crowley and Trailer Bridge.  (SCAC, ¶¶  88-89, 105-106 and 108.)

The market effects of this conspiratorial scheme were felt almost immediately.  Before April 2002, the Puerto Rican cabotage market had overcapacity.  Despite a nearly 14% increase in the number of containers shipped on Puerto Rican trade routes from 1994 through approximately 2003, freight rates for shipping between the U.S. mainland and Puerto Rico declined by 30% due to excess supply.  Yet, although capacity for Puerto Rican cabotage remained flat between May 2002 through April 2008, beginning in 2003, rates, surcharges and

---

[5] *See* Peter Baci's Sentencing Memorandum, **Exhibit 3** to Second Consolidated Amended Complaint, pp. 8-9.

fees increased dramatically and nearly simultaneously across Defendant suppliers.  (SCAC, ¶ 113.)

During this period, the Defendants increased rates to supra-competitive levels by, among other things, agreeing to carry each other's shipping containers when demand outstripped one Defendant shipping line's capacity.  Absent this agreement, the Defendant shipping lines would have bid against each other for this business.  Additionally, the Defendants harmonized their bunker fuel surcharge, and continued to increase it throughout the duration of the conspiracy, even though fuel cost as a percentage of operating cost (per shipped-unit) and fuel efficiency varied across these Defendant carriers.  These increased surcharges were not driven by legitimate economic considerations.  Indeed, through their bunker fuel surcharges (as well other fees and charges that likewise could not be explained by cost increases), the Defendants increased profit margins in a declining market, which is directly contrary to what would occur in a competitive market.  (SCAC, ¶¶ 115-127.)

Moreover, since at least early 2006, the Puerto Rico economy has experienced a downturn, including a recession throughout 2007 and 2008.  As a result, there was a significant and substantial softening of consumer demand and a corresponding decrease in the volume of goods transported to Puerto Rico from the U.S. mainland.  Despite these weak economic conditions, softening demand and increasing overcapacity, the Defendants increased their rates during this recessionary period by approximately 9% -- which is directly contrary to what would have occurred in a competitive market.  (SCAC, ¶ 114.)

Because the Defendants, who exclusively controlled the Puerto Rican cabotage market during the relevant period, fixed, maintained and increased prices (and corollary fees) at supra-

competitive levels, the Plaintiffs and the Class paid substantially higher prices for Puerto Rican

cabotage than they would have paid absent the unlawful conspiracy.

**C.      The Conspiracy Sinks: The Criminal Indictment And Guilty Pleas**

Although not announced publicly until April 2008, in February 2008, a grand jury sitting

in the Middle District of Florida, assisted by the DOJ's Antitrust Division and the Federal

Bureau of Investigation ("FBI"), began investigating potential antitrust offenses in connection

with domestic ocean shipping between the mainland United States and Puerto Rico.  On April

17, 2008, FBI agents executed search warrants on the premises of Defendants Sea Star, Horizon,

and Crowley regarding Puerto Rican cabotage.  On October 1, 2008, the federal government

charged Defendants Baci, Gill, Glova, and Serra with one count of conspiracy to suppress and

eliminate competition among the corporate Defendants in the Puerto Rican cabotage trade by

rigging bids, fixing prices, and allocating customers.  On the same date, the government charged

Defendant Chisholm with corruptly altering, destroying, and concealing records and documents

in an attempt to impair their availability for a criminal investigation.  (SCAC, ¶¶ 67-73.)  On

October 20, 2008, all five of the criminally charged Defendants pled guilty. (SCAC, ¶¶ 74, 77,

80, 85, 91.)

On January 30, 2009, Defendant Baci was sentenced to a prison term of 48 months,

which is the longest prison sentence ever given for an antitrust violation in U.S. history.  The

federal government intervened in this litigation, and, during the February 3, 2009 hearing,

expressly advised that its criminal investigation was ongoing, thus suggesting that more criminal

indictments will likely be issued in connection with this unprecedented antitrust conspiracy, with

resulting pleas likely to follow.  The government has taken the same position in press releases

and the memorandum it filed in connection with the Baci sentencing.

## II. <u>ARGUMENT</u>

### A.    *Twombly* Did Not Heighten The Pleading Standards Under *Rule* 12(b)(6)

The motions to dismiss filed by the five groups of Defendants should be denied.  The Complaint more than adequately supports a plausible inference of antitrust violations and conspiracy to do so.

Contrary to Defendants' arguments, *Twombly* created no new heightened pleading standard for price fixing cases.[6]   Indeed, the Supreme Court, with express reference to its *Twombly* decision, has reiterated the governing notice-pleading standard under Fed. Civ. P. 8:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not necessary; the statement need only "give the Defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, [] 127 S. Ct. 1955, [1959] (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 . . . (1957)).

*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  The Court has also directed, again with specific reference to *Twombly*, that "when ruling on a Defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the Complaint."  *Id.*  (citing *Twombly*, 127 S. Ct. at 1965).

The United States Court of Appeals for the First Circuit similarly observed in a recent ruling referring to *Twombly* that it would "accept well-pled factual allegations in the Complaint as true and make all reasonable inferences in plaintiff's favor."  *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 44 (1st Cir. 2008).  Indeed, the pleading standard under Rule 8 has not changed.  *Carana, Inc. v. Jovani Fashion*, 2009 U.S. Dist. LEXIS

---

[6]  Nor could the *Twombly* Court have created such a heightened pleading standard.  Any change to the applicable standards of Rule 8 would have required amendments to the Federal Rules.  *See Aktieselskabet*, 525 F.3d8, 16 (D.C. Cir. 2008) (rejecting notion that *Twombly* introduced a heightened pleading standard, because any such standard "would have to arise from an amendment of the Federal Rules of Civil Procedure").

8660, at *6 (D.P.R. Feb. 5, 2009) (referring to *Twombly* and stating that "Under our liberal pleading standards, a plaintiff must set forth a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), and need only give the respondent fair notice of the nature of the claim and petitioner's basis for it."); *Arista Records, LLC v. Does 1-27,* 2008 U.S. Dist. LEXIS 6241, at *14 (D. Me. Jan. 25, 2008) ("Nothing in *Twombly* forbids lower courts from drawing inferences or accepting conclusory recitations as true for purposes of a motion to dismiss so long as the factual content that is supplied in the Complaint demonstrates the plausibility of any necessary inferences.")

Allegations in antitrust cases such as this litigation are to be considered as a whole, and not on a piecemeal or compartmentalized basis. *Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1, 16 (1st Cir. Mass. 1979) (concluding that a plaintiff in an antitrust case "was entitled to present all the proof relating to the anticompetitive behavior to the jury without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962))[7] This principle is reflected in post-*Twombly* rulings, where price-fixing Defendants failed in trying similar strategies. *See, e.g., In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934, 948 n.7 (E.D. Tenn. 2008) (rejecting Defendants' "attempt to parse and dismember the Complaints"). If plaintiffs could not proceed to discovery without detailed knowledge of all

---

[7] *See Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 154 (D.D.C. 2004) ("[A]llegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself.'") (quoting *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (1982)); *see also Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quoting *U.S. v. Patten*, 226 U.S. 525, 544 (1913)).

facets of a price-fixing cartel's conduct, private enforcement of the antitrust laws would be virtually impossible.[8]

The Supreme Court made clear that it considered the Complaint in *Twombly* to "proceed *exclusively* via allegations of parallel conduct." 127 S. Ct at 1971 n.11 (emphasis added). Unlike the Complaint at issue before this Court, the Complaint in *Twombly* alleged parallel practices by the Defendants and contained "a few stray statements" of an agreement by Defendants to stay out of each other's markets. *Id.* at 1970. Despite occasional references in the *Twombly* Complaint to an unlawful agreement, "[t]he nub of the Complaint . . . is [Defendants'] parallel behavior." *Id.* at 1960, 1970-71.[9]

On these allegations, the Supreme Court in *Twombly* held that the plaintiffs failed to state a claim for relief under Section 1. The Court explained that "*an allegation of parallel conduct and a bare assertion of a conspiracy* will not suffice . . . and a *conclusory allegation of an agreement at some unidentified point* does not supply facts to show illegality." *Id.* at 1966 (emphasis added). A Complaint alleging parallel conduct must provide "some setting suggesting the agreement to make out a § 1 claim." According to the Court, "without some further factual

---

[8]   *See, e.g.*, *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d at 948 n.7 (level of factual pleading defendants seek under *Twombly* could rarely, if ever, be met by a plaintiff in an antitrust case before discovery); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959224, at *14 (D.N.J. June 29, 2007) ("adequate notice of the particular grounds upon which Plaintiffs' claims rest" is all that is required "particularly given the fact that Plaintiffs have not yet had the benefit of discovery") (citing *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-747 (1976) (explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly")); *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 ("*Twombly* does not . . . require plaintiffs to prove their allegations before taking discovery.").

[9]   Courts have consistently recognized that the allegations in *Twombly* constituted mere parallelism and nothing more. *See, e.g.*, *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2008 WL 1735856, at *3 (D.D.C. April 16, 2008) ("Unlike in *Twombly*, the plaintiffs here do not rely on only bare allegations of parallel behavior, or assume that there is a conspiracy because there is an 'absence of any meaningful competition.'") (citing *Twombly*, 127 S. Ct. at 1970)); *Fair Isaac Corp. v. Equifax Inc.*, 2008 WL 623120, at *5 (D. Minn. March 4, 2008) ("The *Twombly* plaintiffs' allegations of an illegal § 1 agreement rested exclusively on the parallel conduct of the defendant regional telecommunications providers.").

enhancement," the Complaint in *Twombly* "stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

The Court in *Twombly* emphasized that there was "an obvious alternative explanation" for Defendants' alleged agreement not to compete – that the former monopolies were merely doing the same thing they had done before the Telecommunications Act:  keeping to their long-held geographical territories and "sitting tight, expecting their neighbors to do the same thing." *Id.* at 1972.

*Twombly* is thus readily distinguishable from the case here, in which the plaintiffs make direct allegations of Defendants' unlawful conspiracy to suppress and eliminate competition in the market for Puerto Rican cabotage beginning at least as early as May 2002 by allocating customers, rigging bids to customers, and fixing the prices of rates, surcharges and other fees charged to customers.  Nothing in *Twombly* precludes circumstantial allegations from also being considered in an antitrust Complaint.  Rather, *Twombly* held that a Complaint must contain merely "enough factual matter (taken as true) *to suggest* that an agreement was made."  *Id.* at 1965 (emphasis added).  *Twombly* confirms that Sherman Act claims can be made on the basis of circumstantial allegations alone, including allegations of parallel conduct alone under certain circumstances.[10]  Indeed, the Court noted that "[a]n allegation of parallel conduct is thus much

---

[10]   Many post-*Twombly* courts have held that circumstantial evidence, including parallel conduct, should still be considering in assessing the viability of antitrust claims.  *See, e.g., Hyland v. Homeservices of America, Inc.*, No. 05-612, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) ("Plaintiffs . . . have properly put the Defendants on notice of its alleged antitrust claims by setting out facts of an alleged a conspiracy [*sic*] to price-fix between the Defendants, supported by actions of parallel conduct.  Accordingly, the Court finds that the Plaintiffs have 'nudged' their claims across the line from conceivable to plausible."); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 ("These complaints, while not answering all specific questions about 'who, what, when, and where,' do put defendants on notice concerning the basic nature of their complaints . . . and the grounds on which their claims exist."); *Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 741 (E.D. Pa. 2007) ("'[A] complaint warrant[s] dismissal only where it fail[s] 'to render plaintiffs' entitlement to relief plausible'.... [A]n antitrust complaint would certainly meet the *Twombly* criteria if the complaint constitutes notice to the defendant of the legal claims asserted and includes a statement of the elements of those claims, along with allegations of the defendant's underlying conduct that, if proven, would plausibly demonstrate such elements.") (citations omitted); *City of Moundridge*, 2008 WL 1735856, at *4, *6 ("All inferences are construed in favor of the plaintiffs and, while the claim may rest ultimately

like a naked assertion of conspiracy in a § 1 Complaint: *it gets the Complaint close to stating a claim*." *Id.* at 1966 (emphasis added). The allegations of parallel conduct must be placed in a factual context that "nudge[s]" the conspiracy claim "across the line from conceivable to plausible." *Id.* at 1974.

In short, *Twombly* reaffirmed that cases brought under the Sherman Act can be properly pleaded by either (a) sufficient allegations of an actual agreement; or (b) allegations of parallel action placed in a context plausibly suggesting such an agreement. As demonstrated below, the Complaint here does both. The Complaint directly alleges that Defendants conspired to suppress and eliminate competition in the market for Puerto Rican cabotage beginning at least as early as May 2002. It also states that they entered into an unlawful agreement to allocate customers, rig bids to customers, and fix the prices of rates, surcharges and other fees charged to customers, and that a number of their former employees have pled guilty to the same, with one, Baci, having already been sentenced to a four year prison term. Baci is cooperating with the government, and has been deemed to be a credible source whose cooperation should lead to additional indictments.[11] The Complaint also contains multiple additional facts that more than "nudge" the claim across the plausibility line.

**B.     The Guilty Pleas Of Certain Defendants To The Very Same Illegal Conspiracy Alleged Herein Easily Satisfies *Twombly*.**

Incredibly, moving Defendants contend that Plaintiffs' allegations describing the guilty pleas entered by the individual Defendants to the *exact* anticompetitive conduct at issue in this case "fail to nudge [plaintiffs'] claims across the line from conceivable to plausible." *Twombly*,

---

on a thin factual reed, the plaintiffs have alleged supporting circumstantial facts and placed their claims 'in a context that raises a suggestion of a preceding agreement,' 'nudg[ing] their claims across the line from conceivable to plausible[.] . . . Because the complaint alleged some circumstantial facts that support an inference of an agreement, the plaintiffs' claim is plausible." (citations omitted)).

[11] *See* Memorandum of the United States in Aid of Sentencing regarding Baci, **Exhibit 4** to Second Consolidated Amended Complaint, pp. 8-9.

127 S. Ct. at 1974.  The guilty pleas, however, provide direct and admissible evidence that the conspiracy alleged in the Complaint took place.  Defendants' efforts to twist the Supreme Court's holding in *Twombly* to one that requires specific and detailed allegations of each and every aspect and facet of an alleged conspiracy[12] has been and should again be roundly rejected. The detailed allegations, including various Defendants' guilty pleas to specific elements of the violations of the Sherman Act alleged in the Complaint, far exceed the dismissal standards established in *Twombly*.  Requiring more would destroy private enforcement of the federal antitrust laws, as well as distort *Twombly* beyond recognition..

   1.    **The Guilty Pleas Entered in Parallel Criminal Proceedings are Admissions by Defendants' Own Employees that the Conspiracy Alleged in the Complaint Existed.**

   As discussed above, in *Twombly*, the Supreme Court held that mere allegations of parallel conduct standing alone and without more, are insufficient to set out a claim for a Section 1 conspiracy.  127 S. Ct. at 1965-66.  Here, however, Plaintiffs' claim of conspiracy is based on far more than mere allegations of parallel conduct.  Here, the conspiracy allegations are supported with admissions by some of the Defendants' own former employees and the Department of Justice not only as to the existence and successful execution of the six-year old conspiracy, but also of the Defendants' roles in it.  These allegations themselves more than "raise an expectation that discovery will reveal evidence of an illegal agreement."  127 S. Ct. at 1965.

   The Complaint alleges that four of the five individual Defendants in this case, Gill, Baci, Glova, and Serra (three of whom worked for Horizon and one of whom worked for Sea Star), were criminally charged by the DOJ for violating federal antitrust laws.  (SCAC, ¶ 72.)  As stated above, the DOJ charged that these individual Defendants sought to eliminate competition

---

[12]  *See Twombly*, 127 S. Ct. at 1973 n.14 (We do not apply any heightened pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9. . . .")

and raise the prices charged by the corporate Defendants by agreeing not to compete for their respective customers, particularly by agreeing to rig bids submitted to government and commercial buyers; and by agreeing to fix the prices of rates, surcharges and other fees charged to the customers for Puerto Rican cabotage.  *Id.*  These four individual Defendants, each of whom was an executive employee of either Horizon or Sea Star, and each of whom had pricing authority, pled guilty to their roles in the conspiracy to eliminate competition and raise prices for the movement of goods in the United States to Puerto Rico shipping lane, which began at least as early as May 2002 and continued until at least April 2008.

Moving Defendants contend that allegations referencing the guilty pleas of the individual Defendants do not support an inference of a conspiracy implicating the corporate Defendants. The allegations of the Complaint, however, make clear that the wrongful conduct set forth in the Complaint was carried out by the Defendant companies *through their employees, acting within the scope of their employment, and acting for the benefit of their employers.*  (SCAC, ¶¶ 43-44.) These allegations, which must be accepted as true for the purposes of Defendants' motions, are more than sufficient to implicate the corporate Defendants in the alleged conspiracy.[13]   *Cf.*

---

[13]  This is so even with respect to defendants Crowley and Trailer Bridge, whose employees have not yet admitted to participating in the scheme.  These two defendants focus on the fact that none of their employees have yet been criminally charged and that the five individual defendants who have been criminally charged by the DOJ, so far, for violating federal antitrust laws, did not work for them.  Crowley Mem. at 22-23 and Trailer Bridge Mem. at 6-7. This fact does not permit dismissal of the claims against them.  While the individual defendants are executive employees of either Horizon or Sea Star, **all** of the defendants are the subject of an investigation by the Antitrust Division of the DOJ into the pricing practices of ocean carriers in the Puerto Rico trade.  (SCAC., ¶¶ 67-94.)  **All** of the defendants were either served with search warrants and grand jury subpoenas, in relation with their participation in a conspiracy to suppress and eliminate competition in the market for Puerto Rican cabotage in which **all** of the defendants have an oligopolistic participation; **all** of the defendants' offices were raided by the FBI in conjunction with the government's investigation of anticompetitive conduct in the Puerto Rican cabotage market.  *Id.*  Crowley's offices were raided by the FBI in connection with the government's investigation of anticompetitive conduct in the Puerto Rican cabotage market.  (SCAC., ¶ 92.)  And Trailer Bridge announced that it was served with a DOJ subpoena seeking documents and information relating to a grand jury investigation of pricing practices in the Puerto Rican cabotage.  (SCAC., ¶ 93.)  Thus, the plausibility of the conspiracy, among the few members of the oligopolistic Puerto Rcio cabotage market, is bolstered significantly by the fact that alleged co-conspirators of two of the principal 4 companies that control the market, conceded responsibility for cartel activity, even though the investigation is ongoing and not all defendants have yet been indicted.

17

*United States v. O'Connell*, Civ. A. No. 86-2133, 1988 WL 103329, *5-6 (D. Mass. Sept. 23, 1988) (holding employer liable based on finding that employee who pled to criminal conspiracy charge acted with apparent authority and that he was acting, at least in part, to benefit the corporation); *Moecker v. Honeywell International*, 144 F. Supp. 2d 1291 (M.D. Fla. 2001) (issues of material fact existed as to whether manufacturer's employees were acting within scope of their employment, or with apparent authority, when they allegedly extorted payments precluded summary judgment on restraint of trade claim by distributor).

Cases, like the instant action, in which guilty pleas have already been entered in parallel criminal proceedings are universally considered "viable" under *Twombly*. *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *5 ("Nor is this a case where it is almost certain that the Complaint is viable, such as is often true where guilty pleas have been entered in a parallel criminal case."). S*ee also In re SRAM Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding that guilty pleas in DRAM criminal investigation (a different but related market) supported "an inference of conspiracy in the SRAM industry"). Here, both Defendant Horizon and Sea Star executives have pled guilty in the parallel criminal case, thereby *admitting* that the conspiracy alleged in the Complaint existed and that they participated in it. *Olsen v. Correiro*, 189 F.3d 52, 59-60 (1st Cir. 1999) (guilty plea is an express admission of guilt by the pleader and is therefore admissible in subsequent proceedings). Indeed, Defendant Baci, a former Sea Star executive, has already been sentenced to four years in prison, which is the stiffest sentence under the Sherman Act in U.S. history.

The moving Defendants attempt to undermine the plausibility of Plaintiffs' alleged conspiracy by distancing themselves from the admissions of guilt by the individual Defendants. For example, Defendant Sea Star argues (wrongly) that the guilty pleas by the individual

Defendants "can raise no inference of antitrust wrongdoing by their employers. . . ." (Sea Star Mem. at 16.)  In support of this assertion, Sea Star quotes Section 5(a) of the Clayton Act, which provides that a judgment "to the effect that a Defendant has violated [the antitrust laws] shall be Prima facie evidence against <u>such defendant</u> in any action or proceeding brought by any other party against <u>such defendant</u>."  Sea Star Mem. at 16 (emphasis provided by Sea Star).  Yet there is *no support* at all for the converse proposition– that a guilty plea *cannot* raise an inference of conspiracy as to any other party, except the party asserting the plea.  This is especially true where, as here, the conduct underlying the pleas occurred while the Defendant employees were carrying out the business of their Defendant employers.  *See United Technologies Corp. v. Mazer*, Nos. 06-15561, 0615562, __, F.3d __, 2009 WL 263329, *5-6 (11th Cir. Feb. 5, 2009) (president was acting within the scope of his employment with the company when he engaged in tortuous acts alleged and therefore plaintiff properly stated claims of conspiracy against employer company).

In *Mazer*, a Florida corporate Defendant filed a motion to dismiss for failure to allege facts sufficient to maintain the claims against it, as opposed to only its president, who pled guilty to a related criminal charge for the same conduct at issue in the civil case.  The Eleventh Circuit reversed the district court's decision granting the Florida company's dismissal motion, holding that the plaintiff adequately alleged that the company's president was acting within the scope of his employment when he engaged in the tortuous acts alleged:

> At the pleading stage, we assess only whether UTC's allegations are "enough to raise a right to relief above the speculative level." *Mills*, 511 F.3d at 1303 (quoting *Twombly*, 127 S.Ct. at 1964-65). Giving UTC, which is at a clear informational disadvantage, some benefit of the doubt to go along with the specific facts it has pled, its allegation that Mazer was acting on behalf of West-Hem reaches at least above the speculative level.

*      *      *      *

Furthermore, it is hard to imagine how UTC could have pled its case with greater specificity or accuracy at this stage. The intricacies of the scope of Mazer's employment authority, as well as the details regarding exactly who provided the funds for DiLorenzo and received the benefit of the payments from APM, are peculiarly within the knowledge of Mazer and West-Hem. Although UTC has pled a reasonable good faith basis for its claims against both Mazer and West-Hem, it has not yet been in a position to know all of the particulars. Should discovery reveal that Mazer was undisputably outside the scope of his employment or that he, not West-Hem, was the sole beneficiary of the sale of the blueprints, then West-Hem may be entitled to summary judgment or judgment as a matter of law. At the initial pleading stage, however, UTC's allegations were sufficient to state a claim.

*Mazer*, 2009 WL 263329 at *7-8.  As in *Mazer*, Plaintiffs in the present case have alleged that the individual Defendants who pled guilty to the federal antitrust violations at issue all acted within the scope of their employment and therefore on behalf of certain corporate Defendants. Accordingly, the motions to dismiss filed by these Defendants must also be denied.

Criminal guilty pleas are prima facie evidence of the existence of the same antitrust conspiracy.  *See* 15 U.S.C. § 16(a) (1964); *Orbo Theater Corp. v. Loew's*, 156 F. Supp. 770, 777 (D.D.C. 1957) (final judgment or decree is prima facie evidence of a conspiracy covering the same area and existing during the same time as that involved in any subsequent case), *aff'd*, 261 F.2d 380 (D.C. Cir. 1958), *cert. denied,* 359 U.S. 943 (1959); *Yeager v. Waste Management*, 3:89CIV7248, 1994 WL 761961, *8-9 (N.D. Ohio Aug. 19, 1994) ("Included within the scope of the phrase 'final judgment or decree' [in 15 U.S.C. § 16(a)] are guilty pleas in criminal cases.") (*citing Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 323 F.2d 412 (7th Cir. 1963), *cert. denied*, 376 U.S. 939 (1964)).  Indeed, the Informations upon which the individual guilty pleas are based state, among other things, that: "**Various corporations** and individuals, **not made Defendants in this Information, participated as co-conspirators in the offense charged**

20

herein and performed acts and made statements in furtherance thereof." *See United States v. Gill*, 08-cr-351, Information at 3, ¶ 5 (M.D. Fla. Oct. 1, 2008); *United States v. Glova*, 08-cr-352, Information at 3, ¶ 6 (M.D. Fla. Oct. 1, 2008); *United States v. Serra*, 08-cr-349, Information at 3, ¶ 5 (M.D. Fla. Oct. 1, 2008); *United States v. Baci*, 08-cr-350, Information at 3, ¶ 5 (M.D. Fla. Oct. 1, 2008).

Nevertheless, the moving Defendants contend that because the guilty pleas do not specifically mention any involvement by these corporate Defendants by name, the facts contained in them should be insufficient to sustain a claim. In support of their contention, Defendants cite *In re Citric Acid*, 191 F.3d 1090, 1098 (9th Cir. 1999), for the proposition that even where competitors have admitted to meeting to fix prices, it is not reasonable to infer that another competitor who communicated with admitted conspirators participated in the conspiracy. *See*, *e.g.*, Crowley Mem. at 24 (discussing guilty pleas and citing *Citric Acid*, 191 F.3d at 1098). In *Citric Acid* (a pre-*Twombly* decision), however, there was no allegation that the competitor who had not pled guilty had attended the conspiratorial meetings, only the legitimate ones. *Cf. In re Mercedez Benz*, 2006 WL 2129100, *16 (D.N.J. July 26, 2006) ("When . . . price information is exchanged with members of a pre-existing price-fixing conspiracy, it is undoubtedly circumstantial evidence of participation in that conspiracy. If the fact finder accepts that the exchange of such data by the Sheft Kahn group was in furtherance of a price-fixing conspiracy, MBM's agreement could reasonably be inferred from its active participation in the group."). Moreover, the Complaint now alleges that Defendant Baci, in his Sentencing Memorandum, **specifically identifies Defendants Sea Star, Horizon, Crowley and Trailer Bridge as the companies involved in this conspiracy**. (SCAC, ¶ 88.) The Complaint also alleges that **all** the Defendants participated in trade association meetings that fostered the

conspiracy that is the subject of this action.  (SCAC, ¶ 129.)   Accordingly, this Court should reject moving Defendants' contention that the guilty pleas do not plausibly suggest the existence of a conspiracy among all the Defendants.

### 2.        The Case Law Cited by Defendants does not Support Dismissal.

In support of their argument that the guilty pleas of certain Defendants' employees cannot support an inference of conspiracy, the corporate Defendants cite to Magistrate Judge Pohorelsky's report and recommendation in *In re Air Cargo Shipping Services Antitrust Litig.*, MD 06-1775 (1:08-md-0195-WSD), Order (Docket No. 256-2) (E.D.N.Y. Sept. 26, 2008) (the "Order").[14]  In that case, plaintiffs alleged a wide-ranging conspiracy that accused the defendants – 30 international airlines that shipped cargo via air transportation – of engaging in a price-fixing conspiracy affecting "thousands of routes flown by Defendants worldwide, including flights to, from, and within the United States."  The claims in that case arose under both U.S. and European Union law.  *Id*. at 4.  The magistrate dismissed the Sherman Act claims, with leave for plaintiffs to replead, finding that the sheer breadth of the conspiracy was implausible.  *Id*. at 14-15 (concluding that the multi-year term, the unrelated markets and the thirty Defendants allegedly involved made the allegations of a single overarching conspiracy implausible).  In light of the extremely broad conspiracy alleged in that case, the magistrate concluded that the allegations lacked specifics that would give "the Defendants sufficient notice of the claims against them." *Id*. at 20.

The present case is easily distinguished from *Air Cargo*.  In that case, the guilty pleas of nine of the Defendants were entered years **after** the complaint was filed and **were not alleged in the complaint** before the court.  Therefore, the only references to related criminal proceedings in

---

[14] Objections to the Order are currently pending *sub judice*.

the plaintiffs' complaint concerned the Lufthansa Defendants' application to the European Commission for immunity from fines in Europe and its application to the DOJ pursuant to its Corporate Leniency Policy.  While the court in *Air Cargo* acknowledged that guilty pleas were entered by nine of the Defendants, it recommended dismissal based on the fact that the plaintiffs' allegations did not provide a basis from which to infer that the Lufthansa leniency deal implicated all of the Defendants in the broad conspiracy alleged.  *Id.* at 18.

The magistrate's analysis in *Air Cargo* is inapplicable here.  In the present case, the detailed allegations of the Complaint give Defendants sufficient notice of the claims against them, the focus of which is a much narrower conspiracy than the one alleged in *Air Cargo* and includes specific details regarding guilty pleas, resulting sentences and the involvement of all Defendants in the alleged antitrust conspiracy scheme.. Moreover, unlike in *Air Cargo*, the scope and nature of the conspiracy alleged in the Complaint herein parallels the conspiracy described in the criminal Informations that led to the guilty pleas.  Consistent with those Informations, the Complaint alleges that each of the individual Defendants, for the purpose of engineering and executing the charged conspiracy scheme relating to Puerto Rican cabotage, combined and conspired with unnamed co-conspirators to:

> (a) "participate[] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agree[] during those meetings conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agree[] during those meeting, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agree[] during those meetings conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) s[ell] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accept[] payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorize[] or consent[] to the participation of subordinate employees in the conspiracy; and

(h) conceal[] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts[.]"

(SCAC, ¶ 87.)[15]  Because plaintiffs' allegations in this case, unlike those in *Air Cargo*, focus on a much narrower conspiracy among a limited number of Defendants (four of which have entered guilty pleas and expressly include the guilty pleas and underlying admissions), which is also the subject of numerous guilty pleas and resulting sentences, as well as an ongoing criminal investigation, the Defendants cannot credibly argue, as in *Air Cargo*, that they lack sufficient notice of the claims against them.  Thus, *Air Cargo* provides no support for granting Defendants' motions.

Defendants also seek solace in the Second Circuit's decision in *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).  In *Elevator Antitrust*, the Second Circuit affirmed the dismissal of a price-fixing complaint that was based entirely on allegations of Defendants' anticompetitive misconduct in Europe.[16]  In that case, there were neither U.S. pleas nor a DOJ

---

[15]    In the criminal information to which he pled guilty, defendant Chisholm admitted to corruptly altering, destroying, and concealing records and documents and attempting to do so with the intent to impair the availability of the records and documents for use in the investigation, in violation of 18 U.S.C. § 1512(c)(1).

[16]    As the Second Circuit noted, quoting the district court: "[T]he complaint enumerates 'basically every type of conspiratorial activity that one could imagine. . . .  The list is in *entirely general terms* without *any* specification of *any* particular activities by *any* particular defendant [; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing *any* facts whatever."  *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (emphasis added).  Plaintiffs' allegations herein are far from just a "list of theoretical possibilities," but instead

investigation and nothing linking the European conspiracy to any conduct or effect in the United States.  *Id.*  at 52 ("Without an adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not 'nudge [their] claims across the line from conceivable to plausible.'").  In sharp contrast, however, the conduct described in the criminal Informations herein to which the individual Defendants pled guilty not only occurred in the United States, but occurred within the very same industry and involved the very same actors.

The guilty Defendants' admissions herein are the rare type of direct evidence of a Sherman Act violation that often is impossible to obtain.  *See Toledo Mack Sales & Service v. Mack Trucks*, 530 F.3d 204, 220 n.10 (3d Cir. 2008) ("'[I]n direct evidence cases, the plaintiff need not adduce circumstantial evidence that tends to exclude the possibility that the alleged conspirators acted independently, and there need not be an inquiry into the plausibility of the Defendants' claim or the rationality of Defendants' economic motives.  This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate.'"); *Tunica Web Advertising v. Tunica Casino Operators*, 496 F.3d 403, 411 n.11 (5th Cir. 2007) (direct evidence of agreement necessarily tends to exclude the possibility of independent action).  Thus, Defendants' reliance on *Elevator Antitrust* is misplaced.[17]

---

include specific allegations regarding why defendants' actions were inconsistent with independent competitive behavior.  (SCAC, ¶¶ 109-130.)

[17]  Horizon's and Trailer Bridge's further reliance on *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487 (D. Conn. 2008) is also misplaced.  That case is distinguishable because the guilty pleas in *In re Parcel Tanker* related to criminal conspiracy charges involving an entirely different market than that which was the subject of the civil complaint.  In contrast, the guilty pleas enumerated in the Complaint here relate to a conspiracy that affected the same Puerto Rico cabotage market.  Also, unlike the complaint in that case, the Complaint here contains more than general allegations of conspiracy, offers plausible grounds and enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made.

**C.     Plaintiffs' Allegations Demonstrate The Plausibility Of A Preceding Agreement Even Absent The Guilty Pleas.**

**1.     Plaintiffs' Detailed Allegations About the Puerto Rican Cabotage Market Strongly Support the Inference of Conspiracy.**

Defendants argue that plaintiffs' allegations are mere statements of parallel conduct and are insufficient to state a claim under *Twombly*.   As the preceding section conclusively demonstrates, incorporation of Defendants' guilty pleas provide powerful allegations and materially distinguish this case from a case, like *Twombly*, premised on mere parallel conduct. However, even ignoring the guilty pleas, Plaintiffs' remaining allegations standing alone would be sufficient to withstand a *Twombly* challenge.

Since *Twombly*, motions to dismiss in antitrust cases not involving guilty pleas have survived motions to dismiss where plaintiffs have pled sufficient factual detail about market and pricing behavior to make the claimed conspiracy plausible.  *See, e.g., OSB*, 2007 WL 2253419 at *3 (pleading of market concentration, general supply restrictions in furtherance of alleged conspiracy, intercompetitor communications followed by parallel conduct and use of a trade publication to signal anticompetitive practices).   As detailed above, the price fixing conspiracy alleged herein is a standard type of conspiracy that is the subject of antitrust litigation.  *See, e.g., United States v. United States Gypsum Co.*, 438 U.S. 422, 457 (1978) ("Especially in oligopolistic industries . . . , the exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions.").

The Complaint alleges unusual market behavior that resulted in historically unprecedented pricing for Puerto Rican cabotage and is highly suggestive of cartel operation. Prior to May 2002, before the conspiracy began, excess supply of space on cargo ships had led to

declining freight rates despite increasing demand.  (SCAC at ¶¶ 110-112.)  From May 2002 to April 2008, however, while the capacity in the market remained essentially flat, rates surcharges and fees increased drastically and simultaneously across the Defendant carriers.  (SCAC, ¶ 113.)  In fact, those drastic and uniform rate, fee and surcharge hikes were even implemented during 2006 and 2007, when an economic downturn and recession weakened demand for shipping services and increased overcapacity in the industry.  (SCAC, ¶ 114.)  Throughout the conspiracy period, numerous and various surcharges and fees were imposed virtually simultaneously and often in exactly the same increments by all Defendants.[18]  (SCAC, ¶¶ 117-132.)  These fees and surcharges, whether under the guise of "bunker fuel surcharges," "security fees" or "terminal handling charges," were not cost justified.  *Id.*  Competitive markets are not expected to behave this way and the pricing during the conspiracy marked an unprecedented historical shift.

Throughout the Class period, while enjoying the profits of their drastic and uniform run-up in fees and charges, Defendants were also meeting and collaborating regularly.  For example, Defendants agreed to carry each other's shipping containers when demand outstripped one Defendant shipping line's capacity.  (SCAC, ¶ 115.)  These agreements permitted Defendants to avoid bidding against each other.  *Id.*  For example, before Navieras filed its bankruptcy petition, it had provided shipping services out of ports in Houston, Texas and Elizabeth, New Jersey.  (SCAC, ¶ 116).  After Sea Star acquired Navieras's vessels in Navieras's bankruptcy proceeding, Sea Star discontinued the service out of Houston and Elizabeth.  Instead, Sea Star agreed to ship containers on its fellow Defendant Horizon's vessels out of those two ports.  *Id.*

---

[18]   Defendants had ready access to industry data that facilitated efficiently monitoring the conspiracy.  The Port Import Export Reporting Service ("PIERS") collects and distributes, for a fee, data for the maritime industry, including container size and quantity, cargo quantity and unit of measure, and cargo weight and volume.  This type of information allowed defendants to monitor their conspiracy and to verify that it was working.  (SCAC, ¶ 130.)

Defendants also each participated in trade association activities that fostered the conspiracy.  Horizon, Sea Star, Crowley and Trailer Bridge have all been members of the Maritime Cabotage Task Force ("MCTF"), which was founded on September 27, 1995, to protect the U.S. maritime cabotage laws.  The MCTF's Board of Directors has included Chuck Raymond and Robert Zuckerman of Horizon and Michael Roberts of Crowley.  (SCAC, ¶ 129.)[19]

The aforementioned market behavior all occurred in the context of a highly concentrated market, *see* SCAC, ¶¶ 53-57, with fungible services and high barriers to entry, *see id.* ¶¶ 58, 60. In such a market, an inference of conspiracy is generally more plausible and is certainly plausible here.[20]

### 2. Courts have Recognized that Market Behavior Analogous to the Puerto Rican Cabotage Market Behavior Supports an Inference of Conspiracy, Even Absent Guilty Pleas.

Defendants' collusion prevented price declines and caused prices to rise roughly in unison during periods where market forces should have yielded a different result.  Such a pattern, coupled with exchanges of price information, is indicative of collusion, even after *Twombly*. *See, e.g., Hyland v. Homeservices of Am., Inc.*, No. 05-612 2007 U.S. Dist. LEXIS 65731, at *9-10 (W.D. Ky. Aug. 17, 2007) (finding that an antitrust Complaint alleging several facts including

---

[19]  Participation in trade associations is relevant to the *Twombly* analysis because "such participation demonstrates how and when Defendants had opportunities to exchange information or make agreements." *SRAM*, 580 F. Supp. 2d at 903; *see OSB Antitrust Litig.,* 2008 WL 426522 at *6 (considering allegations of "price–fixing discussions during industry events" in denying motion to dismiss); *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (meetings are not inherently unlawful, they have the potential to enhance the anticompetitive effects).

[20]  *See SRAM,* 580 F. Supp. 2d at 902 (denying a motion to dismiss Sherman Act claims on the basis of *Twombly* after noting that market that was the subject of that litigation involved "a homogenous product sold by Defendants and purchased by Plaintiffs and members of the class primarily on the basis of price. The [ ] market is highly concentrated with Defendants accounting for a large portion of all [ ] sales in the United States [and is] subject to high manufacturing and technological barriers to entry."); *Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 741 (E.D. Pa. 2007) (denying a motion to dismiss based on *Twombly* after considering several allegations including those related to market structure and entry); *see also  In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. Ill. 2002) ("[T]he fact that market shares did not fluctuate significantly during the period of the alleged [ ] conspiracy may indicate that the sellers had agreed tacitly or otherwise to share the sales opportunities created by the growth in demand.")

"enforcement actions brought by the Department of Justice; alleged admissions of price-fixing by [the Defendants' employees]; an exchange of price-information and catalogues between the parties; price increases while the Defendants' costs and non-real estate broker fees declined" were enough to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." (citing *Twombly*)).

Another recent example of this judicial trend is the district court's opinion in *Moundridge*. In that case, the court held that circumstantial allegations of a price fixing agreement in the natural gas market stated a claim:

> [The Complaint] alleges that the natural gas total resource base had not decreased, that the prices had risen and never fallen below an agreed-upon price, that the Defendants had reported high profits, . . . and that Hurricanes Katrina and Rita should not have affected the market as the Defendants claimed and they were only a pretextual reason to justify withholding market supply to create an artificial shortage.

*Moundridge*, 2008 WL 426522 at *3. In that case, the court rejected Defendants' argument that these allegations were not inconsistent with conscious parallelism: "it is always in a company's interest . . . to increase its profits." *Id*. That court interpreted *Twombly* to mean that a plaintiffs' burden at the pleading stage, consistent with traditional expectations, was less than at summary judgment. *Id*. Thus, the court held that a Complaint's allegations need not "exclude that possibility of independent business action." *Id*. at *4. Such a requirement "would be counter to Rule 8's requirement of a short, plain statement with 'enough heft to show that the pleader is entitled to relief.' *Id*. The court in that case also held that, at the pleading stage, "all inferences are construed in favor of the plaintiffs and, while the claim may rest ultimately on a thin factual reed, the plaintiffs have alleged supporting circumstantial facts and placed their claims 'in a

context that raises a suggestion of a preceding agreement, 'nudging their claims across the line from conceivable to plausible.'" *Id*.

Another way in which plaintiffs have satisfied the requirements of *Twombly* is by alleging parallel conduct that represents a break with past industry practices. *See Twombly*, 127 S. Ct. at 1966 n.4 ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy.") (internal quotations omitted).  Thus, a "marked change in Defendants' behavior around the time the conspiracy allegedly started" renders plaintiffs' conspiracy allegations plausible. *In re Graphics Processing Units Antitrust Litig*., 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007) ("*GPUs II*") ("Taken as true, plaintiffs' allegations show that there was a marked change in Defendants' behavior in the market around the time the conspiracy allegedly started. . . .   Accordingly, direct-purchaser plaintiffs have pleaded allegations that if true would make an antitrust conspiracy plausible.").[21]

In *GPU II*, the court held that allegations of historically unprecedented changes in industry pricing and practices beginning at about the same time as the conspiracy allegedly began were sufficient to establish the plausibility of a price-fixing conspiracy under *Twombly*. Before the conspiracy in *GPU II*, the Defendants had vigorously competed for market share by bringing new products to the market as soon as possible and undercutting one another's prices. 540 F. Supp. 2d at 1089, 1092-93.  After the conspiracy began, the Defendants slowed the pace

---

[21]  *See also Fair Isaac Corp.*, 2008 WL 623120, at *6 ("In the instant case, the Second Amended Complaint alleges a close temporal proximity between the Credit Bureaus' agreement to jointly create, own, and control VantageScore, and the beginning of the alleged parallel price manipulation and denial of access to the Credit Bureau's data."); *In re Western States Wholesale Natural Gas Antitrust Litig*., MDL No. 1566, slip op. at 6 ("Plaintiffs allege a historically unprecedented change in natural gas prices as the result of widespread false reporting of trade information made by multiple competitors during the same time period in the natural gas industry for no discernible reason other than conspiracy.  This factual pattern is precisely the type of context *Twombly* recognized as supporting a plausible suggestion of agreement.").

at which they released products and began to release products at nearly the same times and at the same prices. *Id*. The court held that these allegations showed a marked change in industry behavior around the time that the plaintiffs alleged the conspiracy began and that this supported a plausible inference of conspiracy. *Id.* at 1092, 1094.

Here, as in *GPU II*, the Complaint includes detailed allegations of sudden and historically unprecedented changes in industry pricing and practices at the time the conspiracy began. In a radical departure from prior industry practice, the Defendants began actively to impose uniform rates and fuel and other surcharges. (SCAC, ¶¶ 109-132.) And Defendants' success in raising their base rates and surcharges significantly above the actual cost of fuel and terminal handling and security fee increases during the Class Period was in marked contrast to what had occurred before the Class Period, where fuel, terminal handling, and security surcharges were only intermittently imposed by Defendants or were not imposed at all. (SCAC, ¶¶ 127-128.)

This case, unlike *Twombly*, is not some arcane market allocation case resting on parallel conduct that was permitted by prior federal regulation. Instead, as the Seventh Circuit said in *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002), *cert. denied sub nom. Archer Daniels Midland Co. v. Dellwood Farms, Inc.*, 537 U.S. 1188 (2003) ("*High Fructose*"), "the charge in this case involves no implausibility. The charge is of a garden-variety price-fixing conspiracy…." Or, as the Third Circuit made clear in *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004), *cert. denied sub nom PPG Indus., Inc. v. Nelson*, 544 U.S. 948 (2005) ("*Flat Glass*"), "plaintiffs' theory of conspiracy--an agreement among oligopolists to fix prices at a supracompetitive level--makes perfect economic sense. In

addition, absent increases in marginal cost or demand, raising prices generally does not approximate--and cannot be mistaken as--competitive conduct."[22]

### 3. Defendants' Attempt to Offer an Alternative Parallel Pricing Justification for the Market Behavior here is Unavailing.

Defendants seek to brush aside these allegations by arguing that their sudden success in implementing virtually simultaneous and identical rate increases, fuel surcharges and other fees could have resulted from increased concentration in the market for Puerto Rican cabotage.  This argument is pure speculation, flies in the face of the parallel government proceedings and guilty pleas, and does not support dismissal of the Complaint.  *See Moundridge*, 2008 WL 426522 at *4 (a Complaint's allegations need not "exclude that possibility of independent business action").  Numerous courts have recognized that increased market concentration is a condition that facilitates price-fixing conspiracies, and is therefore a factor to be considered *against* dismissal of a Complaint.  *See e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03 MDL 1556, 2008 WL 2563358, at *10 (M.D. Pa. June 24, 2008) (an agreement to fix prices at supracompetitive levels makes perfect sense where highly concentrated market conditions "support an inference that collusive conduct was both plausible and in [Defendants'] economic interest"); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 172 (E.D. Pa. 2007) (market concentration one fact that "lends credence to plaintiffs' allegations by demonstrating that the hydrogen peroxide industry is susceptible to a price-fixing conspiracy of the sort alleged here.").

---

[22]  For other examples, *see, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir.), *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets*, 510 U.S. 994 (1993) (market allocation conspiracy intended to drive up prices was plausible); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 435, 446-48 (9th Cir. 1990), *cert. denied sub nom. Chevron U.S.A., Inc. v. State of Ariz.*, 500 U.S. 959 (1991) ("*Petroleum Products*") (price-fixing conspiracy could plausibly be inferred from parallel pricing conduct by a few competitors in a concentrated market, where rivals signaled their pricing moves to each other).

While Defendants in any conspiracy case can point to details missing from the complaint, Defendants here cannot seriously contend that they are not "on notice" of the Sherman Act violations of which they stand accused.  The Complaint more than adequately explains the conduct, participants and timeframe at issue and these same Defendants are busy defending criminal investigations regarding these same acts.  This is ultimately the test of a complaint's sufficiency.  *See Carana*, 2009 U.S. Dist. LEXIS 8660, at *6 (referring to *Twombly* and stating that "Under our liberal pleading standards, a plaintiff must set forth a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R. Civ. P. 8(a)(2), and need only give the respondent fair notice of the nature of the claim and petitioner's basis for it.").

Moreover, while Defendants in any civil antitrust conspiracy case may compartmentalize plaintiffs' claims and attempt to offer alternative explanations for observable market behaviors during the relevant period, these Defendants cannot seriously contend that the allegations of conspiracy are unsupported.  As detailed at length above, the existing guilty pleas and continuing criminal investigation eviscerate any contention that plaintiffs' allegations of a Puerto Rican cabotage cartel is somehow implausible.

**D.      Defendants' Guilty Pleas Coupled With Plaintiffs' Circumstantial Allegations "As A Whole" Are Overwhelming.**

As detailed above, Plaintiffs' allegations regarding the Puerto Rican cabotage market provide a strong inference of cartel behavior which, standing alone, would be sufficient to defeat the pending motions to dismiss.  Those allegations, however, cannot be separated from the allegations that key employees of each of the Defendant corporations have pled guilty to a wide-ranging antitrust conspiracy involving the same market and actors at the same time as the civil complaint at issue. *See Cont'l Ore Co.*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by

33

looking at it as a whole.") (quoting *U.S. v. Patten*, 226 U.S. 525, 544 (1913).   When the circumstantial evidence of collusive market behavior is considered in conjunction with the direct evidence of conspiracy arising from the guilty pleas in the criminal case, the conspiracy alleged in the Complaint is not merely "plausible," but is essentially certain.

Despite the above, Defendants argue that even more is required; that the complaint must allege specific facts about the "who, what, when, where and how" of the alleged conspiracy. *See*, *e.g.*, Trailer Bridge Mem. at 6; Horizon Mem. at 18-21; Crowley Mem. at 23-24. Defendants' argument has no merit and, as in other jurisdictions, should be rejected.

In *Southeastern Milk Antitrust Litig.*, Defendants argued, as they do here, that plaintiffs' complaint failed to plead sufficient facts that Defendants engaged in an antitrust conspiracy. The court rejected that argument, holding that specific allegations of the "who, what, when and where" of an alleged conspiracy need not be pled under *Twombly*:

> These complaints, while not answering all specific questions about "who, what, when and where," do put Defendants on notice concerning the basic nature of their complaints against the Defendants and the grounds upon which their claims exist.  While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the Defendants, *i.e.*, that there is a legitimate business justification for each of the acts, **a view of the complaint <u>as a whole</u>, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under §1 of the Sherman Act. . . .**

555 F. Supp. 2d at 943 (emphasis added).[23]   The Court further observed:

---

[23]   Moving defendants cite *In re Graphics Processing Units Antitrust Litig.*, 527 F Supp. 2d 1011, 1024 (N.D. Cal. 2007) ("*GPUs I*"), for the proposition that the mere existence of a Government investigation does not raise the inferences that are needed to sufficiently allege an antitrust claim.  *See*, *e.g.*, Sea Star Mem. at 15 (citing *Graphics*, 527 F. Supp. 2d at 1024 ("The [DOJ] investigation . . . carries no weight in pleading an antitrust conspiracy claim. It is unknown whether the investigation will result in indictments or nothing at all.")).  *See also* Crowley Mem. at 23 and Trailer Bridge Mem. at 6.    The Complaint here, however, alleges much more than a Government investigation, including that certain defendants pled guilty to violating federal antitrust laws for the same wrongful conduct at issue in this case.

> The level of factual pleading [Defendants] seek, however, could rarely, if ever, be met by a plaintiff in an antitrust case before discovery. While *Twombly* certainly requires of plaintiffs a degree of pleading that may not be required in other cases, it was not intended as a shield to be used by antitrust Defendants to defeat even a meritorious claim. Arguing that plaintiffs have not pleaded sufficient facts appears to have become the mantra of Defendants in antitrust cases.

555 F. Supp. 2d at 948 n.7. Recognizing that the existence of the alleged conspiracy could not be decided on the pleadings alone, the court in *Southeastern Milk* found that the complaint contained sufficient facts under Rule 8(a)(2) of the Federal Rules of Civil Procedure and *Twombly*. *See also In re Rail Freight Fuel Surcharge Antitrust Litig.*, __ F. Supp. 2d ___, 2008 WL 4831214, *4 n.4 (D.D.C. Nov. 7, 2008) (noting that *Twombly* did not change the principle that antitrust allegations cannot be compartmentalized and considered in isolation).[24]

Similarly, in *In re OSB Antitrust Litig.*, 2007 WL 2253419, on allegations *less specific* than those here, the court stated:

> Plaintiffs have made specific factual allegations of Defendants' wrongdoing – including actions in furtherance of the conspiracy, Defendants' purported motive, the approximate time and manner of their agreement, and the mechanism by which Defendants fixed prices. *Twombly requires no more.*

Id. at *1 (emphasis added).[25]

---

[24]   Indeed, while not required to make out their claims, the Complaint in fact alleges: (1) **who** engaged in what anticompetitive conduct (including the specific companies' concerted actions at particular times, which companies were under government investigation and the names of specific executives and employees who pled guilty to criminal charges stating that they had engaged in a combination and conspiracy to suppress and eliminate competition in the market for Puerto Rican cabotage in violation of Sections 1 and 3 of the Sherman Act) (SCAC, ¶¶ 74, 77, 80, 85, 91); (2) **what** illegal steps defendants took in furtherance of the conspiracy (SCAC, ¶¶ 95-132; (3) **when** the unlawful conduct took place, including specific dates, as well as the timing of defendants' actions. (SCAC, ¶¶ 137-146); (4) **where** conspiratorial meetings occurred (e.g. trade association meetings through the Maritime Cabotage Task Force ("MCTF")) (SCAC, ¶ 129); and (6) **how** the unlawful concerted conduct was carried out (the specific steps taken by defendants to implement their conspiracy) (SCAC, ¶¶ 109-132, 137-146). There can be little question that these facts provide sufficient detail at the motion to dismiss phase.

[25]   *See also City of Moundridge*, 2008 WL 1735856, at *3 (applying *Twombly* and finding that identification of "years and locations where the agreement was reached and the defendants who participated" was sufficient to support conspiracy allegations); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, Civ. Action No. 05-6792, 2008 WL 2120493 (E.D. Pa. May 20, 2008); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934; *Fair Isaac Corp.*,

While the Complaint in the present case, like that in *Southeastern Milk* and *In re OSB* may not answer each and every question about the alleged conspiracy, it undisputedly contains "sufficient factual detail" to give the Defendant "fair notice" of the claim and the grounds upon which it rests. *Twombly,* 127 S. Ct. at 1973 n.14 (retaining Rule 8(a) pleading standard and refusing to apply the heightened pleading standard of Rule 9(b)). *Twombly* requires no more.

In their separate motions to dismiss, Defendants Horizon, Trailer Bridge, and Crowley also contend that the Complaint herein should set forth specific facts as to each Defendant's role in the conspiracy. *See* Horizon Mem. at 6-7, Trailer Bridge Mem. at 20-21, Crowley Mem. at 14. Similar arguments have been squarely rejected by numerous courts. For example, *In re OSB Antitrust Litigation*, Master File No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007), one of the Defendants argued that the Complaint did not plausibly state a claim as to that Defendant because it mentioned the Defendant in only "one lone paragraph." The Court rejected this argument:

> **Antitrust conspiracy allegations need not be detailed Defendant by Defendant.** *See In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (district court should not "compartmentalize" a conspiracy claim by conducting "a seriatim examination of the claims against each of five conspiracy Defendants as if they were separate lawsuits") (citing *Continental Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99, 82 S. Ct. 1404, 8 L.Ed.2d 777 (1962)). **Rather, an antitrust complaint should be viewed as a whole, and the plaintiff must allege that each individual Defendant joined the conspiracy and played some role in it.** *See Jung v. Ass'n of American Medical Colleges*, 300 F. Supp.2d 119, 164 n.27 (D.D.C. 2004) (plaintiff must plead that "an individual Defendant was a participant in the conspiracy in the first instance," but "need not allege overt acts committed by each Defendant in furtherance of a conspiracy") (citing *In re Vitamins Antitrust Litig.*, 2000 WL

---

2008 WL 623120; *Beach v. Atlas Van Lines,* Civ. Action No. 2:07-764-CWH (D.S.C. Mar. 31, 2008) (order denying motion to dismiss); *In re Western States*, MDL No. 1566, slip op. (D. Nev. Feb. 19, 2008); *In re Graphics Processing Units Antitrust Litigation*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007); *Hyland*, 2007 WL 2407233; *Behrend*, 532 F. Supp. 2d 735; *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959224

1475705 (D.D.C. 2000)).  *See also Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp.2d 262, 278 (D. Conn. 2003) (on motion to dismiss, district court must view plaintiff's complaint as a whole).

Plaintiffs have satisfied this requirement: they have alleged that each Defendant, including Grant, joined the conspiracy and committed acts in furtherance of it.  *See Direct Purchaser Pl. Second Amended Compl. ¶ 3-4, 21A, 22, 66, 80.* Accordingly, Plaintiffs have provided Grant with reasonable notice of their allegations, and have stated a plausible claim for relief against Grant. *See In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp.2d 303, 313-314 (D.N.J. 2001) (plaintiff must allege sufficient facts to provide Defendant notice of nature and reasonable basis for the claims against it).

*Id.* at *5-6 (emphasis added).

Here, as in *OSB*, plaintiffs have satisfied *Twombly*'s pleading standard by alleging that each Defendant was part of the same antitrust conspiracy and that all of the Defendants committed acts in furtherance of that conspiracy.  *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003) (plaintiffs not required to "specify individual acts of each Defendant" where the complaint identified the co-conspirators and described nature and effect of conspiracy).  *See also Jung v. Ass'n of American Medical Colleges,* 300 F.Supp.2d 119, 164 n. 27 (D.D.C.2004) (plaintiff must plead that "an individual Defendant was a participant in the conspiracy in the first instance," but "need not allege overt acts committed by each Defendant in furtherance of a conspiracy") (citing *In re Vitamins Antitrust Litig.,* 2000 WL 1475705 (D.D.C.2000)).[26]  Nor are plaintiffs required to

---

[26]  *See also In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("[p]laintiffs have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation."); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) ("The short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy" and whether "a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator"); *See In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982) (district court should not "compartmentalize" a conspiracy claim by conducting "a seriatim examination of the claims against each of five conspiracy defendants as if they were separate lawsuits")

specify which Defendants led or participated in the various overt actions in furtherance of the conspiracy, or at what exact times these actions occurred, as long as they have sufficiently pled each Defendant's involvement. *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ("An overt act need not be pleaded against each Defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits.") (*quoting In re Nasdaq Mkt. Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995)).

As the Third Circuit noted in *Flat Glass*, 385 F.3d at 363, "[i]f six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also party to the agreement. That is especially so if the sister firm's behavior mirrored that of the five conceded coconspirators." Accordingly, the fact that the Complaint does not restate each allegation against a particular Defendant by name does not entitle that Defendant to dismissal.

The Defendants in *SRAM*, like Defendants Horizon, Trailer Bridge and Crowley in this case, argued that allegations against particular Defendants in the antitrust complaint were insufficient. The court in *SRAM*, however, rejected that argument as one applying only to summary judgment:

> Defendants . . . argue that, even if Plaintiffs' overall allegations are sufficient to survive a motion to dismiss, the complaint should be dismissed because Plaintiffs have failed to allege how each individual Defendant participated in the alleged conspiracy. . . .
>
> Defendants' arguments fail because they rely upon the standard for a motion for summary judgment. Although Plaintiffs will need to

---

(citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698-99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

> provide evidence of each Defendants' participation in any conspiracy, they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.

580 F. Supp. 2d at 903-904.  Plaintiffs in the instant action have included allegations that do more than "plausibly suggest" that Defendants participated in an alleged conspiracy.  Rather, plaintiffs have specifically alleged that individual Defendants Baci, Gill, Serra and Glova pled guilty to participating in the very same conspiracy that is alleged in the Complaint.  (SCAC, ¶¶ 74, 77, 80, 85.)   Furthermore, Plaintiffs alleged that one of the main contributors to the government's investigation, Baci, has already implicated **all** of the Defendants companies in his Sentencing Memorandum. (SCAC, ¶¶ 88-89.)

The crux of the circumstantial allegations against Defendants here involve the period from May 2002 through April 2008.  The allegations identify increased rates, surcharges and other fees that Defendants imposed roughly simultaneously and uniformly despite market conditions that would not normally support such increases and had not historically supported such pricing.  Plaintiffs also allege that Defendants met regularly during that period to discuss the Puerto Rican cabotage market. In their guilty pleas, Defendants Baci, Gill, Glova and Cerra each admitted to participating in an extensive conspiracy to suppress and eliminate competition for Puerto Rican freight services.  (SCAC, ¶¶ 75, 76, 78, 79, 81, 82, 86, 87.)  They publicly acknowledged that they agreed to fix the prices of rates, surcharges and other fees charged to customers from at least as early as May 2002 and until at least April 2008.  *Id.*  They also admitted to concealing the conspiracy from their customers. *Id.*  Nothing could more directly establish the plausibility of plaintiffs' circumstantial allegations of conspiracy than the corporate Defendants' key officers' admissions under oath that the observed market behaviors resulted from a secret conspiracy to fix prices rather than legitimate competition.

39

When plaintiffs' circumstantial allegations are considered in conjunction with certain individual Defendants' guilty pleas to the very same federal antitrust violations alleged in the Complaint, the Defendants lose all credibility in challenging the plausibility of plaintiffs' antitrust conspiracy allegations as a whole.  Defendants' motions to dismiss should therefore be denied outright.

**WHEREFORE,** for the reasons set forth above, Plaintiffs respectfully request this Honorable Court to deny Defendants' motions to dismiss.

**I HEREBY CERTIFY** that today I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which, on information and belief, shall automatically notify counsel of record, and which pursuant to Local Civil Rule 5.1(b)(2), constitutes the equivalent service.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 23rd day of February, 2009.

/s/ John Nevares & Associates, PSC
John F. Nevares (PR 130502)
P.O. Box 13667
San Juan, Puerto Rico 00908-3667
Tel. (787) 793-4906
Fax (787) 721-8820
Email: jfnevares@nevareslaw.com.

***Liaison Counsel for Plaintiffs***

/s/Néstor M. Méndez-Gómez
**Pietrantoni Méndez & Alvarez LLP**
Banco Popular Center, 19th Floor
209 Muñoz Rivera Ave.
San Juan, PR 00918
Tel: (787) 274-1212
Fax: (787) 274-1470
nmendez@pmalaw.com

/s/Camilo K. Salas, III
**Salas & Co., L.C.**

40

650 Pydras, Suite 1650
New Orleans, LA 70130
(Orleans Parish)
Tel: (504) 799-3080
Fax: (504) 799-3085
csalas@salaslaw.com

/s/Linda P. Nussbaum
**Kaplan Fox & Kilsheimer, LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (2120 687-7714
lnussbaum@kaplanfox.com

/s/Vincent J. Esades
**Heins Mills & Olson, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com

/s/Hollis Salzman
**Labaton Sucharow, LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
hsalzman@labaton.com

/s/Joe R. Whatley Jr.
**Whatley Drake & Kallas, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com

41

/s/Daniel E. Becnel, Jr.
**Becnel Law Firm, LLC**
106 W. Seventh St.
P.O. Box Drawer H
Reserve, LA 70084
Tel: (985) 535-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

***Lead Class Counsel***