**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

|  |  |  |
|---|---|---|
| IN RE: PUERTO RICAN CABOTAGE ANTITRUST LITIGATION | ) ) ) ) ) ) | **Master Docket  No. 08-md-1960 (DRD)** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH HORIZON DEFENDANTS, CERTIFICATION OF SETTLEMENT CLASS, AUTHORIZATION TO DISSEMINATE CLASS NOTICE, AND STAY OF PROCEEDINGS AGAINST THE RELEASED DEFENDANTS, AND MEMORANDUM IN SUPPORT THEREOF**

**TO THE HONORABLE COURT:**

Pursuant to Federal Rule of Civil Procedure 23(a) and (e), Plaintiffs respectfully move the Court, on behalf of themselves and the other members of a proposed settlement class (the "Settlement Class" or "Class"), for entry of an order granting preliminary approval of a proposed Settlement (the "Settlement") between Plaintiffs and Defendants Horizon Lines, Inc., Horizon Lines, LLC ("Horizon Lines"), Horizon Logistics Holdings, LLC, Horizon Logistics, LLC, and Horizon Lines of Puerto Rico, Inc. (collectively, the "Horizon Defendants").[1]  Additionally, to advance the Settlement toward final approval, Plaintiffs' motion asks the Court to:

(i)      conditionally certify the proposed Settlement Class;

(ii)     approve the form and manner of giving notice of the Settlement to the Class members;

---

[1] All capitalized terms not defined herein are intended to have the same meaning as set forth in the Settlement Agreement, which is attached hereto as Attachment A.

(iii)    authorize payment from the Horizon Settlement Fund of (1) expenses related to providing notice to the Settlement Class members; (2) taxes, estimated taxes, and tax-related expenses; (3) escrow and other bank fees; and (4) other settlement administration expenses necessarily incurred before the Court determines whether to grant final approval of the Settlement;

(iv)    preliminarily approve the proposed Plan of Distribution;

(v)    schedule a hearing (the "Fairness Hearing") at which the Court will consider granting final approval of the Settlement and proposed plan of distribution as fair, reasonable and adequate; and

(vi)    set deadlines for accomplishing other steps in the settlement-approval process.

Finally, in accordance with the parties' Settlement Agreement, Plaintiffs move for a stay of proceedings against the Horizon Defendants and three of their former employees, Defendants Gabriel Serra ("Serra"), R. Kevin Gill ("Gill"), and Gregory Glova ("Glova"), who would be released under the settlement (collectively, the "Released Defendants").

Accompanying this motion is a proposed order providing the relief Plaintiffs seek (the "Proposed Preliminary Approval Order").  In support of their motion, Plaintiffs submit the following memorandum and the accompanying declaration of Cameron R. Azari, Plaintiffs' settlement administration expert, regarding class notice.

## INTRODUCTION

The terms of the proposed Settlement, discussed in further detail below, are memorialized in a settlement agreement between Plaintiffs and the Horizon Defendants, dated June 11, 2009,

attached to this memorandum as Attachment A (the "Settlement Agreement").[2]  The Settlement Agreement provides, *inter alia*, that the Horizon Defendants will (1) make cash payments totaling $20,000,000; (2) offer Class members the option of freezing for two years the base rates of any shipping contracts they have with the Horizon Defendants on the Effective Date of the Settlement; and (3) cooperate with Plaintiffs in litigating their claims against the remaining Defendants.  In return, Plaintiffs and the other Settlement Class members will release their claims against the Released Defendants.

The Settlement does not include Sea Star Line, LLC ("Sea Star"), Peter Baci ("Baci"), Alexander G. Chisholm ("Chisolm"), Crowley Maritime Corporation and Crowley Liner Services, Inc. (collectively, "Crowley"), Trailer Bridge, Inc. ("Trailer Bridge"), Saltchuk Resources, Inc. ("Saltchuk"), and Leonard Shapiro ("Shapiro") (collectively, the "Non-Settling Defendants").  Aided by the extensive cooperation that the Released Defendants must provide to fulfill their obligations under the Settlement Agreement, Plaintiffs will continue to vigorously prosecute their claims against the Non-Settling Defendants.

The proposed Settlement is in the best interests of the Settlement Class and lies squarely within the "range of possible approval," which is the standard for preliminary approval of a class-action settlement.  Accordingly, the Class members should be informed of the terms of the proposed Settlement and their right to object or exclude themselves from the Class.  To do so, Plaintiffs propose both mailed and published notice.  Once the Class members have had an opportunity to object or opt out, the Court would conduct the Fairness Hearing to consider whether to grant final approval of the Settlement under Rule 23(e)(2).

---

[2] The exhibits to the Settlement Agreement are not attached to this memorandum.  After executing the Settlement Agreement, Plaintiffs and the Horizon Defendants agreed to make some revisions to the exhibits.  The other attachments to this memorandum, discussed below, reflect these revisions.

Additionally, Plaintiffs seek conditional certification of the Settlement Class under Rule 23(b)(3), solely for purposes of effectuating the Settlement.  Certifying the Class will not prejudice in any way the rights of the Non-Settling Defendants, who will remain free to oppose certification of a class with respect to Plaintiffs' claims against them.

Finally, in accordance with the Settlement Agreement, Plaintiffs move for an immediate stay of all proceedings in this action against the Released Defendants.

## I.    PROCEDURAL BACKGROUND

### A.    <u>Background of Litigation</u>

This consolidated class action originated with the filing of a number of separate federal antitrust actions in several judicial districts, including the District of Puerto Rico, each alleging that Defendants conspired to fix prices for shipping services in the noncontiguous ocean trade between the continental United States and Puerto Rico ("Puerto Rican Cabotage") in violation of the antitrust laws.  On August 13, 2008, the Judicial Panel on Multidistrict Litigation transferred the actions pending in other districts to this District for coordinated or consolidated pre-trial proceedings (and has since transferred other subsequently filed actions).  On November 18, 2008, this Court ordered consolidation of the actions (Docket Nos. 167, 168), and on December 5, 2008, Plaintiffs filed the First Consolidated Amended Class Action Complaint (Docket No. 173).

By Order dated December 12, 2008 (Docket No. 190), the Court stayed all pretrial discovery proceedings until an Initial Scheduling Conference (the "ISC") to take place on February 3, 2009.  On January 20, 2009, the Horizon Defendants and three of the Non-Settling Defendants (Sea Star, Crowley, and Trailer Bridge) brought separate Rule 12(b)(6) motions to dismiss the complaint.  Three days later, on January 23, 2009, these Defendants filed a joint

motion to stay discovery pending disposition of their pending motions to dismiss. The ISC was held on February 3, 2009, at which time the Court granted a motion of the United States to intervene (Docket No. 259) and stayed discovery until the Court ruled on any motions to dismiss a second amended complaint to be filed by Plaintiffs. In accordance with deadlines prescribed at the ISC, Plaintiffs moved on February 9, 2009 for leave to amend their complaint (Docket No. 269), which the Court granted on February 11, 2009. (Docket No. 274.)

On February 23, 2009, Plaintiffs filed a Second Consolidated Amended Class Action Complaint (the "Complaint" or "SCAC").[3] (Docket No. 276.) The Complaint alleges that, beginning no later than May 2002 and continuing until at least April 2008, Defendants and their co-conspirators engaged in a conspiracy to suppress competition in the Puerto Rican Cabotage market by agreeing to allocate customers, rig bids to customers, and fix the prices of rates, surcharges and other fees charged to customers, in violation of the Sherman Act and Puerto Rico Statutes Title 10 Section 258.

As the Complaint further alleges, five of the six individual Defendants—including the three individual Released Defendants, Gill, Serra and Glova—have pled guilty to criminal charges arising from an ongoing investigation by the Department of Justice ("DOJ"). (SCAC ¶ 5.) Gill and Serra entered guilty pleas to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." (DOJ Press Release dated October 1, 2008, Ex. 2 to

---

[3] The class representatives are CC1 Limited Partnership, Horizon International Shipping, Inc., Linde Gas Puerto Rico, Inc., Rona Distributors, Inc., Ferrmax, Inc., and La Rosa del Monte Express Inc.

SCAC.)  Glova entered a plea to similar charges while representing that he did not join the conspiracy until about December 2005.  (SCAC ¶ 6.)

On March 10, 2009, Trailer Bridge, the Horizon Defendants, Crowley, and Sea Star moved separately to dismiss the Complaint for failure to state a claim.  (Docket Nos. 285, 287, 291 and 292, respectively.)  Since then, Gill and Serra have filed their own motions to dismiss (Docket Nos. 300 and 302, respectively), and Chisholm, Glova, Shapiro and Saltchuk have joined the motions to dismiss of one or more of the other Defendants (Docket Nos. 333, 336, 362 and 363, respectively).  On April 14, 2009, Plaintiffs moved to lift the stay of discovery. (Docket No. 331.)

 **B.** <u>**Settlement Negotiations**</u>

The Settlement occurred after eight months of intense arm's-length negotiations between Interim Co-Lead Counsel for the Class and counsel for the Horizon Defendants.  Throughout the discussions, the Horizon Defendants vigorously challenged the Complaint, disputed the damages claimed by Plaintiffs, and contended that there were significant limitations upon their ability to pay a substantial amount to settle.  Interim Co-Lead Counsel zealously advocated for the most favorable settlement terms for the Settlement Class in light of all of the relevant circumstances. The positions they took during negotiations were well informed by their investigation of the facts giving rise to Plaintiffs' claims, information developed by the DOJ in the course of its criminal investigation, careful consideration of the current conditions of the Puerto Rican Cabotage market, and scrutiny of the Horizon Defendants' current and anticipated future financial condition.  Interim Co-Lead Counsel also assessed Plaintiffs' ability to prove the central role of the Non-Settling Defendants in the alleged conspiracy absent cooperation from the Released Defendants.

To further inform their evaluation of the Settlement, Interim Co-Lead Counsel supplemented publicly available financial information about the Horizon Defendants' financial condition with confidential internal information provided by the Horizon Defendants during the negotiations, including data regarding the volume of Puerto Rican Cabotage and their market share and information concerning Horizon Lines' balance sheet, capital/debt structure, and lines of credit.  Interim Co-Lead Counsel engaged a forensic financial expert to analyze available information and to evaluate the Horizon Defendants' financial situation and ability to pay a larger judgment.

Interim Co-Lead Counsel determined on the basis of this information that there were significant limitations upon the ability of the Horizon Defendants to pay a substantial amount to settle this litigation.  Horizon Lines, which had gone through three ownership changes in the past six years, is highly leveraged, with virtually no unencumbered assets.  The market capitalization of Horizon Lines has dropped almost 90% since 2007.  The credit agreement that Horizon Lines had negotiated in 2007 included restrictive debt covenants that used EBITDA to determine compliance; EBITDA was declining as a result of the economic downturn in all of the Horizon Lines' businesses.  Also of interest to Interim Co-Lead Counsel was the fact that the Horizon Defendants are currently litigating on several other fronts.  In addition to this class action, the Horizon Defendants are defending multiple lawsuits in far-flung locations, including a class action alleging antitrust violations related to ocean shipping to Alaska; a class action alleging antitrust violations related to ocean shipping to Hawaii; a federal securities fraud class action in the District of Delaware alleging false or misleading financial statements resulting from price-fixing; and individual actions venued in this District and elsewhere.  The Horizon Defendants are not only exposed to the potential of paying large judgments in the private lawsuits, but they also

face the very real possibility of paying a substantial fine in connection with the DOJ proceedings. As this litigation proceeds, the Horizon Defendants continue to incur attorneys' fees and litigation costs, necessitating considerable cash outlays.

Taking all of this into account, Interim Co-Lead Counsel were able to reach an agreement calling for a cash payment by the Horizon Defendants of $20,000,000. The Horizon Defendants were unable to commit to pay even this amount without negotiating a costly amendment to the credit agreement with their banks.[4]   And, to supplement the cash payment, Interim Co-Lead Counsel were able to negotiate a Base-Rate Freeze, discussed below, which offers an alternative to a cash payment as an option for certain members of the Settlement Class.

In light of their extensive experience in prosecuting antitrust actions, Interim Co-Lead Counsel also carefully considered the value of the extensive cooperation mandated by the Settlement Agreement (summarized in Section I.C.2(c) below).   This cooperation will substantially reduce the burden and expense of litigating against the Non-Settling Defendants and provide crucial information to continue to build Plaintiffs' case.

Relying on their collective experience and expertise to evaluate all of the relevant information, Interim Co-Lead Counsel concluded that the Settlement is fair and in the best interests of the Settlement Class.   It will secure substantial monetary and litigation benefits immediately and obviate the uncertainties, burden and expense of further litigation against the Horizon Defendants.

---

[4] In order to enter into the Settlement Agreement, Horizon Lines agreed to certain economic and structural changes in its credit agreement.  *See* Horizon Lines Press Release, "Horizon Lines Reaches Puerto Rico Class Action Settlement Agreement And Successfully Amends Credit Agreement," dated June 12, 2009, available at http://online.barrons.com/article/PR -CO-20090612-903132.html.  According to this release, the concessions made by Horizon Lines included increasing interest rates by 150 basis points, reducing the size of its revolving credit line, eliminating its $150 million incremental credit facility, and a step-down in its secured leverage ratio.  The aggregate cost of the amendment to the credit agreement is estimated at over $13 million.

### C.   **Basic Terms of the Settlement Agreement**

    1.    Settlement Class

Subject to the Court's approval, the Settlement Class to be certified for purposes of the Settlement with the Horizon Defendants is defined as follows:

> All persons (excluding governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased Puerto Rican Cabotage directly from any of the Defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from at least May 1, 2002, until April 17, 2008.

    2.    Benefits to Settlement Class

    a.    Cash Payments

The cash component of the Settlement requires the Horizon Defendants to pay to the Settlement Class a total of $20,000,000, to be transferred by wire into an interest-bearing escrow account in three installments.  The first $5,000,000 will be deposited within 5 business days following submission of this motion for preliminary approval.  Another $5,000,000 installment will be deposited within 90 days after the Court grants preliminary approval of the Settlement, and a final payment of $10,000,000 will be deposited within 5 business days after final approval by the Court.  (Settlement Agreement (hereinafter "SA") ¶¶ 7, 10.)

    b.    Base-Rate Freeze Option

In addition to the $20,000,000 cash payment, the Settlement Agreement provides that any member of the Settlement Class who is a party to a Transportation Service Agreement ("Contract") with Horizon Lines for Puerto Rican Cabotage as of the Effective Date[5] of the Settlement Agreement may elect, in lieu of receiving a cash payment, a freeze of its then-existing Contract "base rates" for a period of two years beginning when the Contract expires (the "Base-

---

[5] The Effective Date of the Settlement, as defined in Section 2.7 of the Settlement Agreement, is the first date upon which the Settlement has been finally approved and all appeals have been exhausted.

Rate Freeze").  (SA ¶ 7.)  A member of the Settlement Class who does not have a Contract with Horizon Lines at the present time will be eligible for the Base-Rate Freeze if it has a Contract with Horizon Lines on the Effective Date of the Settlement Agreement.  A member of the Settlement Class that has a Contract with Horizon at the present time, but not on the Effective Date of the Settlement Agreement, will be eligible to apply for a cash payment.

Nothing in the Settlement Agreement requires a member of the Settlement Class to enter into a Contract with Horizon Lines or to refrain from dealing with any other carrier.  Any Settlement Class member electing the Base-Rate Freeze will remain free to enter into contracts with other carriers or to negotiate lower base rates with Horizon Lines.  (*Id.* ¶ 7(d).)[6]

It is not possible to precisely quantify the monetary value of the Base-Rate Freeze on a class-wide basis, because the actual benefit ultimately depends on what the future base rates of Horizon Lines and other carriers would otherwise be during the two-year freeze period, which is an unknown.  There is no way to predict whether, or to what extent, the rates will remain stable, increase or decrease during that period.  To estimate the value of the Base-Rate Freeze on a class-wide basis, Plaintiffs looked at Horizon Lines' historical base rate changes.  From 2003 through 2008, Horizon Lines increased its base rate (net of fuel surcharges) by an average of 4.78% per year.  The annual increase ranged from a low of 1.7% in 2008, while Puerto Rico Cabotage was experiencing the effects of the current economic slowdown, to a high of 6.3% in 2005.  Using these historical base rate changes for reference, it is possible to construct a range of the *potential* class-wide value of the Base-Rate Freeze by estimating a range of increased

---

[6] For purposes of the Base-Rate Freeze, the Settlement Agreement defines "base rate" to include "the base rate and ancillary charges for terminal handling, port security, hazardous materials, documentation, and other items included in the bill of lading, but not fuel surcharges or wharfage charges."  (SA ¶ 7(e).)  To ensure that the value of Base-Rate Freeze is not diluted by the Horizon Defendants, the Settlement Agreement further provides that no Settlement Class member electing the Base-Rate Freeze will be assessed any fuel surcharges exceeding the applicable tariff rates filed by Horizon Lines with the Surface Transportation Board.  (*Id.* ¶ 7(f).)

revenue that Horizon Lines would realize over the two-year period given a range of hypothetical rate increases.  When this done, the estimated *potential* class-wide value of the two-year freeze period ranges from $14.6 million, assuming an annual rate increase of 1.7%, to $59 million, assuming an annual increase of 7%.  In deciding whether to elect the Base-Rate Freeze, each Settlement Class member having a qualifying Contract will have to make its own assessment of the value of the Base-Rate Freeze to it.

c.   <u>Cooperation</u>

The value of the extensive cooperation component of the Settlement cannot be underestimated.  The Released Defendants have agreed to furnish valuable assistance for Plaintiffs' continued litigation against the Non-Settling Defendants.  (*Id.* ¶ 24.) The information they provide will significantly improve Plaintiffs' ability to prove the nature and extent of Defendants' conspiracy, and may be the impetus for settlement discussions with one or more of the Non-Settling Defendants.

The cooperation required by the Settlement Agreement includes documents, attorney meetings and witness information, to be provided in two phases.  First, after preliminary approval of the Settlement Agreement, the Horizon Defendants will provide Plaintiffs with non-privileged documents seized by, or produced to, the DOJ relating to Puerto Rican Cabotage, as well as other related documents that Plaintiffs request.  (*Id.* ¶ 24(a).)  Second, after the Effective Date of the Settlement Agreement, the Horizon Defendants will, among other things, use all reasonable efforts to make Gill, Glova, Serra and their other current and former officers and employees available for interviews, depositions and trial testimony as requested by Plaintiffs.  (*Id.* ¶ 24(b).)  In addition, the Horizon Defendants will make their attorneys available to meet

with Interim Co-Lead Counsel to provide non-privileged information concerning documents, witnesses and events.  (*Id.* ¶ 24(d).)

The required cooperation is particularly valuable because, as Plaintiffs have alleged, Gill, Glova and Serra have all pled guilty to criminal charges of conspiring to fix prices and allocate customers in Puerto Rican Cabotage (*see* SCAC ¶¶ 5-6)—charges that mirror Plaintiffs' allegations in this action.  Among the statements made in the criminal proceedings is that Serra, formerly Senior Vice President and General Manager for the Puerto Rico division of Horizon Lines, was one of the principal architects of the conspiracy and played an integral role in furthering the conspiracy by meeting and otherwise communicating with senior executives of the Horizon Defendants' competitors.[7]  (Pl. Not. Recent Dev. at 2-3.)   He also reportedly has information useful in building criminal cases against co-conspirators who remain to be charged. (*Id.*)

Glova, a former Marketing and Pricing Director for the Puerto Rico division of Horizon Lines, admitted to engaging in discussions and attending meetings with representatives of one or more competitors during which illegal anticompetitive agreements were reached.  (*Id.* at 3-4.) He, too, assisted the government's case by recording phone calls with co-conspirators inside Horizon Lines and at its competitors.  (*Id.* at 4-5.)  Finally, Gill, formerly Marketing and Pricing Director for Horizon Lines' Puerto Rico division and, later, Horizon Lines' Vice President of Marketing, also played an integral role in the conspiracy and provided incriminating evidence against co-conspirators yet to be charged.  (*Id.* at 5-6.)

---

[7] The source for these facts is information contained in the Sentencing Memoranda and Sentencing Hearing in the record of criminal proceedings against Gill, Glova and Serra (and Defendants Alexander Chisholm and Peter Baci). These documents are attached as Exhibits A through H to the Notice of Recent Developments, Submitted by Plaintiffs in Opposition to Defendants' Motions to Dismiss, filed by Plaintiffs on May 22, 2009 ("Pl. Not. Recent Dev."). (Docket No. 358.)

### 3.    Plan of Distribution

The Settlement Agreement provides that the Net Settlement Fund will be distributed to members of the Settlement Class—except those who elect to receive the Base-Rate Freeze option—according to a plan of distribution to be approved by the Court (the "Plan of Distribution"). (SA ¶ 16.) Under the Plan of Distribution, described in Section 9 of the Mailed Notice (Attachment B-1), each Class member who elects a cash payment and submits a claim accepted by the Court–approved settlement administrator will receive a pro rata share of the Net Settlement Fund in direct proportion to the member's qualified purchases of Puerto Rican Cabotage during the Class Period.  The notice to Class members will describe the Plan of Distribution, and Plaintiffs will submit it to the Court for approval at the Fairness Hearing.

### 4.    Releases

Upon the Effective Date, the members of the proposed Settlement Class (as Releasing Parties defined in the Settlement Agreement) will release all of their claims against the Released Parties (as defined in the Settlement Agreement) relating to direct purchases of Puerto Rican Cabotage or relating in any way to the supplying, pricing, or distribution of Puerto Rican Cabotage (hereinafter the "Released Claims").  (See the specific terms of the Release in SA ¶ 17.)  The Settlement Agreement specifically preserves all claims and rights of the Settlement Class members against the Non-Settling Defendants, and disclaims any release or limitation of joint or several liability of any of the Non-Settling Defendants or other alleged co-conspirators. (*Id.*)

### 5.    Stay of proceedings against the Released Defendants

Because the Settlement will resolve all claims against the Released Defendants, the Settlement Agreement provides that Plaintiffs will move the Court for a stay of all proceedings

in this action against the Released Defendants, except as otherwise provided in the Settlement Agreement, pending the Court's approval of the Settlement.  (SA ¶ 4.)

## II.     THE SETTLEMENT APPROVAL PROCESS.

### A.     The Two-Step Approval Procedure

Federal Rule of Civil Procedure 23 requires court approval of a class action settlement. Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.").    Ultimately, a settlement may be approved "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The First Circuit, like the other circuits, favors settlement of class actions.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).   To determine whether a settlement should be approved, courts in this Circuit and elsewhere follow a bifurcated approach. *See, e.g., Rand v. M/A-Com, Inc.*, Civ. A. No. 86-1347-N, 1993 WL 410874, at *3 (D. Mass. July 19, 1993) (adopting the two-step process).   First, the court considers whether to preliminarily approve a proposed settlement.   At this initial stage, the court does not make findings as to the proposed settlement's fairness, but merely decides whether the settlement is within the "range of possible approval" warranting notice to the class.   *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 204 F.R.D. 6, 9 (D. Mass. 2001).   If the court grants preliminary approval, the class is notified of the settlement and given an opportunity to submit any objections they may have.   The court then holds a hearing to consider any objections and determine whether the settlement is fair, reasonable and adequate.   *Id.  See* Fed. R. Civ. P. 23(e). [8]

_____

[8] The First Circuit has not enunciated a specific test for final evaluation of a class-action settlement's fairness.  *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277, 280 (D.

## B.      Standard for Preliminary Approval

At this preliminary approval stage, the question for the Court is whether the Settlement falls within the range of possible approval, and is sufficiently fair, reasonable and adequate to justify the expense of apprising members of the Settlement Class of the Settlement.  *See Scott v. First American Title Insurance Co.*, Civil No. 06-cv-286-JD, 2008 WL 4820498, at *3 (D.N.H. Nov. 5, 2008) ("If the proposed settlement appears to meet the standard as being fair, reasonable, and adequate, it may be approved, preliminarily, as within the range of possible approval.")  The Court does not definitively inquire into the fairness of the Settlement, and the notice to be given to the Settlement Class will make this clear.  *See New England Mut. Life Ins. Co.*, 204 F.R.D. at 9 (D. Mass. 2001) (reiterating that the district court found the proposed settlement fell within the range of possible approval and sufficient to warrant sending notice to the class).  A settlement falls within the range of possible approval if there is a conceivable basis for presuming that the standard applied for final approval will be satisfied.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-535 (3d Cir. 2004).

In making this preliminary determination, courts consider whether the proposed settlement is illegal or collusive.  *Scott*, 2008 WL 4820498, at *3.  Generally, "a settlement

---

Mass. 2009).  In particular, the First Circuit has not enumerated a list of factors a court is to consider.  *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007) ("In the First Circuit, this [final approval of class settlement] requires a wide-ranging review of the overall reasonableness of the settlement that relies on neither a fixed checklist of factors nor any specific litmus test.").  The "determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999).  To guide this inquiry, courts within the First Circuit have most often looked to the multi-prong standard articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (examining (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation).  *See Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 93-94 (D. Mass. 2005) (applying the *Grinnell* factors as a matter of preference and noting that *Grinnell* has supplied the "most commonly referenced factors").

following sufficient discovery and arm's length negotiation is presumed fair." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206 (D. Me. 2003); *see also* H. Newberg, A. Conte, *Newberg on Class Actions* § 11.41, at 90 (4th ed. 2002).  This deference reflects the understanding that vigorous negotiations between seasoned counsel, like those that occurred in this case, protect against collusion and advance the fairness considerations of Rule 23(e).

     C.     <u>**As the Product of Intensive Arm's-Length Negotiations, the Settlement Is Well Within the Range of Potential Fairness.**</u>

     1.     <u>The Settlement was forged by a vigorous arm's-length negotiation process.</u>

The Settlement is unquestionably the product of serious, informed, arm's-length negotiations, described above, between experienced and capable counsel motivated only by a desire to protect their clients' best interests.  The eight-month course exemplified the zealous efforts that the parties' attorneys have put forth in litigating this case, as reflected in the filings and proceedings to date.  As would be expected in negotiations between parties fundamentally at odds, the discussions were vigorous and precluded any collusion.  They were informed by a deep understanding of antitrust law, the facts underlying Plaintiffs' claims, and other relevant circumstances, such as confidential financial information and disclosures about the Horizon Defendants' financial condition and the ongoing DOJ investigation.  Nothing in the negotiation process, or in the substance of the Settlement Agreement, suggests even the slightest doubt about the Settlement's fairness.

     2.     <u>The Settlement achieves an excellent result for the Settlement Class, squarely within the range of possible approval.</u>

As a settlement that combines an immediate cash payment, an option for certain Settlement Class members to lock in the base rates of their contracts with the Horizon

Defendants, and vital cooperation to assist the prosecution of this action against the Non-Settling Defendants, the Settlement is clearly in the best interests of the Class under all of the present circumstances, and should be preliminarily approved by the Court.  These benefits are especially valuable given the Horizon Defendants' financial condition, as discussed above.   Another important consideration is the principle of joint and several liability.  Because defendants in antitrust actions are jointly and severally liable for all damages resulting from a conspiracy, Plaintiffs will be able to recover from the Non-Settling Defendants any damages they do not recover in this partial settlement.

When these considerations are joined to the risks inherent in antitrust litigation,[9] it is evident that without a settlement the Class members may very well receive no compensation from the Horizon Defendants for their losses.  Especially against this background, the Settlement secures an excellent result for the Class members, and they should be informed of its terms and afforded the opportunity to evaluate them.

The proposed Plan of Distribution is also comfortably within the range of possible fairness.  Because each Settlement Class member's actual purchases would be the basis for determining damages at trial, this method of distributing the Net Settlement Fund is the fairest and most reasonable.

## III.    CERTIFICATION OF SETTLEMENT CLASS

To effectuate the Settlement, Plaintiffs request that the Court certify the Settlement Class.

---

[9] As courts have consistently emphasized, antitrust class actions "are notoriously complex, protracted, and bitterly fought" and "arguably the most complex actions to prosecute." *In re Visa Check/Master Money Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003) (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)); *see also In re NASDAQ Money-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable. . . . [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). As one court put it, given this uncertainty, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

### A.    <u>General Principles</u>

For a class to be certified, a plaintiff must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the categories of requirements prescribed by Rule 23(b).[10]  *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).  Because Plaintiffs seek certification of a settlement class under Rule 23(b)(3), they must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).[11]

The First Circuit has stated that "[t]he class certification prerequisites should be construed in light of the underlying objectives of class actions."  *Smilow*, 323 F.3d at 41.  In this respect, the "core purpose" of Rule 23(b)(3) is "to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."  *Id.*  Courts have repeatedly recognized that class actions are favored vehicles for litigating antitrust claims because they "play a particularly vital role in the private enforcement of antitrust actions."  *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("the framers of Rule 23 seemed to target such cases as this [antitrust action] as appropriate for class determination" (quoting *Brown v. Pro Football Inc.*, 146 F.R.D. 1, 4 (D.D.C. 1992))).  For this reason, in

---

[10] Rule 23(a) provides in full: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

[11] As Rule 23(b)(3) further explains, "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

antitrust cases "courts resolve doubts in favor of certifying the class." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case … any error, if there is to be one, should be committed in favor of allowing a class action."). Although a court should thoroughly analyze the certification requirements established by Rule 23," *Smilow*, 323 F.3d at 38, the First Circuit has cautioned that a motion for class certification must not be transformed into a trial on the merits. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005). Any inquiry into the merits at the class-certification stage should be conducted only "to the extent that the merits overlap the Rule 23 criteria." *In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008).

### B. The Requirements of Rule 23(a) Are Satisfied.

#### 1. The Settlement Class is so numerous that joinder is impracticable.

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement does not demand certainty about the number of purchasers who would qualify for this class; instead, "courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987). Based on available information, Plaintiffs believe that there are hundreds, and possibly, thousands of Class members. Accordingly, the numerosity requirement is easily satisfied.

#### 2. Numerous questions of law and fact are common to the Settlement Class.

The commonality requirement is met where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is not demanding because "[a] *single* common legal or factual issue can suffice" to satisfy the requirement. *Payne v. Goodyear Tire &*

*Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (emphasis in original).  Furthermore, where certification of the proposed class depends on satisfaction of Rule 23(b)(3)'s more stringent requirement that common questions of law or fact predominate over individual ones, as it does here, the commonality requirement of Rule 23(a) is rendered "largely irrelevant."  *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989).  Discussion of the common issues will therefore be addressed in the context of the predominance requirement.

> 3.   <u>Plaintiffs' claims are typical of those of the other Settlement Class members</u>.

The typicality requirement is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied by showing that the plaintiff's injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class.  *See In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008).  This inquiry "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 311 (3d Cir. 1998).

The typicality requirement is readily satisfied here because Plaintiffs and the other members of the Settlement Class have suffered a common injury, in the form of anti-competitive prices for Puerto Rican Cabotage, arising from an identical set of facts—Defendants' allegedly collusive actions during the Class Period—and they share the identical legal theory that Defendants' actions violated federal and Puerto Rico antitrust law.

> 4.   <u>Plaintiffs will fairly and adequately represent the Settlement Class</u>.

The adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This entails a two-part

showing: "The moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

The first prong of the test seeks to ensure that the interests of the class representative are aligned with the interests of absent class members. *In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 287 (D. Mass. 2009). For the same reasons that the Settlement Class representatives' claims typify those of the other Class members, their interests align perfectly, creating no conflict, and they are all motivated to obtain the best possible result for the Class. *See In re Credit-Suisse*, 253 F.R.D. at 22-23 (noting that the requirements of typicality and adequacy "tend to merge"). The second prong is also amply satisfied here. Interim Co-Lead Counsel, individually and collectively, bring expertise and extensive experience in class litigation generally and antitrust direct purchaser class actions in particular.

**C.     Class Certification Is Also Appropriate Under Rule 23(b)(3).**

1.     Common questions of law and fact predominate.

The predominance prong requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In making this inquiry, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). Here, it is clear that common issues of law and fact will predominate as this case is litigated. Plaintiffs have identified numerous common questions concerning the existence, nature and extent of Defendants' alleged conspiracy, the nature and common pattern of any

resulting injury, and the appropriate remedies for that injury.  These issues include, among others, (a) whether Defendants engaged in a combination or conspiracy to allocate customers, rig bids, and fix the prices of rates, surcharges and other fees for Puerto Rican Cabotage; (b) the identity of the participants in the conspiracy; (c) the meetings, communications and other collusive acts performed by Defendants in furtherance of the conspiracy; (d) the duration of the conspiracy; (e) the effect of Defendants' conduct on the prices of Puerto Rican Cabotage during the Class Period; (f) whether the conspiracy violated Sections 1 and 3 of the Sherman Act and Puerto Rico Statutes Title 10 Section 258; and (g) the appropriate measure of damages sustained by Plaintiffs and other Settlement Class members, and whether they are entitled to equitable relief.  (*See* SCAC ¶ 152.)

2.   <u>A class action is the superior method for fairly resolving this case and efficiently administering the Settlement</u>.

The superiority prong requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As Rule 23(b)(3) further provides, "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

All of these factors weigh strongly in favor of certifying the Settlement Class.  Indeed, the decision of the Judicial Panel on Multi-District Litigation to transfer all the related actions to this Court for consolidation reflects the advantages of class litigation of the claims against Defendants.  The Settlement itself manifests the virtues of class litigation, resolving in one stroke

the claims of hundreds, if not thousands, of direct purchasers against the Horizon Defendants. Resolving such claims, whether by settlement or trial, would serve the same the policies of efficiency, judicial economy, and consistency of results embodied in Rule 23.  Given the size of the proposed Settlement Class, it is clear that piecemeal adjudication of claims involving virtually identical facts and a single common legal theory would be a very inefficient allocation of court resources.  Class certification in this case is also superior to other methods because, consistent with the "core purpose" of Rule 23(b)(3), the class device will afford individual purchasers of Puerto Rican Cabotage the opportunity to vindicate their claims regardless of amount.  As a practical matter, denying certification would deprive purchasers who suffered relatively small damages of a viable legal remedy given the cost and inconvenience of individual litigation against large corporate defendants.  For these reasons, a class action is far superior to other methods of adjudicating the claims asserted against Defendants.

In short, this action—like countless other direct purchaser antitrust actions certified by the courts of this Circuit and elsewhere—is ideally suited for class certification.

## IV.   THE FORMS OF NOTICE AND PROOF OF CLAIM SHOULD BE APPROVED.

### A.   <u>Requirements for Class Notice</u>

A court which certifies a class under Rule 23(b)(3) "must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  This notice must "clearly and concisely" inform the class members of the essential terms of the settlement, its effects, and their options with respect to the settlement.  *Id.*  As discussed next, the proposed notice to the Settlement Class (the "Notice") satisfies these requirements and conforms to the prevailing practice in antitrust class actions.

B.     **The Proposed Notice**

In accordance with the Settlement Agreement (SA ¶ 5), the Notice will be disseminated to members of the Settlement Class in two ways, as described in the accompanying declaration of Affidavit of Cameron R. Azari, the expert engaged by Plaintiffs to consult regarding the provision of class notice. First, a long-form notice in the form attached to this memorandum as Attachment B-1 (the "Mailed Notice") will be sent by first-class mail to all members of the Class who have been identified by reasonable means and efforts. (Azari Aff. ¶ 4, 11-12.) Next, within five days later, a short-form notice in the form attached to this memorandum as Attachment B-2 to the Proposed Preliminary Approval Order (the "Summary Notice") will be published in *El Nuevo Dia* and *Caribbean Business*. *El Nuevo Dia*, published in San Juan, is the largest newspaper in Puerto Rico, and *Caribbean Business* is the main business publication in Puerto Rico. (*Id*. ¶ 15.) In both publications, the notice will appear in Spanish. (*Id.*) The Summary Notice will also appear in the largest newspapers in the four cities with ports handling the largest volume of shipments between Puerto Rico and the mainland United States. These papers are the *Houston Chronicle* (Houston), the *Newark Star-Ledger* (Pennsauken/Elizabeth, New Jersey), *The Florida Times* (Jacksonville), and the *Sun-Sentinel* (Port Everglades). (*Id.*)

C.     **The Proposed Form and Manner of Notice Are the Best Practicable Under the Circumstances and Satisfy Due Process Requirements.**

1.     Explanation of Settlement, Plan of Allocation, Class member options, and deadlines

The proposed manner of Notice comports with Rule 23 and is the standard for providing class notice in federal antitrust class-action litigation. To facilitate identification of the Settlement Class members for the Mailed Notice, the Horizon Defendants have agreed to provide Plaintiffs with information identifying persons and entities that purchased Puerto Rican Cabotage

24

during the Class Period, which is expected to identify virtually all of the Settlement Class members.  The Summary Notice will appear in the six publications listed above, which are likely to be read by Class members who may not receive the Mailed Notice.  It will also be posted on the websites of other selected publications.  In addition, copies of the Notices will be made publicly available to Class members on the settlement administrator's website.  (*Id.* ¶ 15.)

The content of the Notice also comports with Rule 23.  Both the Mailed Notice and the Summary Notice are modeled after notices approved in many other federal antitrust class actions.  (*Id.* ¶ 18.)  Each of them—the Mailed Notice in more detail than the Summary Notice—describes, in clear, concise and plain language, the nature of this litigation, the Settlement, and the proposed certification of the Settlement Class.  The Summary Notice describes how to obtain a copy of the Mailed Notice.  More specifically, the Notice informs Class members of the principal terms of the Settlement, including the benefits to the members, the Plan of Distribution, attorneys' fees and expenses, and requested incentive awards.  The Notice also explains eligibility to participate in the Settlement, options available to the Class members, and the rights and obligations accompanying each option, including the opportunity to object to the Settlement, the Plan of Distribution, and potential attorneys' fees and expenses or incentive awards.  Plaintiffs' Proposed Preliminary Approval Order would allow Class members 60 days from the mailing of the Mailed Notice to object.

The Notice also informs the Class members of their right to exclude themselves from the Settlement Class, describing the binding effect of the release terms and explaining how the consequences of remaining a Class member differ from those of opting out.  The Proposed Preliminary Approval Order also would allow Class members 60 days from the mailing of the

Mailed Notice to opt-out. This time period affords the Class members more than sufficient time to fully consider their options and take any required action to object or opt out.

The Notice also explains how the Class members can obtain copies of the Settlement Agreement and other papers filed in the case, and how to contact Class Counsel if they have questions about the Settlement or the case in general.

2.     Process for submitting claims

The Notice also describes the process for submitting claims and the deadline for doing so. Attached to the Mailed Notice will be a Proof of Claim Form in the form attached to this memorandum as Attachment B-3, by which Settlement Class members can apply to receive a cash payment or, if eligible, elect to participate in the Base-Rate Freeze. To receive a cash payment or to elect the Base-Rate Freeze option, Settlement Class members must timely return a properly completed Proof of Claim Form. Any Settlement Class member who would otherwise qualify for the cash payment or the Base-Rate Freeze but does not properly complete and timely return the Proof of Claim Form will not receive a cash payment or the Base-Rate Freeze.

3.     Fairness Hearing

The Notice also informs the Settlement Class members of the Fairness Hearing date and advises them of their right to appear. To allow sufficient time for the parties to respond to any objections, and for the Horizon Defendants to review the list of opt-outs to determine whether to exercise any right they may have to terminate the Settlement Agreement, the Fairness Hearing should not take place until at least 35 business days after the objection and opt-out deadlines.[12]

4.     Class representative awards, attorneys' fees, and litigation expenses

---

[12] The Settlement Agreement provides that Interim Co-Lead Counsel will furnish a list of the opt-outs to the Horizon Defendants within 10 business days after the opt-out deadline, that the Horizon Defendants will have 10 business days from that date to notify Interim Co-Lead Counsel if they believe that the conditions for terminating the Settlement Agreement have been met, and that the Horizon Defendants will have 10 days thereafter to terminate the Settlement Agreement. (SA ¶ 11(a), (b) and (c).)

At this time, Plaintiffs are not requesting any incentive awards for the Class representatives or any award of attorneys' fees or reimbursement of litigation costs. Instead, at some time in the future they will submit a fee application for no more than one-third of the Horizon Settlement Fund, litigation expenses of no more than $250,000, and a request for incentive awards of not more than $10,000 for each Class representative.

In summary, the Mailed and Summary Notices will afford the best notice practicable under the circumstances. This combination of mailing and publication has become the standard practice for notifying class members in antitrust cases and is routinely approved by courts as satisfying the requirements of Rule 23 and due process. Accordingly, the proposed form and manner of notice to the Settlement Class should be approved.

## V.   PROPOSED TIMETABLE FOR FINAL SETTLEMENT APPROVAL

To accomplish the steps necessary for final approval of the Settlement, Plaintiffs propose the following schedule for disseminating the Notice, filing objections, opting out, and scheduling the Fairness Hearing:

| Event | Time for Compliance |
|---|---|
| Mailing of Notice to Class | No later than twenty (20) business days after Preliminary Approval. |
| Publication of Summary Notice | No later than five (5) business days after mailing of Notice. |
| Deadline for submitting objections to Settlement | No later than sixty (60) calendar days after mailing of Notice. |
| Deadline for opting out of Settlement Class | No later than sixty (60) calendar days after mailing of Notice. |
| Deadline for returning Claim Form | No later than sixty (60) calendar days after mailing of Notice. |

| Event | Time for Compliance |
|-------|---------------------|
| Filing of papers in support of Final Approval of Settlement and Plan of Allocation, and proof of Notice | No later than ten (10) calendar days before Fairness Hearing. |
| Fairness Hearing | No earlier than thirty-five (35) business days following deadline for submitting objections and opting out. |

The parties believe that this proposed schedule will adequately apprise the Settlement Class members of the Settlement and their options with respect to the Settlement, and afford them sufficient opportunity to object if they wish.

## VI.   STAY OF PROCEEDINGS AGAINST RELEASED DEFENDANTS

Because the Settlement, if approved by the Court, will resolve all claims against the Released Defendants, it is appropriate to immediately stay all proceedings in this action against them until the Court has ruled on approval of the Settlement, or the Horizon Defendants terminate the Settlement Agreement pursuant to its termination provisions.  (*See* SA ¶ 11.)  This stay will avoid potentially needless expense and consumption of judicial resources.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court (1) grant preliminary approval of the proposed Settlement; (2) conditionally certify the proposed Settlement Class; (3) adopt the proposed schedule for a Fairness Hearing and completion of the settlement approval process; (4) grant preliminary approval of the Plan of Distribution; (5) authorize payment from the Horizon Settlement Fund of reasonable expenses related to class notice, taxes, escrow and other bank fees, and other settlement administration expenses necessarily incurred before the Court determines whether to grant final approval of the

Settlement; and (6) stay all proceedings as to the Released Defendants.  To grant this relief, Plaintiffs ask the Court to sign the proposed Preliminary Approval Order submitted herewith.

**I HEREBY CERTIFY** that today I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which, on information and belief, shall automatically notify counsel of record, and which pursuant to Local Civil Rule 5.1(b)(2), constitutes the equivalent service.

**RESPECTFULLY SUBMITTED**

In San Juan, Puerto Rico, this 8th day of July, 2009.

/s/ John Nevares & Associates, PSC
John F. Nevares (PR 130502)
P.O. Box 13667
San Juan, Puerto Rico 00908-3667
Tel. (787) 793-4906
Fax (787) 721-8820
Email: jfnevares@nevareslaw.com.

***Interim Liaison Counsel***


**HEINS MILLS & OLSON, P.L.C.**
Vincent J. Esades
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com

**SALAS & CO., L.C.**
Camilo K. Salas, III
650 Poydras, Suite 1660
New Orleans, LA 70130
(Orleans Parish)
Tel: (504) 799-3080
Fax: (504) 799-3085
csalas@salaslaw.com

**LABATON SUCHAROW LLP**
Hollis L. Salzman
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
hsalzman@labaton.com

**KAPLAN FOX & KILSHEIMER, LLP**
Linda P. Nussbaum
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (2120 687-7714
lnussbaum@kaplanfox.com

**WHATLEY DRAKE & KALLAS, LLC**
Joe R. Whatley Jr.
1540 Broadway, 37th Floor
New York, NY 10036

Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com

**PIETRANTONI MENDEZ &
ALVAREZ LLP**
Nestor M. Mendez-Gomez
Banco Popular Center, 19th Floor
209 Munoz Rivera Ave.
San Juan, PR 00918
Tel: (787) 274-1212
Fax: (787) 274-1470
nmendez@pmalaw.com

**BECNEL LAW FIRM, LLC**
Daniel E. Becnel, Jr.
106 W. Seventh St.
P.O. Box Drawer H
Reserve, LA 70084
Tel: (985) 535-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

*Interim Co-Lead Class Counsel*


Andres W. Lopez
**Law Offices of Andres W. Lopez**
207 Del Parque St. Third Floor
San Juan, PR 00912
Tel: 787-641-4541
Fax: 787-641-4544
andreswlopez@yahoo.com

Benjamin Brown
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Avenue, NW
Suite 500, West Tower
Washington, D.C. 20005
Tel: 202-408-4600
Fax: 202-408-4699
bbrown@cmht.com

Bryan Clobes
**Cafferty Faucher LLP**
1717 Arch Street, Suite 3610
Tel: 215-864-2800

Fax: 215-864-2810
bclobes@caffertyfaucher.com

Salvador Antonetti
**Fiddler, Gonzalez & Rodriguez**
PO Box 363507
San Juan, PR 00936-3507
Tel: 787-759-3209
Fax: 787-759-3109
santonetti@fgrlaw.com

Ruthanne Gordon
**Berger & Montague, PC**
1622 Locust St.
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604
rgordon@bm.net

Stephen A. Asher
**Weinstein Kitchenoff & Asher LLC**
1845 Walnut Street, Suite 110
Philadelphia, PA 19103
Tel: 215-545-7200
Fax: 215-545-6535
asher@wka-law.com

David C. Indiano-Vicic
**Indiano & Williams, PSC**
207 Del Parque Street
Third Floor
San Juan, PR 00912
Tel: 787-641-4545
Fax: 787-641-4544
david.indiano@indianowilliams.com

Richard Lockridge
**Lockridge Grindal Nauen P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: 612-339-6900
Fax: 612-339-0981
ralockridge@locklaw.com

Lawrence Silverman
**Silverman Cosgrove & Sammataro**

One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131-1704
Tel: 305-377-1666
Fax: 305-377-1664
lsilverman@scs-legal.com

Stuart G. Gross
**Cotchett, Pitre & McCarthy**
840 Malcolm Road
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577
sgross@cpmlegal.com

Eric Pérez Ochoa
**Adsuar Muniz Goyco Seda**
**& Perez-Ochoa, P.S.C.**
PO Box 70294
San Juan, PR 00936-8294
Tel: 787-756-9000
Fax: 787-756-9010
epo@amgprlaw.com

Eric M. Quetglas-Jordan
**Quetglas Law Office**
PO Box 16606
San Juan, PR 00908-6606
Tel: 787-722-7745
Fax: 787-725-3970
quetglaslaw@hotmail.com

Archie Lamb
**Law Offices of Archie Lamb, LLC**
P.O. Box 2088
Birmingham, AL 35201
Tel: 205-324-4644
Fax: 205-324-4649
alamb@archielamb.com

Andrés Guillermard
**Nachman Santiago & Guillemard**
1302 Ponce de León, Suite 302
San Juan, PR 00907
Tel: 787-724-1212
Fax: 787-725-1339

33

Kevin B. Love
**Criden & Love PA**
7301 SW 57th Court, Suite 515
South Miami, FL 33134
Tel: 305-357-9000
Fax: 305-357-9050
klove@cridenlove.com

*Plaintiffs' Steering Committee*