**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

IN RE: PUERTO RICAN CABOTAGE          **Master Document No. 08-MD-1960 (DRD)**
ANTITRUST LITIGATION


THIS DOCUMENT RELATES TO:
ALL ACTIONS

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH
CROWLEY DEFENDANTS, CERTIFICATION OF SETTLEMENT CLASS,
AUTHORIZATION TO DISSEMINATE CLASS NOTICE, AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**


**TO THE HONORABLE COURT:**

Pursuant to Federal Rule of Civil Procedure 23(a) and (e), Plaintiffs  respectfully move

the Court, on behalf of themselves and the other members of a proposed settlement class (the

"Settlement Class" or "Class"), for entry of an order granting preliminary approval of a proposed

Settlement (the "Settlement") between Plaintiffs and the Crowley Defendants (collectively, the

"Settling Parties").[1]  Additionally, to advance the Settlement toward final approval, the motion

asks the Court to:

(i)     conditionally certify the proposed Settlement Class;

(ii)    approve the form and manner of giving notice of the Settlement to the Class

        members;

(iii)   authorize payment from the Crowley Settlement Fund of (1) expenses related to

        providing notice to the Settlement Class members; (2) taxes, estimated taxes, and

        tax-related expenses; (3) escrow and other bank fees; and (4) other settlement

---

[1]      All capitalized terms not defined herein are intended to have the same meaning as set forth in the
Settlement Agreement, which is attached hereto as Attachment A.

administration expenses necessarily incurred before the Court determines whether to grant final approval of the Settlement;

(iv)    preliminarily approve the proposed Plan of Distribution;

(v)    schedule a hearing (the "Fairness Hearing") at which the Court will consider granting final approval of the Settlement and proposed plan of distribution as fair, reasonable and adequate; and

(vi)    set deadlines for accomplishing other steps in the settlement-approval process.[2]

Accompanying this motion is a proposed order providing the relief the Settling Parties seek (the "Proposed Preliminary Approval Order")(Attachment E).   In support of their motion, the Plaintiffs' submit the following memorandum and the accompanying declaration of Cameron R. Azari, Plaintiffs' settlement administration expert, regarding class notice.

## INTRODUCTION

The terms of the proposed Settlement, discussed in further detail below, are memorialized in a settlement agreement between the Settling Parties, dated January 15, 2010, attached to this memorandum as Attachment A (the "Settlement Agreement").[3] The Settlement Agreement provides, *inter alia*, that the Crowley Defendants will (1) make cash payments totaling $13,750,000; (2) offer Class members the option of freezing for two years the base rates of any shipping contracts they have with the Crowley Defendants on the Effective Date of the Settlement; and (3) cooperate with Plaintiffs in litigating their claims against the remaining Defendants.   In return, Plaintiffs and the other Settlement Class members will release their claims against the Released Defendants.

---

[2]    It should ne noted that while Paragraph 4 of the Settlement Agreement  provides that "Interim Co-lead Counsel for the Class shall submit to the Court a motion for preliminary approval of the Settlement and for a stay of all proceedings in the Class Action against the Released Defendants," this motion does not request for a stay at this time.

[3]    The exhibits to the Settlement Agreement are not attached to this memorandum.

The Settlement Agreement does not include Sea Star Line, LLC ("Sea Star"), Peter Baci ("Baci"), Trailer Bridge, Inc. ("Trailer Bridge"), Saltchuk Resources, Inc. ("Saltchuk"), and Leonard Shapiro ("Shapiro") (collectively, the "Non-Settling Defendants").[4] Aided by the extensive cooperation that the Released Defendants must provide to fulfill their obligations under the Settlement Agreement, Plaintiffs will continue to vigorously prosecute their claims against the Non-Settling Defendants.

The proposed Settlement is in the best interests of the Settlement Class and lies squarely within the "range of possible approval," which is the standard for preliminary approval of a class-action settlement. Accordingly, the Class members should be informed of the terms of the proposed Settlement and their right to object or exclude themselves from the Class. To do so, Plaintiffs propose both mailed and published notice. Once the Class members have had an opportunity to object or opt out, the Court would conduct the Fairness Hearing to consider whether to grant final approval of the Settlement under Rule 23(e)(2).[5]

This memorandum will demonstrate that the proposed Settlement Class satisfies the requirements of Rules 23(a) and (b)(3). It will explain how the named plaintiffs are proper class representatives regardless of the fact that they did not each deal with all of the defendants throughout the class period. To support their argument in this regard, the Settling Parties discuss in detail the recent preliminary approval of a partial settlement in the highly analogous case of *Air Cargo Shipping Services Antitrust Litigation*, MDL No. 1775 (E.D.N.Y.) where the court

---

[4]      On June 11, 2009, Plaintiffs signed a settlement agreement with Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics Holdings, LLC, Horizon Logistics, LLC and Horizon Lines of Puerto Rico, Inc. (collectively, "Horizon Defendants"). Similarly, Plaintiffs have also reached a settlement agreement with individual Defendant Alexander G. Chisholm on July 29, 2009. (See Doc. No. 597 p. 2).

[5] In anticipation that the Non-Settling Defendants will object to the proposed settlement, the Plaintiffs note that Non-Settling Defendants lack standing to object because they can show no legal injury resulting from the settlement. Moreover, the Non-Settling Defendants are not class members and have no legal basis for challenging the fairness of the settlement. Finally, the Non-Settling Defendants are not bound by a finding that the proposed settlement class satisfies the requirements of Rule 23. As the Court will recall, many of these arguments were raised in connection with preliminary approval of the Horizon settlement.

found the named plaintiffs were proper class representatives despite the fact that they had not dealt with each of the defendants.[6]   Finally, the Settling Parties seek conditional certification of the Settlement Class under Rule 23(b)(3), solely for purposes of effectuating the Settlement. Certifying the Class will not prejudice the rights of the Non-Settling Defendants, who will remain free to oppose certification of a class with respect to Plaintiffs' claims against them.

## I.   PROCEDURAL BACKGROUND

### A.   <u>Background of Litigation</u>

This consolidated class action originated with the filing of a number of separate federal antitrust actions in several judicial districts, including the District of Puerto Rico, each alleging that Defendants conspired to fix prices for shipping services in the noncontiguous ocean trade between the continental United States and Puerto Rico ("Puerto Rican Cabotage") in violation of the antitrust laws. On August 13, 2008, the Judicial Panel on Multidistrict Litigation transferred the actions pending in other districts to this District for coordinated or consolidated pre-trial proceedings (and has since transferred other subsequently filed actions).   On November 18, 2008, this Court ordered consolidation of the actions (Docket Nos. 167, 168), and on December 5, 2008, Plaintiffs filed the First Consolidated Amended Class Action Complaint (Docket No. 173).

By Order dated December 12, 2008 (Docket No. 190), the Court stayed all pretrial discovery proceedings until an Initial Scheduling Conference (the "ISC") to take place on February 3, 2009. On January 20, 2009, all of the defendants in this action brought separate Rule 12(b)(6) motions to dismiss the complaint.  Three days later, on January 23, 2009, the defendants filed a joint motion to stay discovery pending disposition of their pending motions to dismiss.

---

[6]/        The *Air Cargo* case and its application to the facts of this case are discussed in detail in Sections III. B. 2 & III. C. 1 below.

The ISC was held on February 3, 2009, at which time the Court granted a motion of the United States to intervene (Docket No. 259) and stayed discovery until the Court ruled on any motions to dismiss a second amended complaint to be filed by Plaintiffs. In accordance with deadlines prescribed at the ISC, Plaintiffs moved on February 9, 2009 for leave to amend their complaint (Docket No. 269), which the Court granted on February 11, 2009. (Docket No. 274.)

On February 23, 2009, Plaintiffs filed a Second Consolidated Amended Class Action Complaint (the "Complaint" or "SCAC").[7] (Docket No. 276.) The Complaint alleges that, beginning no later than May 2002 and continuing until at least April 2008, Defendants and their co-conspirators engaged in a conspiracy to suppress competition in the Puerto Rican Cabotage market by agreeing to allocate customers, rig bids to customers, and fix rates, surcharges and other fees charged to customers, in violation of the Sherman Act and Puerto Rico Statutes Title 10 Section 258.[8]

As the Complaint further alleges, five of the six individual Defendants have pled guilty to criminal charges arising from an ongoing investigation by the Department of Justice ("DOJ"). (SCAC ¶5.) Two of the individual Defendants entered guilty pleas to "participating in a conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May

---

[7] The class representatives are CCI Limited Partnership, Horizon International Shipping, Inc., Linde Gas Puerto Rico, Inc., Rona Distributors, Inc., Ferrmax, Inc. and La Rosa del Monte Express Inc.

[8] On September 23, 2009, the Plaintiffs filed a Third Consolidated Amended Complaint (Docket No. 444) and based on arguments raised at the October 20, 2009 hearing concerning preliminary approval of the Horizon settlement and the pending motions to dismiss, the Plaintiffs requested and were granted leave to file a Fourth Consolidated Amended Complaint. The Fourth Consolidated Amended Complaint was filed under seal on October 21, 2009. Because the Fourth Amended Complaint is under seal in order to reference confidential material in the factual allegations and the claims have not changed, this memorandum only references the Second Consolidated Amended Complaint.

2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."
(DOJ Press Release dated October 1, 2008, Ex. 2 to SCAC.)   A third individual Defendant
entered a plea to similar charges while representing that he did not join the conspiracy until about
December 2005. (SCAC ¶6.)

On March 10, 2009, Trailer Bridge, the Horizon Defendants, the Crowley Defendants,
and Sea Star moved separately to dismiss the Complaint for failure to state a claim. (Docket Nos.
285, 287, 291 and 292, respectively)[9] In addition, two individual Defendants filed their own
motions to dismiss (Docket Nos. 300 and 302, respectively), and three others joined the motions
to dismiss of one or more of the other Defendants (Docket Nos. 333, 336, 362 and 363,
respectively).

### B.    Settlement Negotiations

The Settlement occurred after seven (7) months of intense arm's-length negotiations
between Interim Co-Lead Counsel for the Class and counsel for the Crowley Defendants.
Throughout the discussions, the Crowley Defendants vigorously challenged the Complaint.
disputed the damages claimed by Plaintiffs, and repeatedly noted that none of their employees
had been indicted by a grand jury after months of investigation and seizure of materials.   Interim
Co-Lead Counsel zealously advocated for the most favorable settlement terms for the Settlement
Class in light of all of the relevant circumstances. The positions they took during negotiations
were well informed by their investigation of the facts giving rise to Plaintiffs' claims,
information developed by the DOJ in the course of its criminal investigation, and careful
consideration of the current conditions of the Puerto Rican Cabotage market.   Interim Co-Lead

---

[9] The Crowley Defendants, Trailer Bridge, Saltchuck and Shapiro moved to dismiss the operative Fourth
Consolidated Amended Complaint on or about November 4, 2009.  Sea Star and Baci did not move to dismiss the
Fourth Consolidated Amended Complaint.  On December 4, 2009, the Court held a hearing on the pending motions
to dismiss.

Counsel also assessed Plaintiffs' ability to prove the central role of the Non-Settling Defendants in the alleged conspiracy absent cooperation from the Released Defendants.

Taking all of this into account, Interim Co-Lead Counsel were able to reach an agreement calling for a cash payment by the Crowley Defendants of $13,750,000. And, to supplement the cash payment, Interim Co-Lead Counsel were able to negotiate a Base-Rate Freeze, discussed below, which offers an alternative to a cash payment as an option for certain members of the Settlement Class.

In light of their substantial experience in prosecuting antitrust actions, Interim Co-Lead Counsel also carefully considered the value of the extensive cooperation mandated by the Settlement Agreement (summarized in Section I.C.3 below). This cooperation will significantly reduce the burden and expense of litigating against the Non-Settling Defendants and provide crucial information to continue to build Plaintiffs' case.

Relying on their collective experience and expertise to evaluate all of the relevant information, Interim Co-Lead Counsel concluded that the Settlement is fair and in the best interests of the Settlement Class. It will secure substantial monetary and litigation benefits immediately and obviate the uncertainties, burden and expense of further litigation against the Crowley Defendants.

C.   **Basic Terms of the Settlement Agreement**

1.   Settlement Class

Subject to the Court's approval, the Settlement Class to be certified for purposes of the Settlement with the Crowley Defendants is defined as follows:

> All persons (excluding governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased Puerto Rican Cabotage directly from any of the Defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate

thereof, at any time during the period from at least May 1, 2002, until April 17, 2008.

2.    Benefits to Settlement Class

a.    Cash Payments

The cash component of the Settlement requires the Crowley Defendants to pay to the Settlement Class a total of $13,750,000, to be transferred by wire into an interest-bearing escrow account within five (5) business days following the execution of the Settlement Agreement and submission of a motion for preliminary approval to the Court. (Settlement Agreement (hereinafter "SA") ¶¶8, 11(a).)  In addition, the Crowley Defendants are required to deposit into the escrow account an additional sum of $250,000 within five (5) business days following the execution of the Settlement agreement which shall be used, upon the approval by the Court, to defray Plaintiffs' litigation expenses incurred in connection with this matter.  (*Id.* ¶11(b).)

b.    Base-Rate Freeze Option

In addition to the $13,750,000 cash payment, the Settlement Agreement provides that any member of the Settlement Class who is a party to a Transportation Service Agreement ("Contract") with Crowley Puerto Rico Services Inc. ("CPRS") for Puerto Rican Cabotage as of the Effective Date[10] of the Settlement Agreement may elect, in lieu of receiving a cash payment, a freeze of its then-existing Contract "base rates" for a period of two years beginning when the Contract expires (the "Base-Rate Freeze"). (SA ¶8.)  Nothing in the Settlement Agreement requires a member of the Settlement Class to enter into a Contract with CPRS or to refrain from dealing with any other carrier. Any Settlement Class member electing the Base-Rate Freeze will

---

[10]    The Effective Date of the Settlement, as defined in Section 2.7 of the Settlement Agreement, is the first date upon which the Settlement has been finally approved and all appeals have been exhausted.

remain free to enter into contracts with other carriers or to negotiate lower base rates with CPRS. (*Id.* ¶8(d).)[11]

It is not possible to precisely quantify the monetary value of the Base-Rate Freeze on a class-wide basis, because the actual benefit ultimately depends on what the future base rates of CPRS and other carriers would otherwise be during the two-year freeze period,  which is an unknown. There is no way to predict whether, or to what extent, the rates will remain stable, increase or decrease during that period.  Given the similarities between CPRS and Horizon in terms of rates, rate increases and volume, the estimated potential class-wide value of the two-year freeze period of this settlement ranges from $ 14.6 million, assuming an annual rate increase of 1.7%, to $59  million, assuming an annual increase of 7%.  In deciding whether to elect the Base-Rate Freeze, each Settlement Class member having a qualifying Contract will likely assess the value of the Base-Rate Freeze to its business and compare this value to the cash option.

### 3.    Cooperation

The value of the extensive cooperation component of the Settlement cannot be underestimated.   The Released Defendants have agreed to furnish valuable assistance for Plaintiffs' continued litigation against the Non-Settling Defendants. (*Id.* ¶25.)  The information they provide will significantly improve Plaintiffs' ability to prove the nature and extent of Defendants' conspiracy, and may be the impetus for settlement discussions with one or more of the Non-Settling Defendants.

---

[11/]    For purposes of the Base-Rate Freeze, the Settlement Agreement defines "base rate" to include "the base rate and ancillary charges for terminal handling, port security, hazardous materials, documentation, and other items included in the bill of lading, but not fuel surcharges or wharfage charges." (SA ¶8(e).) To ensure that the value of Base-Rate Freeze is not diluted by the Crowley Defendants, the Settlement Agreement further provides that no Settlement Class member electing the Base-Rate Freeze will be assessed any fuel surcharges exceeding the applicable tariff rates filed by CPRS with the Surface Transportation Board. (*Id.* ¶8(f).)

The cooperation required by the Settlement Agreement includes documents, attorney meetings and witness information, to be provided in two phases.  First, after preliminary approval of the Settlement Agreement, the Crowley Defendants will provide Plaintiffs with non-privileged documents seized by, or produced to, the DOJ relating to Puerto Rican Cabotage, as well as other related documents that Plaintiffs request. (*Id.* ¶ 25(b).)  Second, after the Effective Date of the Settlement Agreement, the Crowley Defendants will, among other things, use all reasonable efforts to make current and former officers and employees of Crowley Liner Services ("CLS") involved in pricing decisions relating to Puerto Rican Cabotage available for interviews, depositions and trial testimony as requested by Plaintiffs.  (*Id.* ¶25(b).)  In addition, the Crowley Defendants agreed to make their attorneys available to meet with Interim Co-Lead Counsel to provide non-privileged information concerning documents, witnesses and events. (*Id.* ¶25(f).)

4. <u>Plan of Distribution</u>

The Settlement Agreement provides that the Net Settlement Fund will be distributed to members of the Settlement Class—except those who elect to receive the Base-Rate Freeze option—according to a plan of distribution to be approved by the Court (the "Plan of Distribution"). (SA ¶17.)  Under the Plan of Distribution, described in Section 9 of the Mailed Notice (Attachment B-1), each Class member who elects a cash payment and submits a claim accepted by the Court–approved settlement administrator will receive a pro rata share of the Net Settlement Fund in direct proportion to the member's qualified purchases of Puerto Rican Cabotage during the Class Period.  The notice to Class members will describe the Plan of Distribution, and Plaintiffs will submit it to the Court for approval at the Fairness Hearing.

5. <u>Releases</u>

Upon the Effective Date, the members of the proposed Settlement Class (as Releasing Parties defined in the Settlement Agreement) will release all of their claims against the Released

Parties (as defined in the Settlement Agreement) relating to direct purchases of Puerto Rican Cabotage or relating in any way to the supplying, pricing, or distribution of Puerto Rican Cabotage (hereinafter the "Released Claims").   (See the specific terms of the Release in SA ¶¶18, 20.)   The Settlement Agreement specifically preserves all claims and rights of the Settlement Class members against the Non-Settling Defendants, and disclaims any release or limitation of joint or several liability of any of the Non-Settling Defendants or other alleged co-conspirators. (*Id.*)

## II.    THE SETTLEMENT APPROVAL PROCESS

### A.    <u>The Two-Step Approval Procedure</u>

Federal Rule of Civil Procedure 23 requires court approval of a class action settlement. Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.").   Ultimately, a settlement may be approved "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The First Circuit, like the other circuits, favors settlement of class actions.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).   To determine whether a settlement should be approved, courts in this Circuit and elsewhere follow a bifurcated approach. *See, e.g.*, *Rand v. M/A-Com, Inc.*, No. 86-CV-1347, 1993 WL 410874, at *3 (D. Mass. July 19, 1993) (adopting the two-step process).   First, the court considers whether to preliminarily approve a proposed settlement. At this initial stage, the court does not make findings as to the proposed settlement's fairness, but merely decides whether the settlement is within the "range of possible approval" warranting notice to the class.  *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 204 F.R.D. 6, 9 (D. Mass. 2001).  If the court grants preliminary approval, the

class is notified of the settlement and given an opportunity to submit any objections they may have.   The court then holds a hearing to consider any objections and determine whether the settlement is fair, reasonable and adequate.  *Id.  See* Fed. R. Civ. P. 23(e).[12]

**B.     Standard for Preliminary Approval**

At this preliminary approval stage, the question for the Court is whether the Settlement falls within the range of possible approval, and is sufficiently fair, reasonable and adequate to justify the expense of apprising members of the Settlement Class of the Settlement.  *See Scott v. First American Title Insurance Co.*, No. 06-cv-286, 2008 WL 4820498, at *3 (D.N.H. Nov. 5, 2008) ("If the proposed settlement appears to meet the standard as being fair, reasonable, and adequate, it may be approved, preliminarily, as within the range of possible approval.")   The Court does not definitively inquire into the fairness of the Settlement, and the notice to be given to the Settlement Class will make this clear.  *See New England Mut. Life Ins. Co.*, 204 F.R.D. at 9 (D. Mass. 2001) (reiterating that the district court found the proposed settlement fell within the range of possible approval and sufficient to warrant sending notice to the class).   A settlement falls within the range of possible approval if there is a conceivable basis for presuming that the

---

[12]      The First Circuit has not enunciated a specific test for final evaluation of a class-action settlement's fairness. *New England Carpenters Health Benefits Fund* v. *First DataBank, Inc.*, 602 F. Supp. 2d 277, 280 (D. Mass.2009). In particular, the First Circuit has not enumerated a list of factors a court is to consider. *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007) ("In the First Circuit, this [final approval of class settlement] requires a wide-ranging review of the overall reasonableness of the settlement that relies on neither a fixed checklist of factors nor any specific litmus test."). The "determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *Bussie v. Allmerica Fin. Coip.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999). To guide this inquiry, courts within the First Circuit have most often looked to the multi-prong standard articulated by the Second Circuit in *City of Detroit* v. *Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (examining (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation). *See Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 93-94 (D. Mass. 2005) (applying the *Grinnell* factors as a matter of preference and noting that *Grinnell* has supplied the "most commonly referenced factors").

standard applied for final approval will be satisfied.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-535 (3d Cir. 2004).

In making this preliminary determination, courts consider whether the proposed settlement is illegal or collusive.  *Scott,* 2008 WL 4820498, at *3.  Generally, "a settlement following sufficient discovery and genuine arm's length negotiation is presumed fair."  *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206 (D. Me. 2003); *see also* H. Newberg, A. Conte, <u>Newberg on Class Actions</u> § 11.41, at 90 (4th ed. 2002).  This deference reflects the understanding that vigorous negotiations between seasoned counsel, like those that occurred in this case, protect against collusion and advance the fairness considerations of Rule 23(e).

> **C.**   **As the Product of Intensive Arm's-Length Negotiations, the Settlement Is Well Within the Range of Potential Fairness.**
>
> > 1.    <u>The Settlement was forged by a vigorous arm's-length negotiation process.</u>

The Settlement is unquestionably the product of serious, informed, arm's-length negotiations, described above, between experienced and capable counsel motivated only by a desire to protect their clients' best interests.  The seven (7) month course of negotiations exemplified the zealous efforts that the parties' attorneys have put forth in litigating this case, as reflected in the filings and proceedings to date.  As would be expected in negotiations between parties fundamentally at odds, the discussions were vigorous and precluded any collusion.  They were informed by a deep understanding of antitrust law, the facts underlying Plaintiffs' claims, and other relevant circumstances, such as confidential financial information and disclosures about the Crowley Defendants' financial condition and the ongoing DOJ investigation.  Nothing

in the negotiation process, or in the substance of the Settlement Agreement, suggests even the slightest doubt about the Settlement's fairness.

          2.      <u>The Settlement achieves an excellent result for the Settlement Class, squarely within the range of possible approval.</u>

As a settlement that combines an immediate cash payment, an option for certain Settlement Class members to lock in the base rates of their contracts with the Crowley Defendants, and vital cooperation to assist the prosecution of this action against the Non-Settling Defendants, the Settlement is clearly in the best interests of the Class under all of the present circumstances, and should be preliminarily approved by the Court.

Preliminary approval should not be withheld on the speculative fear that the base rate freeze will provide the settling Defendants with an unfair competitive advantage over the non-settling Defendants.  When analyzing the competitive effects of the proposed base rate freeze, the Court should focus on the class members and not the non-settling Defendants.  From the class members' perspective, the proposed settlement provides a choice between receiving cash or participating in base-rate freeze.  Class members are not required to exclusively ship with one of the settling defendants to obtain the benefits of a base rate freeze.  Nor are they required to agree to a specific volume of business to receive the benefits of the base rate freeze.   In other words, class members are free to simultaneous deal with any and all of the carriers involved in Puerto Rican Cabotage.  As the Horizon Defendants observed, "shippers in the market for Puerto Rican Cabotage, including the plaintiffs in this case, typically use multiple carriers and shift back and forth among the carriers to whom they tender cargo for shipment." (Docket No. 450, p. 9).  The base freeze does not, in any way, alter the right of class members to freely choose among competing carriers.

The concern that a base rate freeze may force the non-settling defendants to lower prices in order to compete for business is not a legally sufficient reason to deny approval.  It is well settled that the anti-trust laws are designed to promote competition and not to insulate companies from competition.  *See*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977)(observing that antitrust laws were "enacted for the 'protection of competition not competitors.'")  The Supreme Court recently observed that "cutting prices in order to increase business is the very essence competition" and "that low prices benefit consumers regardless of how those prices are set . . ."  *Pacific Bell Telephone Co. v. Linkline Communications*, 129 S. Ct. 1109, 1120 (2009).  Thus, the fact that lower prices result from the settlement cannot justify denial of approval.

Another important consideration is the principle of joint and several liability.  Because defendants in antitrust actions are jointly and severally liable for all damages resulting from a conspiracy, Plaintiffs will be able to recover from the Non-Settling Defendants any damages they do not recover in this partial settlement.

When these considerations are joined to the risks inherent in antitrust litigation,[13] it is evident that without a settlement the Class members may very well receive no compensation from the Crowley Defendants for their losses.  Especially against this background, the Settlement

---

[13]/     As courts have consistently emphasized, antitrust class actions "are notoriously complex, protracted, and bitterly fought" and arguably the most complex actions to prosecute. *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003) (quoting *Weseley* P. *Spear, Leeds Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable. . . . [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). As one court put it, given this uncertainty, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

secures an excellent result for the Class members, and they should be informed of its terms and afforded the opportunity to evaluate them.

The proposed Plan of Distribution is also comfortably within the range of possible fairness. Because each Settlement Class member's actual purchases would be the basis for determining damages at trial, this well established method of distributing the Net Settlement Fund is the fairest and most reasonable.

## III.    CERTIFICATION OF SETTLEMENT CLASS

To effectuate the Settlement, the Settling Parties request that the Court certify the Settlement Class.

### A.    General Principles

For a class to be certified, a plaintiff must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the categories of requirements prescribed by Rule 23(b).[14] *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Because the Settling Parties seek certification of a settlement class under Rule 23(b)(3), they must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[15]

---

[14] Rule 23(a) provides in full: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: ( 1 ) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

[15] As Rule 23(b)(3) further explains, "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The First Circuit has stated that "[t]he class certification prerequisites should be construed in light of the underlying objectives of class actions." *Smilow*, 323 F.3d at 41. In this respect, the "core purpose" of Rule 23(b)(3) is "to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Id.* Courts have repeatedly recognized that class actions are favored vehicles for litigating antitrust claims because they "play a particularly vital role in the private enforcement of antitrust actions." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) ("the framers of Rule 23 seemed to target such cases as this [antitrust action] as appropriate for class determination" (quoting *Brown v. Pro Football Inc.*, 146 F.R.D. 1, 4 (D.D.C. 1992))). For this reason, in antitrust cases "courts resolve doubts in favor of certifying the class." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action."). Although a court should thoroughly analyze the certification requirements established by Rule 23, *Smilow*, 323 F.3d at 38, the First Circuit has cautioned that a motion for class certification must not be transformed into a trial on the merits. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1. 17 (1st Cir. 2005). Any inquiry into the merits at the class-certification stage should be conducted only "to the extent that the merits overlap the Rule 23 criteria." *In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir. 2008).

### B.    The Requirements of Rule 23(a) Are Satisfied.

#### 1.    The Settlement Class is so numerous that joinder is impracticable.

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement does not demand certainty about the number of purchasers who would qualify for this class; instead,

"courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987). Based on available information, Plaintiffs believe that there are hundreds, and possibly, thousands of Class members.  Accordingly, the numerosity requirement is easily satisfied.

        2.    <u>Numerous questions of law and fact are common to the Settlement Class.</u>

The commonality requirement is met where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  This requirement is not demanding because "[a] *single* common legal or factual issue can suffice" to satisfy the requirement. *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (emphasis in original).  Furthermore, where certification of the proposed class depends on satisfaction of Rule 23(b)(3)'s more stringent requirement that common questions of law or fact predominate over individual ones, as it does here, the commonality requirement of Rule 23(a) is rendered "largely irrelevant."  *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989).  Discussion of the common issues will therefore be addressed in the context of the predominance requirement.

        3.    <u>Plaintiffs' claims are typical of those of the other Settlement Class members.</u>

The typicality requirement is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied by showing that the plaintiff's injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class.  *See In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008).  This inquiry "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998).

In the context of an antitrust conspiracy, the key to typicality is that the claims of the named plaintiffs are based on the same legal theory that is the basis for the claims of the class. "The overarching scheme is the linchpin . . . regardless of the product purchased, the market involved or the price ultimately paid.  Furthermore, the various products purchased and the different amounts of damages sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of action arises from a common wrong." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999).  Here, the Plaintiffs readily meet the typicality requirement because Plaintiffs and the other members of the Settlement Class have suffered a common injury, in the form of anti-competitive prices for Puerto Rican Cabotage, arising from an identical set of facts—Defendants' allegedly collusive actions during the Class Period and they share the identical legal theory that Defendants' actions violated federal and Puerto Rico antitrust law.  *See In re Carbon Black Litig.*, No. 03-cv-10191, 2005 WL 102966, at *12 (D. Mass. Jan. 18, 2005) ("[T]ypicality is normally satisfied in price-fixing conspiracy claims."); *see also In re Catfish Antitrust Litig.*, 826 F.Supp 1019, 1035 (N.D. Miss 1993) ("[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members."); *Martino v. McDonald's Sys., Inc.* 81 F.R.D. 81, 85 (N.D. Ill. 1979) ("Rule 23 (a)(3) requires that the representative parties' claims be typical, not that the parties themselves be typical.").

       A.       *Plaintiffs do not need to have purchased services from all defendants throughout the Class Period*

In a class antitrust litigation, plaintiffs need not deal with all of the defendants in order to satisfy the "typicality" prong of Rule 23(a)(3).  The recent opinion in *Air Cargo Shipping Services Antitrust Litigation,* MDL No. 1775 (E.D.N.Y), preliminarily approving a settlement

with one of the multiple defendants in that litigation is particularly instructive and persuasive. The *Air Cargo* case is extremely similar to this case both on the facts and the law. That case originated in a grand jury investigation by the Antitrust Division of the DOJ into possible violations of the antitrust laws by air cargo carriers to and from the United States. Shortly after the investigation became public, various plaintiffs filed suits seeking damages, and those suits were consolidated and transferred by the Judicial Panel on Multidistrict Litigation to the Eastern District of New York.

Early on in the litigation – even before the plaintiffs filed their consolidated amended complaint and before defendants moved to dismiss the complaint – the plaintiffs entered into a settlement agreement with Lufthansa. The settling parties jointly moved for preliminary approval. The motion was referred to a magistrate judge who issued a report and recommendation recommending that the motion be granted, *In re Air Cargo Shipping Services Antitrust Litig.*, MDL. No. 1775 (E.D.N.Y. October 16, 2007) (Report and Recommendation recommending grant of certification of the settlement class and preliminary approval of the Lufthansa settlement) ("R&R"). (Attachment D) The R&R was approved by the district court judge, *In re Air Cargo Shipping Services Antitrust Litig.*, M.D.L. No. 1775 (E.D.N.Y. January 10, 2008) (order adopting Report and Recommendation dated October 16, 2007 and granting preliminary approval of the Lufthansa settlement). The magistrate judge carefully addressed each of the elements of Rule 23 and concluded that a single class consisting of all persons and entities "that purchased airfreight cargo shipping services . . . from *any* air cargo carrier" should be certified for purposes of the settlement. R&R at 4 (emphasis added).

In determining whether typicality under rule 23(a)(3) had been met, the magistrate first noted that "when the same unlawful conduct was directed at both the named plaintiff and the

class to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims." R&R at 7, *citing D'Alauro v. GC Services Ltd. P'ship*, 168 F.R.D. 451, 456-57 (E.D.N.Y. 1996). The court then applied that standard to allegations in the complaint:

> There is nothing to indicate that the claims pressed by the named plaintiffs are any different from those that would be brought by the members of the proposed class. Both groups seek to prove that the defendants conspired to fix the prices of air freight services through a range of anti-competitive measures. The claims thus all arise out of a common course of events, and rest on essentially identical legal theories. *To the extent differences exist as to the facts relevant to the claim of each plaintiff or the damages suffered by each potential class member, such disparities do not preclude a finding of typicality.*

R&R at 8 (emphasis added).

Similarly, Plaintiffs in this litigation should not be required to have dealt with each defendant over the entire class period to be proper class representative in this case. In *In re Vitamins Antitrust Litigation*, 209 F.R.D. 251 (D.D.C. 2002), the defendants contended that the class claims would "differ greatly in terms of . . . the defendants from whom they purchased and the differing . . . duration of conspiracies.'" *Id.* at 260. There, defendants even pointed out that one of the named plaintiffs never purchased one of the products allegedly affected by the conspiracy. Still, the typicality requirement was not defeated. The court found that in the context of an antitrust conspiracy the named plaintiffs did not need to make purchases from all of the defendants over the entire class period. *Id.* The "overarching conspiracy to fix prices and allocate the market in violation of antitrust laws will be common to all class members." *Id.*[16]

---

[16]   *See also In re Workers' Compensation*, 130 F.R.D. 99, 106 (D.Minn. 1990) ("The fact that the purchases were not made from all of the defendants…is not dispositive of their ability to represent the class."); *In re Art Materials Antitrust Litig.*, MDL No. 436, 1983 WL 1802 (N.D.Ohio 1983) (finding a named plaintiff only having purchases in the early part of a 15 year class period will not have interests antagonistic to those with more recent

The *Air Cargo* court applied the correct legal standard in approving the Lufthansa settlement.  It did not require named plaintiffs to have dealt with each of the defendants throughout the class period or even to have dealt with each of the defendants at any point during the class period; it was sufficient that the complaint alleged that they had purchased airfreight shipping services "from any cargo carrier." *Id.* at 4.  The same logic should apply here.

        B.        *Plaintiffs do not need to be the same size as other Class Members.*

Named plaintiffs are not required to have "the same claim size or financial interest as the class they seek to represent" in order to satisfy the typicality requirement.  *See In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D. Minn. 1995).  In that case, the named class representatives were small, local retailers.  The defendants argued that much of the class was comprised of large-volume purchasers, who because of their size were able to negotiate special arrangements not available to the small retailers.  The court found the typicality requirement was satisfied with the allegations of an antitrust price-fixing scheme that affected all purchasers. *Id.* at 692-693.  Similarly, the court in *Air Cargo* did not look into whether the named plaintiffs were large shippers or small shippers or find it necessary to inquire at all about the substantiality of their purchases.  It was sufficient that they had purchased airfreight shipping services and thus had the incentive to seek the fullest possibility recovery for the alleged antitrust violations.  The same reasoning should be applied here.

        C.        *Factual differences do not negate typicality.*

The fact that some members of the class shipped via different ports, in different types of equipment, shipped different commodities, or paid different rates does not render their claims atypical.  Such differences do not undermine the suitability of a class action as long as the

---

purchases); *Wolfson v. Artisans Savings Bank*, 83 F.R.D. 547, 550 (D.Del. 1979) (finding that a named plaintiff with dealings with only one defendant bank still has an incentive to prove that its bank was part of a larger conspiracy with "as many banks as possible over as long a period as possible.")

members of the class are pursuing the same legal theory. *See In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001) ("A finding of typicality will generally not be precluded even if there are 'pronounced factual differences' where there is a strong similarity of legal theories.").

The court in *Air Cargo* did not find it necessary to separate members of the class according to the origin or destination of their cargo, the kind of cargo shipped, or the kind of equipment used to transport the cargo.  It was sufficient that the complaint had alleged a single global conspiracy; indeed, the court in the *Air Cargo* did not have before it, as this Court does, an affidavit from a person described by the Antitrust Division as the "right-hand" man to the person who hatched the conspiracy supporting the allegations in the complaint.  Sentencing Hearing Transcript, page 104, line 20 (May 12, 2009).  Yet, the court certified a single settlement class.  R&R at 4.  No subclasses were necessary despite the variations in markets served, equipment used, or the cargo transported.

The *Air Cargo* court also found specifically that differences in potential damages incurred by members of the class did not preclude certification for purposes of the Lufthansa settlement.  The court's finding is logical: in the context of a settlement, differences between and among class members about how they were impacted and damaged by a conspiracy can and should be addressed through the process of claims administration, subject to court review upon motion for final approval.

Here, Plaintiffs allege an antitrust conspiracy that includes all purchasers regardless of ports used, types of equipment used, specific commodities shipped, or rates paid.  In *Vitamins*, where the factual differences were even more striking, a court found that "[t]he typicality requirement does not mandate that products purchased, methods of purchase, or even damages of

the named plaintiffs must be the same as those of the absent class members."  209 F.R.D. at 261

(*citing Potash*, 159 F.R.D. at 691).  In that case, the plaintiffs alleged an antitrust conspiracy of

price-fixing and market allocation across various different vitamin product lines, but the court

found that the claims were all based on the same legal theories.  *Id.* at 261.  The defendants

argued that the "class would be an amalgam of 'diverse businesses, facing different competitive

environments and paying widely different prices.'"  *Id.* at 260.  The court rejected that argument

and stated that:

> [T]here is nothing in Rule 23 (a)(3) which requires the named plaintiffs
> to be clones of each other or clones of other class members.  The
> diversity of named plaintiffs who differ in their methods of operation
> and conduct is often cited by defendants as an impediment to class
> certification.  However, as long as the substance of the claim is the
> same as it would be for other class members, then the claims of the
> named plaintiffs are not atypical.

*Id.* at 261, *quoting Catfish,* 826 F. Supp. at 1036.

Plaintiffs have alleged an overarching conspiracy that affects all members of the

proposed Settlement Class.  For purposes of ruling on a motion for class certification, the

allegations must be taken as true.  *See In re Playmobil Antitrust Litig.*, 35 F. Supp 2d 231, 236

(E.D.N.Y. 1998).  Thus, even if members of the class were impacted differently (*i.e.*, some had

greater rate increases than they would have had absent the conspiracy or some had smaller rate

reductions than they would have had absent the conspiracy), in the context of a settlement, those

differences can be taken into account in the evaluation of their claims by the settlement

administrator and in the plan of distribution developed by named plaintiffs, all of which are

subject to comments by members of the class at the hearing on final approval and, ultimately, to

a finding by the Court that the settlement is "fair, reasonable, and adequate."  Rule 23(e)(2).

4.      Plaintiffs will fairly and adequately represent the Settlement Class.

The adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This entails a two-part showing: "The moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

The first prong of the test seeks to ensure that the interests of the class representative are aligned with the interests of absent class members. *In re Boston Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 287 (D. Mass. 2009). For the same reasons that the Settlement Class representatives' claims typify those of the other Class members, their interests align perfectly, creating no conflict, and they are all motivated to obtain the best possible result for the Class. *See In re Credit-Suisse*, 253 F.R.D. at 22-23 (noting that the requirements of typicality and adequacy "tend to merge"). The second prong is also amply satisfied here. Interim Co-Lead Counsel, individually and collectively, bring expertise and extensive experience in class litigation generally and antitrust direct purchaser class actions in particular.

**C.      Class Certification Is Also Appropriate Under Rule 23(b)(3).**

1.      Common questions of law and fact predominate.

The predominance prong requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  In making this inquiry, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 298 (1st Cir. 2000).  Here, it is clear that common issues of law and fact will predominate as this case is

litigated. Plaintiffs have identified numerous common questions concerning the existence, nature and extent of Defendants' alleged conspiracy, the nature and common pattern of any resulting injury, and the appropriate remedies for that injury.  These issues include, among others, (a) whether Defendants engaged in a combination or conspiracy to allocate customers, rig bids, and fix the prices of rates, surcharges and other fees for Puerto Rican Cabotage; (b) the identity of the participants in the conspiracy; (c) the meetings, communications and other collusive acts performed by Defendants in furtherance of the conspiracy; (d) the duration of the conspiracy; (e) the effect of Defendants' conduct on the prices of Puerto Rican Cabotage during the Class Period: (f) whether the conspiracy violated Sections 1 and 3 of the Sherman Act and Puerto Rico Statutes Title 10 Section 258; and (g) the appropriate measure of damages sustained by Plaintiffs and other Settlement Class members, and whether they are entitled to equitable relief.  (See SCAC ¶152.)

The common issues identified above are virtually identical to the common issues involved in the *Air Cargo* litigation.  In *Air Cargo*, the court found that the allegation that the "defendants created and furthered a 'single global conspiracy' to fix the prices of air cargo shipping" was sufficient to "easily" satisfy the predominance requirement.  R&R at 12.  The court noted that taking this allegation as true (which it was required to do on a Rule 23 preliminary approval motion), there was "little question that all of the class members will resort to common proof to establish the existence of the conspiracy and its impact on all members of the class." *Id.* at 12.   Moreover, the district court in *Air Cargo* held that the predominance requirement was met even though the alleged price fixing conspiracy apparently involved over twenty (20) foreign airlines flying "to and from" multiple locations and covered different routes, different kinds and sizes of cargo and different aircraft.

As the Court knows, the Plaintiffs in this case allege, *inter alia*, that the Defendants agreed to fix prices for shipping cargo, allocated purchasers of cargo shipping services through a bid rigging scheme and/or also fixed the surcharges imposed on class members.   These allegations are substantially similar to the factual allegations directed at the airline defendants in *Air Cargo*.  Like the *Air Cargo* case, there can be little doubt that class members in this case will resort to the same evidence to establish the existence of the conspiracy and its impact on the class.  This is not surprising given that in a Section 1 antitrust claim, the elements primarily focus on the conduct of the defendant.  *See, In Re Insurance Brokerage Antitrust Litigation*, 579 F. 3d 241, 267-68 (3rd Cir. 2009)(noting that three of the four elements of Section 1 antitrust claim focus on the defendants' conduct or the market-wide effects of such conduct and thereby establishing common issues of fact subject to common proof).

2.      A class action is the superior method for fairly resolving this case and efficiently administering the Settlement.

The superiority prong requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).   As Rule 23(b)(3) further provides, "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).[17]

---

[17] In the context of a settlement class, considerations related to manageability present no obstacle to certification because the proposal is that there be no trial at all.  *See, In Re Relafen Antitrust Litigation*, 231 F.R.D. 52, 68 (D. Mass. 2005); *see als*o, *In Re Lupron Marketing & Sales Practices  Litigation*, 228 F.R.D. 75, n. 33 (D. Mass. 2005)(observing that manageability issues are not a consideration in the settlement class context).

All of these factors weigh strongly in favor of certifying the Settlement Class. Indeed, the decision of the Judicial Panel on Multi-District Litigation to transfer all the related actions to this Court for consolidation reflects the advantages of class litigation of the claims against Defendants. The Settlement itself manifests the virtues of class litigation, resolving in one stroke the claims against the Crowley Defendants of hundreds, if not thousands, of direct purchasers. *See*, *Air Cargo*, at p. 13 (noting that resolution of thousands of claims from direct purchasers of shipping services supported finding that the class action was an efficient method). Resolving such claims, whether by settlement or trial, would serve the same the policies of efficiency, judicial economy, and consistency of results embodied in Rule 23. Given the size of the proposed Settlement Class, it is clear that piecemeal adjudication of claims involving virtually identical facts and a single common legal theory would be a very inefficient allocation of court resources and that class treatment is clearly superior in light of the fact that there is no trial and the other elements of Rule 23 are satisfied. *See*, *In Re Relafen Antitrust Litigation*, 231 F.R.D. 52, 71 (D. Mass. 2005)(noting that in light of the fact that the other elements of Rule 23 are met, a class action is "surely a superior method for resolving claims.")

Class certification in this case is also superior to other methods because, consistent with the "core purpose" of Rule 23(b)(3), the class device will afford individual purchasers of Puerto Rican Cabotage the opportunity to vindicate their claims regardless of amount. As a practical matter, denying certification would deprive purchasers who suffered relatively small damages of a viable legal remedy given the cost and inconvenience of individual litigation against large corporate defendants. For these reasons, a class action is far superior to other methods of adjudicating the claims asserted against Defendants.

In short, this action like countless other direct purchaser antitrust actions certified by the courts of this Circuit and elsewhere—is ideally suited for class certification.

## IV.    THE FORMS OF NOTICE AND PROOF OF CLAIM SHOULD BE APPROVED

### A.    <u>Requirements for Class Notice</u>

A court which certifies a class under Rule 23(b)(3) "must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). This notice must "clearly and concisely" inform the class members of the essential terms of the settlement, its effects, and their options with respect to the settlement. *Id.*   As discussed next, the proposed notice to the Settlement Class (the "Notice") satisfies these requirements and conforms to the prevailing practice in antitrust class actions.

### B.    <u>The Proposed Notice & Claim Form</u>

In accordance with the Settlement Agreement (SA ¶5), the Notice will be disseminated to members of the Settlement Class in two ways, as described in the accompanying declaration of Cameron R. Azari, the expert engaged by Plaintiffs to consult regarding the provision of class notice.  First, a long-form notice in the form attached to this Motion as Attachment B-1 (the "Mailed Notice") will be sent by first-class mail to all members of the Class who have been identified by reasonable means and efforts. (Azari_Aff. ¶ 12)  The package sent to individual class members will include a claim form substantially identical to the form attached to this Motion as Attachment C.  (Azari ¶ 19)

Next, within five days later, a short-form notice in the form attached to this Memorandum as Attachment B-2 (the "Summary Notice") will be published in El Nuevo Dia and Caribbean Business.  El Nuevo Dia, published in San Juan, is the largest newspaper in Puerto Rico, and Caribbean Business is the main business publication in Puerto Rico. (Azari Aff.

¶ 14)  In both publications, the notice will appear in Spanish. (*Id.*)  The Summary Notice will also appear in the largest newspapers in the four cities with ports handling the largest volume of shipments between Puerto Rico and the mainland United States.  These papers are the Houston Chronicle (Houston), the Newark Star-Ledger (Pennsauken/Elizabeth, New Jersey), The Florida Times (Jacksonville), and the Sun-Sentinel (Port Everglades). (*Id.*)

The forms of notice attached hereto are the same as the notices provided to the Court on July 8, 2009 with Plaintiffs' motion for preliminary approval of settlement with the Horizon Defendants (Docket. Nos. 375-3, 375-4, and 375-5) except for additional language needed to "fold in" the separate settlement agreements with the Crowley Defendants and individual Defendant Alexander G. Chisholm.  The notices attached hereto differ from the July 8, 2009 notices only in that they include discussion of the settlements with the Crowley Defendants and Mr. Chisholm.  The other settling Defendants had reviewed and signed off on the notices.

### C.    The Proposed Form and Manner of Notice Are the Best Practicable Under the Circumstances and Satisfy Due Process Requirements.

#### 1.    Explanation of Settlement, Plan of Allocation, class member options, and deadlines

The proposed manner of Notice comports with Rule 23 and is the standard for providing class notice in federal antitrust class-action litigation.   To facilitate identification of the Settlement Class members for the Mailed Notice, the Crowley Defendants have agreed to provide Plaintiffs with information identifying persons and entities that purchased Puerto Rican Cabotage during the Class Period, which is expected to identify virtually all of the Settlement Class members.  The Summary Notice will appear in the six publications listed above, which are likely to be read by Class members who may not receive the Mailed Notice.  It will also be posted on the websites of other selected publications.  In addition, copies of the Notices will be made publicly available to Class members on the settlement administrator's website. (*Id.* ¶ 16)

The content of the Notice also comports with Rule 23. Both the Mailed Notice and the Summary Notice are modeled after notices approved in many other federal antitrust class actions. Each of them (the Mailed Notice in more detail than the Summary Notice) describes, in clear, concise and plain language, the nature of this litigation, the Settlement, and the proposed certification of the Settlement Class. The Summary Notice describes how to obtain a copy of the Mailed Notice. More specifically, the Notice informs Class members of the principal terms of the Settlement, including, the benefits to the members, the Plan of Distribution, attorneys' fees and expenses, and requested incentive awards. The Notice also explains eligibility to participate in the Settlement, options available to the Class members, and the rights and obligations accompanying each option, including the opportunity to object to the Settlement, the Plan of Distribution, and potential attorneys' fees and expenses or incentive awards. Plaintiffs' Proposed Preliminary Approval Order would allow Class members 60 days from the mailing of the Mailed Notice to object.

The Notice also informs the Class members of their right to exclude themselves from the Settlement Class, describing the binding effect of the release terms and explaining how the consequences of remaining a Class member differ from those of opting out. The Proposed Preliminary Approval Order also would allow Class members to opt-out 60 days from the mailing of the Mailed Notice. This time period affords the Class members more than sufficient time to fully consider their options and take any required action to object or opt out.

The Notice also explains how the Class members can obtain copies of the Settlement Agreement and other papers filed in the case, and how to contact Class Counsel if they have questions about the Settlement or the case in general.

2.      Process for submitting claims

The Notice also describes the process for submitting claims and the deadline for doing so. Attached to the Mailed Notice will be a Proof of Claim Form in the form attached to this memorandum as AttachmentB-3, by which Settlement Class members can apply to receive a cash payment or, if eligible, elect to participate in the Base-Rate Freeze.  To receive a cash payment or to elect the Base-Rate Freeze option, Settlement Class members must timely return a properly completed Proof of Claim Form.  Any Settlement Class member who would otherwise qualify for the cash payment or the Base-Rate Freeze but does not properly complete and timely return the Proof of Claim Form will not receive a cash payment or the Base-Rate Freeze.

3.      Fairness Hearing

The Notice also informs the Settlement Class members of the Fairness Hearing date and advises them of their right to appear.  To allow sufficient time for the parties to respond to any objections, and for the Crowley Defendants to review the list of opt-outs to determine whether to exercise any right they may have to terminate the Settlement Agreement, the Fairness Hearing should not take place until at least 35 business days after the objection and opt-out deadlines.[18]

4.      Class representative awards, attorneys' fees, and litigation expenses

At this time, Plaintiffs are not requesting any incentive awards for the Class representatives or any award of attorneys' fees or reimbursement of litigation costs.  Instead, at some time in the future they will submit a fee application for no more than one-third of the

---

[18] The Settlement Agreement provides that Interim Co-Lead Counsel will furnish a list of the opt-outs to the CrowleyDefendants within 10 business days after the opt-out deadline, that the Crowley Defendants will have 10 business days from that date to notify Interim Co-Lead Counsel if they believe that the conditions for terminating the Settlement Agreement have been met, and that the Crowley Defendants will have 10 days thereafter to terminate the Settlement Agreement. (SA ¶12(a), (b) and (c).)

Crowley Settlement Fund, litigation expenses of no more than $250,000, and a request for combined incentive awards of not more than 10,000.00 for each Class representative.[19]

In summary, the Mailed and Summary Notices will afford the best notice practicable under the circumstances.  This combination of mailing and publication has become the standard practice for notifying class members in antitrust cases and is routinely approved by courts as satisfying the requirements of Rule 23 and due process.  Accordingly, the proposed form and manner of notice to the Settlement Class should be approved.

## V.    EFFECT OF THE SETTLEMENT AGREEMENT ON THE NON-SETTLING DEFENDANTS' ABILITY TO RECEIVE SET-OFF

The Settlement Agreement does not impact the Non-Settling Defendants' right to set-off. The relevant provision states:

> [T]he fact or terms of this Settlement with the  Crowley Defendants and the releases contained herein shall not be construed to release or limit in any way the joint or several liability or damage responsibility of any non-settling Defendant or any alleged co-conspirator other than the Released Parties arising from the alleged combination and conspiracy, or from sales or other acts alleged in the Second Consolidated Amended Class Action Complaint in MDL 1960, including, but not limited to, any alleged damage or responsibility for any of the acts of the Released Parties.

(SA ¶20.) While this provision does not address or impact Non-Settling Defendants' set-off rights, it is a restatement of the law that a defendant in a price fixing case is jointly and severally liable for all damages caused by its co-conspirators, but if one defendant settles, its co-conspirators remain jointly and severally liable unless they are also released from liability.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 345-46 (1971) (holding that the effect of a release of a settling antitrust defendant on a non-settling defendant is to be determined

---

[19] Because there are multiple proposed settlements, each Class Representative will only receive a maximum aggregate of $10,000.00 in incentive awards.

in accordance with the parties' intentions.) Accordingly, Paragraph 20 of the Settlement Agreement expresses Plaintiffs' intention to release their claims against the Released Parties, and only reserves Plaintiffs' ability to pursue their claims against the Non-Settling Defendants by stating that it is not Plaintiffs' intention to release them from liability as a result of the settlement with the Crowley Defendants.  Indeed, the language in the Settlement Agreement is clear that it cannot be construed to limit the Non-Settling Defendants' right to set-off.

Moreover, the Supreme Court has explicitly stated that a settling defendant in an antitrust case cannot impact a non-settling defendant's right to receive set-off based on a settlement agreement with a plaintiff.  In *Zenith* the Supreme Court held that "entirely apart from any release, a plaintiff who has recovered any item of damage from one co-conspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment." 401 U.S. at 348.  Thus, the Non-Settling Defendant's right to receive set-off is not prejudiced because Plaintiffs and the Crowley Defendants do not have the ability to eliminate or alter that right under the law.

Similarly, Plaintiffs and the Crowley Defendants do not have the ability to determine the type of set-off rights Non-Settling Defendants receive because the antitrust laws allow only one type of set-off.  Due to joint and several liability in antitrust cases, non-settling defendants' set-off rights can only be calculated by deducting settlement amounts already received from the treble damages that are due to plaintiffs at the end of trial.  *See Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 391-92 (4th Cir. 1982).  Joint and severally liable non-settling defendants remain liable for all the remaining damages regardless of each defendant's share calculated on the basis of proportionate fault.  *See id.* at 392 n.8.  Accordingly, the Proposed Order attached

hereto explicitly states: "The Settlement Agreement shall not be construed to impact the right of Non-Settling Defendants to receive any set-off to which they are entitled."

## VI.   THE FILED-RATE DOCTRINE HAS NO EFFECT ON THE PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENT

The filed-rate doctrine does not bar the preliminary approval of the Settlement Agreement.  Even if there were the potential for Non-Settling Defendants to use a filed-rate doctrine defense and successfully defeat the antitrust claims made against them in this case, it does not mean that the Court should not grant preliminary approval to this settlement.  *See, e.g., In re Real Estate Title and Settlement Sers. Antitrust Litig.*, MDL No. 633, 1986 WL 6531, at *17, 22 (E.D. Pa. June 10, 1986) (granting approval of settlement agreement notwithstanding fact that, if case had been litigated, plaintiffs faced the nearly "insurmountable" hurdle of overcoming defendants' many defenses, among them a filed rate doctrine defense); *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566, 2007 WL 1319457, at *1 (D. Nev. May 3, 2007) (granting preliminary approval of settlement agreement notwithstanding fact that defendants had asserted a filed rate doctrine defense); *In re Arizona Escrow Fee Antitrust Litig.*, No. 80-cv-840, 1982 WL 1938, at *4, 13 (D. Ariz. Sept. 22, 1982) (noting that settlement had been reached and approved notwithstanding potential filed rate doctrine defense); *Milkman v. Am. Travellers Life Ins. Co.*, 2002 WL 778272, at * 15, 23 (Pa. Comm. Pl. Apr. 1, 2002) (granting final approval of settlement agreement notwithstanding defendants' potential filed rate doctrine defense).

In fact, courts have said that the filed-rate doctrine weighs in favor of approval of proposed settlement agreements due to the fact that settlements provide benefits to plaintiffs that may not be available to them through litigation.  *See, e.g., In re Real Estate Title and Settlement Servs. Antitrust Litig.,* 1986 WL 6531, at *17 (holding that plaintiffs' risk of not being able to

establish liability where defendants had a potential filed-rate doctrine defense weighed in favor of approving the settlement); *Milkman,* 2002 WL 778272, at *14-15 (same).

Indeed, defendants are permitted to settle claims even if they believe that they have a valid filed-rate doctrine defense. Even when defendants prevail at trial, plaintiffs can appeal and successfully persuade an appeals court to overturn a lower court's decision.[20] Thus, a settlement eliminates the risk of losing their case on appeal. Therefore, the existence of a filed-rate doctrine defense should not preclude this Court from granting preliminary approval of the Settlement Agreement.

Similarly, the fact that contract customers could share settlement proceeds with tariff customers whose claims can potentially be defeated under the filed-rate doctrine should not preclude this Court from granting preliminary approval. Class Members' claims are handled during the process of class notice, claims administration, and allocation and distribution of settlement funds subject to Court approval. Thus, this issue is not a basis for denying preliminary approval of the Settlement Agreement. Therefore, the Court may grant preliminary approval despite the fact that the Crowley Defendants could assert a filed-rate doctrine defense against some members of the proposed Settlement Class.

## VII.   PROPOSED TIMETABLE FOR FINAL SETTLEMENT APPROVAL

To accomplish the steps necessary for final approval of the Settlement, Plaintiffs propose the following schedule for disseminating the Notice, filing objections, opting out, and scheduling the Fairness Hearing:

---

[20]   *See In re Western States Wholesale Natural Gas Antitrust Litigation,* MDL No. 1566 where plaintiffs and the settling defendants reached a settlement after the district court had dismissed the plaintiffs' complaint and while the action was on appeal to the Ninth Circuit, 2007 WL 1319457, at *7.

| Event | Time for Compliance |
|---|---|
| Mailing of Notice to Class | No later than twenty (20) business days after Preliminary Approval. |
| Publication of Summary Notice | No later than five (5) business days after mailing of Notice. |
| Deadline for submitting objections to Settlement | No later than sixty (60) calendar days after mailing of Notice. |
| Deadline for opting out of Settlement Class | No later than sixty (60) calendar days after mailing of Notice. |
| Deadline for returning Claim Form | No later than sixty (60) calendar days after mailing of Notice. |
| Filing of papers in support of Final Approval of Settlement and Plan of Allocation, and Proof of Notice | No later than ten (10) calendar days before Fairness Hearing. |
| Fairness Hearing | No earlier than thirty-five (35) business days following deadline for submitting objections and opting out. |

The parties believe that this proposed schedule will adequately apprise the Settlement Class members of the Settlement and their options with respect to the Settlement, and afford them sufficient opportunity to object if they wish.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court (1) grant preliminary approval of the proposed Settlement; (2) conditionally certify the proposed Settlement Class; (3) adopt the proposed schedule for a Fairness Hearing and completion of the settlement approval process; (4) grant preliminary approval of the Plan of Distribution; and (5) authorize payment from the Crowley Settlement Fund of reasonable expenses related to class notice, taxes, escrow and other bank fees, and other settlement administration expenses

necessarily incurred before the Court determines whether to grant final approval of the Settlement.   To grant this relief, Plaintiffs ask the Court to sign the proposed Preliminary Approval Order submitted herewith.


Dated February 5, 2010.

                                        Respectfully submitted,

                                        By:    /s/ John Nevares & Associates, PSC
                                        John F. Nevares (PR 130502)
                                        P.O. Box 13667
                                        San Juan, Puerto Rico 00908-3667
                                        Tel. (787) 793-4906
                                        Fax (787) 721-8820
                                        Email: jfnevares@nevareslaw.com.
                                        Interim Liaison Counsel for Plaintiffs

                                        Nestor M. Mendez-Gomez
                                        Pietrantoni Mendez & Alvarez LLP
                                        Banco Popular Center, 19th Floor
                                        209 Munoz Rivera Ave.
                                        San Juan, PR 00918
                                        Tel: (787) 274-1212
                                        Fax: (787) 274-1470
                                        nmendez@pmalaw.com

                                        Camilo K. Salas, III
                                        Salas & Co., L.C.
                                        650 Poydras, Suite 1650
                                        New Orleans, LA 70130
                                        (Orleans Parish)
                                        Tel: (504) 799-3080
                                        Fax: (504) 799-3085
                                        csalas@salaslaw.com

                                        Linda P. Nussbaum
                                        Kaplan Fox & Kilsheimer, LLP
                                        850 Third Avenue, 14th Floor
                                        New York, NY 10022
                                        Tel: (212) 687-1980
                                        Fax: (2120 687-7714

Vincent J. Esades
Heins Mills & Olson, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com

Hollis Salzman
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
hsalzman@labaton.com

Joe R. Whatley Jr.
Richard P. Rouco
Whatley Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com
rrouco@wdklaw.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
106 W. Seventh St.
P.O. Box Drawer H
Reserve, LA 70084
Tel: (985) 535-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Interim Lead Class Counsel

I HEREBY CERTIFY that today I electronically filed the foregoing document with the
Clerk of Court using the CM/ECF system which, on information and belief, shall automatically
notify counsel of record, and which pursuant to Local Civil Rule 5.1(b)(2), constitutes the
equivalent service.

/s/ Richard P. Rouco

Whatley Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@wdklaw.com