**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE PUERTO RICAN CABOTAGE ANTITRUST LITIGATION | MDL Docket No. 3:08-md-1960 (DRD) |

## <u>OPINION AND ORDER</u>

Following a criminal investigation by United States Department of Justice's Antitrust Division (the "DOJ"), Plaintiffs filed suit under the Sherman Act, 15 U.S.C. §§ 1 and 3.[1] The instant case is comprised of a compilation of cases sent to this District Court to be handled as a multi-district litigation.

Plaintiffs represent a Class comprised of direct purchasers of waterborne cabotage between Puerto Rico and the United States, its territories and possessions. Plaintiffs purchased the cabotage from Defendants, companies that provide cabotage services and several individual officers of those companies.

Plaintiffs allege that Defendants engaged in a conspiracy to illegally fix waterborne cabotage prices[2] between the U.S. and Puerto Rico from May 1, 2002 to April 17, 2008. Defendants

---

[1] The criminal investigation led to Horizon Lines, LLC pleading guilty to one count of price fixing in violation of the Sherman Act and five guilty pleas from former employees of the Horizon and Sea Star Defendants. *See* <u>United States v. Horizon Lines, LLC</u>, No. 3:11-CR-0071, *Second Amended Judgment* (D.P.R., Apr. 28, 2011); <u>United States v. Chisholm</u>, No. 08-cr-00353, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); <u>United States v. Serra</u>, No. 08-cr-00349, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); <u>United States v. Glova</u>, No. 08-cr-00352, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); <u>United States v. Gill</u>, No. 08-cr-00351, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); and <u>United States v. Baci</u>, No. 08-cr-00350, *Plea Agreement* (M.D. Fla., Oct. 20, 2008).

[2] "Prices" in this context include both the negotiated costs of shipping and the various surcharges, such as fuel surcharges, imposed by cabotage providers.

1

collectively controlled approximately 86% of the cabotage market during that time period.[3]  Plaintiffs further assert that Defendants colluded by conspiring to allocate customers and rig bids to customers in addition to fixing their rates, surcharges and other fees.  (Docket No. 540-25).  Pending before the Court is Lead Counsel for Plaintiffs' ("Lead Counsel") requests for an award of attorneys' fees, reimbursement of expenses and incentive award payments.

## I. Procedural History

On August 25, 2010, the Court granted preliminary approval for the settlement reached with (1) Horizon Lines, Inc., Horizon Lines, LLC, Horizon Logistics Holdings, LLC, Horizon Logistics, LLC and Horizon Lines of Puerto Rico, Inc. (collectively, the "Horizon Defendants"); (2) Crowley Maritime Corp., Crowley Liner Services, Inc. (collectively, the "Crowley Defendants"); (3) Sea Star Line, LLC, American Shipping Group, Inc., Saltchuk Resources, Inc. and Leonard Shapiro (collectively, the "Sea Star Defendants"); and (4) Alexander Chisholm[4] ("Chisholm"). (Docket

---

[3]Horizon accounts for approximately 35% of the Puerto Rico cabotage market; Crowley and Sea Star account for approximately 30% and 21% of the market, respectively.  Trailer Bridge, a Defendant that was ultimately dismissed from the instant matter (Docket No. 722), accounts for approximately 14% of the  Puerto Rico cabotage market.

[4]Alexander Chisholm was the Assistant Vice President of Yield Management for Sea Star.  On October 20, 2008, Chisholm, along with four other individuals, pled guilt to government charges that he destroyed evidence concealing the alleged conspiracy. United States v. Chisholm, No. 08-cr-00353, *Plea Agreement* (M.D. Fla. Oct. 20, 2008).

No. 800). Therein, the Court concluded that the settlement negotiations were conducted at arm's length and that the parties were sufficiently informed by the limited discovery that occurred. In re Puerto Rican Cabotage Antitrust Litig., 269 F.R.D. 125 (D.P.R. 2010); (Docket Nos. 800 and 801).

The Horizon Settlement Agreement provides, *inter alia*, that the Horizon Defendants agreed to (1) pay $20,000,000 in cash to the Settlement Class; (2) offer Settlement Class Members (the "Class" or "Class Members") the option of freezing the base rates of any shipping contracts they have with the Horizon Defendants for two years, an option valued at $42.9 million; and (3) cooperate with Plaintiffs in litigating their claims against the remaining, non-settling Defendants. In return, Class Members agreed to release any claims against the Horizon Defendants related to the purchases of Puerto Rican Cabotage.

The Crowley and Sea Star Settlement Agreements are substantially identical to the settlement reached with the Horizon Defendants. However, the Crowley Defendants agreed to pay $13,750,000 in cash to the Settlement Class and the value of the base rate freeze offered by Crowley is $38.9 million. The Sea Star Defendants similarly agreed to pay $18,500,000 in cash to the Settlement Class and offer a base rate freeze option valued at $23.2 million.

3

The Chisholm Settlement Agreement provides that in exchange for a release of certain claims, Chisholm agreed to cooperate with Plaintiffs in further litigation against non-settling Defendants. The agreement generally provides that Chisholm will (a) furnish certain documents, data, or other items potentially relevant to Plaintiffs' claims; (b) allow himself to be interviewed by Plaintiffs; (c) provide declarations and affidavits; and (d) provide a deposition and testify at trial.

On December 7, 2010, following a Final Fairness Hearing (Docket No. 876), the Court entered an *Order* (Docket No. 875) regarding final approval of the Crowley (Docket No. 680), Horizon (Docket No. 375), Sea Star (Docket No. 777) and Chisholm (Docket No. 597) Settlement Agreements (collectively, the "Settlement Agreements" or "Settlements"). In that filing, the Court indicated that its previous concerns[5] regarding various aspects of the Settlement Agreements had been assuaged during the Final Fairness Hearing. However, the Court declined to grant the motion for final approval of the Settlement Agreements (Docket No. 840)[6]

---

[5] Specifically, the Court had expressed concern "that the notices may have inadvertently misled Class Members to believe that they could select both the base rate freeze and the cash option." The Court also was concerned that the INEOS Objectors needed additional "time and information to ascertain whether the settlement was adequate as to them." Both of these concerns, however, were allayed through scrutiny of the Notices sent to Putative Class Members and the case law cited by the INEOS Objectors. Additionally, in the Final Fairness Hearing, the Court expressed doubts as to the explanation provided to the Court regarding the methodology utilized by Plaintiffs' expert; however, upon a subsequent review of the materials provided by the expert, the Court verified that all necessary information was included.

[6] The accompanying memorandum of law (Docket No. 841) is now deemed **NOTED**.

as the Court harbored reservations regarding the attorneys' fees requested by Lead Counsel.[7]   (Docket No. 839).   The Court thus invited "Plaintiffs' Counsel to further brief the application of a 'percentage of the fund' approach to attorneys' fees in the instant case in light of the relevant jurisprudence regarding funds whose monetary value is difficult to determine." (Docket No. 875).

Subsequently, Lead Counsel filed a supplemental brief regarding their request for attorneys' fees.   (Docket No. 886).   Therein, Lead Counsel retreats from its previous request of an award consisting of 16% of the maximized potential value of the fund or $25,000,000[8] and, instead, requests an award of 33⅓% of the actual value of the Settlements.   The Settlements are comprised of a cash portion totaling, $52,250,000, and the value

---

[7] The accompanying memorandum of law (Docket No. 839) is now deemed **NOTED**.

[8] Lead Counsel originally valued the total settlement at $157,250,000.  The base rate freeze option was initially valued at $105 million by calculating all the Class Members that could potentially elect the base rate freeze option.  Thus, Lead Counsel assumed that no Class Member would elect the cash settlement.  By adding the cash settlement, $52,250,000, with the Lead Counsel's calculation of the base rate freeze option, $105,000,000, Lead Counsel valued the total settlement at $157,250,000.  Lead Counsel's request for attorneys' fees in the amount of $25 million is approximately 16% of $157,250,000.

     The Court cautioned Lead Counsel against this type of double counting.  The Class Members can elect either to receive a portion of the cash settlement *or* the base rate freeze option thereby locking in lower shipping prices for two years.  Class Members cannot elect both options.  However, by assuming that all members would elect the base rate freeze option Lead Counsel significantly inflated the value of the base rate freeze option.

     Moreover, the Court found it imprudent to rely upon a hypothetical and theoretical "maximized potential" value that the settlement fund may reach at a future date, when Lead Counsel is requesting to withdraw a portion of the settlement fund for their compensation on this certain date.  A court must be conservative in assessing the total value of the settlement fund and base those assessments on actual, tangible benefits that are able to be calculate in the present.  *See* Petruzzi's, Inc. v. Darling Delaware Co., 983 F. Supp. 595, 608 (D. Pa. 1997) (finding that "awarding fees on the basis of a hypothetical 'common fund' in the percentage sought by class counsel would be a perverse result.").

of the base-rate freeze option *actually selected by Class Members,*
$13,600,000. Thus, the actual total value of the Settlements is
$65,850,000 and Lead Counsel requests a third of that sum, or
$21,950,000. Lead Counsel also petitions the Court to grant
$1,035,702.92 in expenses and $20,000 in incentive awards for each
of the six named Class Representatives (totaling $120,000).

V. Suárez, Inc., Central Produce El Jibarito, Inc. and
Caribbean Produce Exchange, Inc., (Docket No. 906) along with Pan
American Grain Co., Inc., Pan American Grain Manufacturing, Inc.
and Pan American Grain Properties, Inc. ("Pan American" and
collectively, the "Objectors")[9] (Docket No. 907) challenged Lead
Counsel's request. Therein, several Class Members note that the
requested 33⅓% of the common fund represents the upper limit of
fees previously granted by this Circuit and others. They also
note that the instant case was not as complex, lengthy in duration
or labor intensive as cases in which such fees were awarded.
Other Class Members note that those who elected the cash fund
option shall bear the burden of paying the requested attorneys'
fees.[10] However, on May 26, 2011 and on June 1, 2011, the

---

[9]"Objectors" includes Pan American Grain Co., Inc., Pan American Grain Manufacturing, Inc. and Pan American Grain Properties, Inc. ("Pan American") as the Court granted leave for Pan American to join the Objectors on January 18, 2011 (Docket No. 892).

[10]As Putative Class Members were advised that attorneys' fees were to be taken from the Settlements in the documents sent to them, the Court finds this argument unmeritorious for the same reasons it found other Objectors' arguments regarding the sufficiency of the Notice lacking in merit. The Court has already found that Putative Class Members were informed and were granted ample information to make educated business decisions regarding

Objectors moved to withdraw their opposition to Lead Counsel's requested attorneys' fees. (Docket Nos. 950 and 982).

Also on May 26, 2011, Objectors moved the Court to award the Objectors a percentage of the amount that Lead Counsel reduced its request for attorneys' fee, which is three million and fifty thousand dollars ($3,050,000). (Docket No. 951). Objectors argue that because of their direct efforts opposing Lead Counsel's initial fees request, the Settlements were enlarged by approximately three million dollars. Objectors claim that they are entitled to a percentage of the amount in which their efforts benefitted the Class. Objectors seek 33⅓% of $3,050,000; or, in the alternative, Objectors request the same percentage that the Court awards Lead Counsel. Lead Counsel supports the Objectors' request for fees. (Docket No. 986).

The Court has set a hearing on the applicability of the Class Action Fairness Act for September 9, 2011 (Docket Nos. 994 and 995). At this hearing, the Court will ascertain whether the base-rate freeze option *actually selected by Class Members*, valued at $13,600,000, constitutes a coupon settlement within the meaning of the Class Action Fairness Act. *See* 28 U.S.C. §1712. The Court will also entertain arguments as to whether the Act requires that

---

whether to opt in or out of the Settlements and regarding their options if they indeed opted in.

the Court employ the Lodestar method or permits the Court to utilize the percentage of the fund method in calculating attorneys' fees.  The Court will determine the attorneys' fees for the $13,600,000 base-rate freeze portion of the Settlements following this hearing.  Hence, the instant *Opinion and Order* only addresses the attorneys' fees for the cash portion of the settlement and the attorneys' fee for the Objectors.[11]

## II. Attorneys Fees

The general "American Rule" is that each side bears its own litigation costs and that the prevailing party is not entitled to recover attorneys' fees or costs.  <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975).  "[H]owever, the Supreme Court has recognized an equitable exception to this rule - known as the common fund or common benefit doctrine - that permits litigants or lawyers who recover a common fund for the benefit of persons other than themselves to obtain reasonable attorney's fees out of the fund, thus spreading the cost of the litigation to its beneficiaries."  <u>In re Zyprexa Prods. Liab.</u>

---

[11]The Class Action Fairness Act also mandates that defendants provide notice of a proposed class action settlement to specific federal and state officials. 28 U.S.C. §1715. Defendants, through the settlement administrator, provided the Attorney General of the United States, state officials in which each class member resides and the Attorney General for the Commonwealth of Puerto Rico with notice of the proposed Horizon Settlement on July 16th and 17th of 2009. (Docket No. 997). Defendants notified these same officials of the proposed Crowley and Sea Star Settlements on October 14, 2010. (Docket No. 997).

Prior to granting final approval of the proposed settlements, the Court notes that it has waited the statutorily required 90 days from the date of notification. *See* 28 U.S.C. §1715(d).

<u>Litig.</u>, 594 F.3d 113, 128 (2d Cir. 2010).  "Class action lawsuits are the prototypical example of instances where the common fund doctrine can apply."  <u>Victor v. Argent Classic Convertible Arbitrage Fund L.P.</u>, 623 F.3d 82, 86 (2d Cir. 2010).

In assessing requests for attorneys' fees, the Court functions "as a quasi-fiduciary to safeguard the corpus of the [settlement] fund for the benefit of the plaintiff class."  <u>In re Fid./Micron Sec. Litig.</u>, 167 F.3d 735, 736 (1st Cir. 1999) (citations omitted). *See* <u>Goldberger v. Integrated Res.</u>, 209 F.3d 43, 52 (2d Cir. 2000) ("[T]he court is to act as a fiduciary who must serve as a guardian of the rights of absent class members.") (citation and quotation marks omitted).  Additionally, Federal Rule of Civil Procedure 23(h) provides, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  However, "a thorough judicial review of fee applications is required in all class action settlements."  <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 333 (3d Cir. 1998) (internal quotations omitted).

## A. Percentage of the Fund

Attorneys' fees are typically assessed through either the percentage of the fund method or through the lodestar method.  <u>In</u>

re AT&T Corp., 455 F.3d 160, 164 (3d Cir. 2006).  The percentage of the fund method applies a certain percentage to the settlement fund whereas the lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services.  Id.  The Court confirms that it shall employ the percentage of the fund approach, as opposed to the lodestar method, to Lead Counsel's requested attorney fees as that methodology is favored in this Circuit.  See In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995); see also In re AT&T Corp, 455 F.3d at 164 (quoting In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) ("[T]he percentage-of-recovery method is generally favored because 'it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'").  Under the percentage of the fund method, the Court has "extremely broad" latitude to determine an appropriate fee award.  In re Thirteen Appeals, 56 F.3d at 309.

Although the First Circuit has not set forth a comprehensive list of factors to be considered when evaluating an attorneys' fees request pursuant to this approach, other District Courts within this Circuit have analyzed factors set forth by the Second and Third Circuits.  See In re Lupron Marketing and Sales Prac. Litig., MDL 1430, 2005 WL 2006833, at *3 (D. Mass. Aug. 17, 2005).

10

This Court shall follow suit and analyze Lead Counsel's request utilizing the following relevant factors:

> (1) the size of the fund and the number of persons benefited; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations, if any.

Id.; *see also* <u>In re Relafen Antitrust Litig.</u>, 231 F.R.D. 52, 79 (D. Mass. 2005).

## 1. The Size of the Fund and the Number of Persons Benefited

Analyzing the net dollars and cents results achieved by counsel for their clients is often the most influential factor in assessing the reasonableness of any attorneys' fee award. *See* <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) (stating that the "most critical factor is the degree of success obtained."). The Court also observes that "[g]enerally speaking, there is an inverse relationship between an increase in the size of the settlement fund and the percentage fee award." <u>Larson v. Sprint Nextel Corp.</u>, 2010 U.S. Dist. LEXIS 3270 (D.N.J. 2010). "The basis for this inverse relationship is the belief that in many instances the increase [in the recovery] is merely a factor of the size of the class and has no direct

relationship to the efforts of counsel." In re Prudential, 148 F.3d at 339 (internal quotations omitted). See In re Union Carbide Corp. Consumer Products Business Sec. Litigation, 724 F. Supp. 160, 166 (S.D.N.Y. 1989) ("Obviously, it is not ten times as difficult to prepare, and try or settle a ten million dollar case as it is to try a one million dollar case, although the percentage contingent fee will return ten times as much."); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 486 (S.D.N.Y. 1998) ("In many instances the increase [in the fund] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.").

The total actual value of the fund in the instant case is $65,850,000[12] and the size of the class is potentially as high as 61,854.[13]  Both of these numbers are substantial.  The Settlements

_____

[12]For purposes of evaluating the size of the fund, Lead Counsel returns to its previous argument that the total value of the settlement is $157,250,000.  (Footnote 8).  Lead Counsel arrives at this figure by adding the cash portion of the Settlements, $52,250,000, with their estimate that the base rate freeze options could have a maximized potential value of $105 million over a two year period.  A handful of Class Members objected in a footnote to Plaintiffs' expert's calculation of the actual value of the Settlements, but the Class Members provided no contrary expert's opinion.

The Court finds that the actual total value of the Settlements is $65,850,000.  The actual total value of the Settlements is comprised of two components: the cash portion of the settlements, $52,250,000, and the value of the base-rate freeze option *actually selected by Class Members*, $13,600,000.  When Lead Counsel is requesting to withdraw a portion of the settlement fund today for their compensation, the Court finds it imprudent to rely upon a hypothetical and theoretical "maximized potential" value of what the settlement fund may reach on a future date.  The Court should be conservative in assessing the total value of the settlement fund and base those assessments on actual, tangible benefits that are able to be calculated in the present.  See Petruzzi's, Inc. v. Darling Delaware Co. Inc., 983 F. Supp. 595, 608 (M.D. Pa.. 1996) (finding that "awarding fees on the basis of a hypothetical 'common fund' in the percentage sought by class counsel would be a perverse result.").

[13]On September 15, 2010, Lead Counsel commenced mailing the Long-Form Notice and Claim Form to 61,854 potential class members.  These members were identified from the transactional records provided by the Horizon, Crowley and Sea Star Defendants.

afford considerable benefits to a considerable number of Class Members.  Accordingly, this factor weighs in favor of Lead Counsel's fees' request.

## 2. The Skill, Experience & Efficiency of the Attorneys Involved

The Court has nothing but the highest respect for Lead Counsel: they represent able and experienced attorneys from both the continental United States and Puerto Rico.  Both Plaintiffs' counsel and opposing counsel are very experienced attorneys hailing from a variety of prominent law firms.  Plaintiffs' counsel has proven themselves to be "honorable litigators devoted to the interests of their clients who [have] vigorously contested the case from its inception." *See* In re Lupron, 2005 WL 2006833, at *4.  Through counsel's skill and ingenuity, counsel has achieved a substantial recovery for the Class.  Thus, counsel's caliber and experience weighs in favor of Lead Counsel's fee request.

## 3. The Complexity & Duration of the Litigation

"The complexity of federal antitrust law is well known" and "antitrust class actions 'are notoriously complex, protracted, and bitterly fought.'" In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003); Id. (citing Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).

13

The instant case has proved to be no exception.  The present matter was complex, involving sophisticated inquiries into the antitrust laws which underlie this action and requiring many days of hearings relating to the intricacies of the Settlements.

However, the Court must note that, even after several years of litigation, the instant case has not yet proceeded to the discovery phase.  While Lead Counsel is to be commended for achieving a significant settlement without the aid of discovery, and thus controlling litigation costs for both sides, the lack of discovery diminishes the complexity and duration of the litigation.  *See* In re Keyspan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *30 (E.D.N.Y. Aug. 25, 2005) (awarding 22.5% of the common fund in attorneys' fees where informal discovery was limited to the review of public documents and "did not involve intricate disputes over privilege or other difficult legal issues nor did plaintiffs have to undertake special means to procure evidence that was hard to obtain."); In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 137 (S.D.N.Y. 2008)(also awarding 22.5% of the common fund in attorneys' fees where plaintiffs' counsel had "relative ease of discovery" as counsel was not "forced to fight for access to documents" or overcome claims of privilege).  Accordingly, the third factor points

against an especially generous fee request of 33⅓% in a case that settled fully without necessitating any discovery.

### 4. The Risks of the Litigation

"Antitrust litigation in general, and class action litigation in particular, is unpredictable....[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."  In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. at 475-476.  Further, whenever an attorney takes a case on a contingency basis, as Lead Counsel has done, there is always the risk of non-payment. Certainly there are instances where diligent and experienced plaintiffs attorneys pour thousands of hours and dollars into their class action case only to recover little or nothing at trial or on appeal.  See Robbins v. Koger Props. Inc., 116 F.3d 1441 (11th Cir. 1997)(In a securities class action suit, the Eleventh Circuit Court of Appeals reversed an $81 million jury verdict in favor of plaintiffs, finding that plaintiffs' had no proof of loss causation).

The Court finds that Lead Counsel did take a risk pursuing the instant litigation on a contingency basis as there is always a risk of not being compensated for counsel's time and expenses.

<u>In re Fidelity/Micron Sec. Litig</u>., No. 95-12676, 1998 WL 313735, at *3 (D. Mass. June 5, 1998)("The case involved some risk, but that is true of almost any litigation."). However, the Court determines that Plaintiffs' counsels' level of risk was minimal. Lead Counsel filed the instant suit on April 22, 2008, a mere five days after the DOJ announced that it had begun investigating cabotage trade, specifically the Puerto Rico trade route on April 17, 2008. (Docket No. 1). On that same date, April 17, 2008, the Federal Bureau of Investigation (the "FBI"), acting at the DOJ's behest, executed search warrants and served subpoenas on each of the Horizon Defendants, Sea Star Defendants and Crowley Defendants. In order to obtain a search warrant, the DOJ, by definition, had to have probable cause to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant. Such a belief must be grounded in reasonably trustworthy information. Several months after this raid, on October 20, 2008, five high ranking executives from Horizon Defendants and Sea Star Defendants pled guilty to violating the Sherman Antitrust Act and provided details of the anti-competitive conspiracy.

Based upon the DOJ's raids of three large businesses, Lead Counsel had a probable basis to believe that there were antitrust violations at the time Lead Counsel filed this action. These

16

suspicions would then have been confirmed a mere six months later when the five executives pled guilty.   Although Plaintiffs' counsel undertook the instant action on a contingency fee basis, the investigation by the DOJ, which became public prior to the commencement of this litigation, mitigates counsels' risk.   Lead Counsel had a strong basis to believe that at least some of the Defendants had colluded in violation of antitrust laws based upon the DOJ's conduct.   Therefore, the Court finds that the risk of litigation factor weighs against granting attorneys' fees under the percentage of the fund methodology.

### 5. The Amount of Time Devoted to the Case by Counsel

Billing more than 30,000 hours, Lead Counsel and members of Plaintiffs' Steering Committee spent significant, but not excessive, time prosecuting the instant action.   Throughout the pendency of this litigation, Lead Counsel has consistently advocated for Plaintiffs' rights and pursued settlement negotiations and agreements to the benefit of the Class. Generally, Lead Counsel performed legal and factual research, worked with economic experts and class representatives, drafted countless briefs and reviewed countless more opposing briefs. More specifically, Lead Counsel drafted five class action complaints and had to defend, and prevail, against several well-written and prima facie, colorable, non-frivolous motions to

dismiss.  Even after reaching a settlement agreement, Lead Counsel still had to oversee the claims administration process, assist Class Members with their proofs of claim and other inquiries as well as handle any appeals to the Settlements.  Although Lead Counsel never engaged in formal discovery, this factor points in favor of Lead Counsel's fee request.

### 6. Awards in Similar Cases

The Court finds it useful to turn to objective academic studies in assessing awards in similar cases.  Such studies provide  "good indicators of what the market would pay for class counsel's services because the [data] show[s] what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."  In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig., 733 F. Supp. 2d 997, 1014 (E.D. Wis. 2010); Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 864 (E.D. La. 2007) (District Court looked to academic research "to determine an average percentage for cases of similar magnitude.").

A recent study analyzing eighteen years of available opinions involving settlements in class action litigation in state and federal courts found that the mean and median fees awarded in the First Circuit are 20%.  Theodore Eisenberg and Geoffrey P.

18

Miller, Attorneys' Fees & Expenses in Class Action Settlements: 1993-2008, 7 J. of Empirical Legal Stud. 248 (2010) (Table 4)("Eisenberg and Miller").  This same study also concluded that, in antitrust cases, the mean fee is 22% and that the median fee is 23%.  Eisenberg and Miller, Table 5.

Eisenberg and Miller additionally list fee percentages in terms of the amount of the class' recovery in Table 7.  The instant settlement fund's actual value is $65,850,000, placing it at the high end of Eisenberg and Miller's tranche of settlements between $38.3 million and $69.6 million.  Eisenberg and Miller, Table 7.  In this tier, the mean fee percentage for recoveries is 20.5% with a standard deviation of 10%.  Thus, a fee in the range of 10.5% or 30.5% are reasonable when viewed against fee awards in comparable cases.  In re Lawnmower Engine, 733 F. Supp. 2d at 1014 (stating that Eisenberg and Miller suggest "that courts view fee requests falling within one standard deviation of the mean as generally reasonable unless reasons are shown to question the fee."); cf. In re Relafen, 231 F.R.D. at 80-81 (While welcoming that "these thorough and objective studies...provide but a starting place...the court concludes it would be inappropriate to use a mean -- an *average* -- categorized according to the size of the settlement fund as the be all and end all of analysis.")(emphasis in the original).

More specifically, the Court investigates fees awarded in other, similar, individual cases within the First Circuit. Lead Counsel has cited several cases where fee awards between 30 and 33⅓% of the available fund were granted. *See* In re Thirteen Appeals, 56 F.3d at 300; *see also* In re Relafen, 231 F.R.D. at 81. However, the Court finds those cases distinguishable. In re Thirteen Appeals spanned a significantly longer time than the instant case, and involved two hundred and seventy component cases, whereas the instant MDL matter encompasses only approximately forty component cases. *See* In re Thirteen Appeals, 56 F.3d at 307. Similarly, the In re Relafen Court found that class counsel had put forth "exceptional efforts" in litigation that "required [an] all out effort" as Class Counsel succeeded, in part, in defeating a summary judgment motion. *See* In re Relafen, 231 F.R.D. at 80. Class counsel in In re Relafen also had a "*a mass of discovery,*" including "hundreds of hours" consulting with experts, as well as the review of "hundreds of boxes of documents." Id. (emphasis added). The situation counsel faced in In re Relafen simply is not present in the instant litigation.

The Court has also located several cases within this Circuit on the lower end of the spectrum where the District Court awarded counsel 20% or less of the fund. *See* Turabao Med. Ctr. v. Beach,

20

Nos. Civ. 96-2250, 96-8671, 96-2290, 96-8578, 96-2459, 96-8590, 96-8712 96-4010, 1997 WL 33810581, at *4-5 (D.P.R. Aug. 13, 1997) (awarding fees of 20% fees of the fund in a case where there was no formal discovery and no motion practice); In re Fidelity/Micron Sec. Litig., No. 95-12676, 1998 WL 313735, at *3, n.6 (D. Mass. June 5, 1998)(awarding fees totaling 17.5% of the fund in a case where no significant discovery took place), remanded on other grounds, 167 F.3d 735; In re Tyco Int'l, Ltd., 535 F. Supp. 2d 249, 254 (D.N.H. 2007) (awarding fees amounting to 14.5% of the fund in a case where "[i]t would be difficult to overstate the volume of discovery in this case" and "there was "aggressive, skillfully argued, and unusually challenging motion practice."); Mazola v. May Dept. Stores Co., 1999 WL 1261312, at *3 (D. Mass. Jan. 27, 1999) (Gertner, J.) (unreported opinion), (awarding fees of 10% of the fund where plaintiffs' counsel opposed and fought defendants for merely a couple of months.[14]).

The Court finds that the award in In re Tyco is not an apt comparison to the present cabotage litigation because In re Tyco had a settlement fund more than three times as large as the fund presently at issue.  See In re Indep. Energy Holdings PLC, No. 00 Civ. 6689, 2003 U.S. Dist. LEXIS 17090, 2003 WL 22244676, at *6

---

[14]The District Court additionally granted plaintiffs' counsel $1.75 million in attorneys' fees to be paid directly by defendant.

(S.D.N.Y. Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."). Excluding In re Tyco, the litigation in the cited cases, as with the matter at hand, did not proceed to a formal discovery phase.  While Turabao, In re Fidelity, and Mazola are comparable on the lack of formal discovery, these cases are less challenging than the instant case in the sense that they were either of a shorter duration or contained fewer dispositive motions.

Lead Counsel conceded in their first brief requesting fees that "[c]ourts in this Circuit frequently have recognized that fee awards in common fund cases typically range from 20 to 30 percent." (Docket No. 836).  Hence, the 33⅓% requested by Lead Counsel exceeds the ceiling on typical percentage of the fund awards in the First Circuit.  Thus, reviewing similar fee awards advocates against granting Lead Counsel's requested award of 33⅓%, but dissuades the Court from approving an award of 20% or less.

## 7. Public Policy Considerations

The Court's final inquiry centers on the public policy considerations.  Class action plaintiffs' attorneys provide an

invaluable service by aggregating the seemingly insignificant harms endured by a large multitude into a distinct sum where the collective injury can then become apparent. Due to the expense, time and difficulty of pursuing complex litigation, it would likely not be economical for an individual Class Member to pursue such litigation on their own. *See* Alpine Pharma., Inc. v. Chas Pfizer & Co., Inc., 481 F.2d 1045, 1050 (2d Cir. 1973) ("In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation."); In re Telectronics Pacing Sys. Inc., 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001) ("Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling such small claimants to pool their claims and resources.); Mazola, 1999 WL 1261312, at *4 ("The litigation is critical, because it gives voice to relatively small claimants who may not be aware of statutory violations or have an avenue to relief."). These considerations weight in favor of granting attorneys' fees under the percentage of the fund methodology, as private civil class action litigation is an important tool in enforcement of antitrust laws. *See* Pillsbury Co. v. Conboy, 459 U.S. 248, 262-263 (1983) (The Supreme Court has previously "emphasized the importance of the private action as a means of

23

furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws.").

## B. Percentage of the Fund Analysis

In weighing all of these factors, the Court cannot approve the 33⅓% award requested by Lead Counsel.  On the one hand, the Court notes that counsel has billed tens of thousands of hours in a complex matter and that counsel has effectively represented the Class in achieving a favorable and sizable settlement.  These considerations, in addition to the public policy objectives of preventing collusion in the market place, point towards granting Lead Counsel's fee request.  On the other hand, however, the Court is more persuaded by the fact that the instant matter settled before formal discovery proceedings commenced as discovery is often the most time intensive aspect of any complex litigation. Additionally, the Court maintains that attorneys' fee awards reasonably close to 33⅓% should be reserved for cases which actually proceed to trial or settle on the eve of trial.  The instant case did not even reach the discovery phase much less approach a trial date.  Furthermore, the Court observes that counsel took almost no risk in accepting the instant case.  Lead Counsel filed this class action a mere five days after the DOJ's and the FBI's raid on several defendants' offices.  As a result of these raids, Lead Counsel had reason to believe that there was

a strong probability that there were antitrust violations.  This probability was later increased by the various defendants' plea agreements, which accepted antitrust liability in either their personal or official capacity.[15]

An influential factor is fee awards granted previously in similar cases.  When courts awarded fees of thirty percent or greater, the cases are generally longer in duration and more complex than the present case.  When courts awarded fees of twenty percent or less, the amount of discovery was comparable, but the cases generally were shorter in duration and had fewer substantive motions than the present case.  Thus, the Court determines that the correct percentage in this matter is between 20% and 30%.  In further narrowing down this range, the Court found the Eisenberg and Miller study helpful in illuminating that the mean and median fee awards in this Circuit, and in antitrust cases in general, are in the low twenty percent range.

Upon careful review, the Court hereby **DENIES** Lead Counsel's fee request for 33⅓% and instead finds that an award of 23% of the cash portion of the Settlements, or more precisely, $12,017,500,

---

[15] As mentioned previously, five former employees of the Horizon and Sea Star Defendants entered guilty pleas accepting criminal antitrust liability.  *See* United States v. Horizon Lines, LLC, No. 3:11-CR-0071, *Second Amended Judgment* (D.P.R., Apr. 28, 2011); United States v. Chisholm, No. 08-cr-00353, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. Serra, No. 08-cr-00349, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. Glova, No. 08-cr-00352, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. Gill, No. 08-cr-00351, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); and United States v. Baci, No. 08-cr-00350, *Plea Agreement* (M.D. Fla., Oct. 20, 2008).

is just.  The Court concludes that 23% is appropriate particularly where a class action settles before undergoing a substantially protracted and costly discovery process.  The Court reiterates that attorneys' fee awards of 33⅓% should be reserved for cases which proceed to trial or settle on the eve of trial.

## C. Lodestar Cross-Check

The First Circuit does not require a court to engage in calculating the lodestar method when awarding fees based upon the percentage of the fund method.  In re Thirteen, 56 F.3d at 307.  Nevertheless, the Court will perform the lodestar calculation as the Court finds that it is a pragmatic cross-check to ensure that the Court is not creating a windfall for Lead Counsel.  See New England Carpenters Health Benefits Fund v. First DataBank, Inc., 2009 U.S. Dist. LEXIS 97364, 7-8 (D. Mass. Oct. 20, 2009); Manual for Complex Litigation (Fourth) § 14.122 (2004) ("the lodestar is . . . useful as a cross-check on the percentage method . . . .); Mesko v. Cabletron Sys. (In re Cabletron Sys. Sec. Litig.), 239 F.R.D. 30, 37 (D.N.H. 2006) ("[I]t is now common practice to use the lodestar as a cross-check on the [percentage of the fund] award."); In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 485 (E.D. Pa. 2008); see also Vaughn R. Walker & Ben Horwich, The Ethical Imperatives of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund

Cases, 18 Geo. J. Legal Ethics 1453, 1468, 1470 (2005) (advocating that courts have an ethical obligation to perform the Lodestar cross-check).  The lodestar cross-check ensures that  fees awarded under the percentage of the fund method are reasonable in light of the amount of work counsel actually performed.  *See* Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992) ("[T]he lodestar represents "a presumptively reasonable fee.").

"The lodestar cross-check is performed by multiplying the hours reasonably expended on the matter by the reasonable hourly billing rate which then provides the court with the 'lodestar calculation.'" In re Diet Drugs, 553 F. Supp. 2d at 485-486.  *See* Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 293 (1st Cir. 2001) ("In implementing this lodestar approach, the judge first calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)").  The proposed fee award is then divided by the lodestar calculation, resulting in a lodestar multiplier.  The lodestar multiplier is compared to other multipliers employed in similar cases.  If the multiplier is too great, the Court should consider reducing its award calculated under the percentage of the fund method.  In re Rite Aid, 396 F.3d at 306.

27

In the instant matter, Lead Counsel arrived at a lodestar of $13,965,579.75 by multiplying the 30,000 hours plaintiffs' counsel expended by their hourly billing rates,[16] which are capped at $600 per hour.[17]  Dividing the Court's proposed fee of 23% of the total fund, $12,017,500, by the lodestar yields a multiplier of 1.16. This low multiplier is certainly within the reasonable range.  *See* In re Relafen, 231 F.R.D. at 82 ("A multiplier of 2.02 is appropriate."); In re Cendant Corp., 243 F.3d at 742 (holding that a lodestar multiplier of three would be reasonable and appropriate); *See*, e.g., In re TJX Cos. Retail Sec. Breach Litig., 584 F. Supp. 2d 395, 408 (D. Mass. 2008) (applying a lodestar multiplier of 1.97); In re Tyco, 535 F. Supp. 2d at 271 (applying a lodestar multiplier of 2.697); In re Visa Check, 297 F. Supp. 2d at 524 (applying a lodestar multiplier of 3.5); *see also* In re Prudential, 148 F.3d at 341 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

---

[16]By dividing the total lodestar by the 30,000 hours billed, the Court calculates that Lead Counsel's average hourly rate is approximately $465.

[17]Lead Counsel has not provided the Court with detailed billing records supporting its claim of working more than 30,000 hours (Docket No. 836).  Nevertheless, to save the Court from engaging in mathematical precision or bean-counting when calculating the lodestar cross-check, the Court may rely on summaries of hours submitted by counsel and not review actual billing records.  In re Rite Aid, 396 F.3d at 306-307.  Based upon the Court's common sense, experience, and familiarity with this case, the Court finds that expending over 30,000 billable hours is reasonable in the instant matter.  The Court also notes that no party has challenged counsels' hours.

The low multiplier of 1.16 indicates the relative closeness of the attorneys' fee calculated under the lodestar method and the percentage of the fund method.  This lack of disparity confirms that the Court's fee award under the percentage of the fund method is reasonable and that the fee closely approximates the fair market value for counsel's services.  The Court finds that the modest enhancement of the lodestar amount of 8%, using the 1.16 multiplier, is fitting for the same reasons supporting the 23% percentage of the fund award: the lack of formal discovery in the litigation and Lead Counsel's lack of risk in undertaking the litigation.  These factors mitigate against increasing the 23% fee awarded under the percentage of the fund method in order to thus increase the multiplier.  The Court concludes that a multiplier of 1.16 is appropriate in this matter.

With the lodestar cross-check supporting the Court's award of 23% under the percentage of the fund method, the Court **GRANTS IN PART AND DENIES IN PART** Lead Counsel's request for attorneys' fees (Docket Nos. 839 & 886).  The Court hereby awards Lead Counsel fees of 23% of the total value of the cash portion of the Settlements, or more precisely $12,017,500.  This sum shall be paid from the three settlements with the Horizon, Crowley and Sea Star Defendants.

### III. Attorneys' Fees for Objectors

Generally in class action suits, once a settlement figure has been reached, defendants have little interest in how the fund is ultimately appropriated, including what percentage of the fund that plaintiffs' counsel receives. At this stage of the litigation, Lead Counsel's interest begins to conflict with the Class Members'. Objectors thus aid the Court in assessing plaintiffs' counsels' request for attorneys' fees to ensure that the Class Members' interests are protected. *See* In re Prudential Ins. Co. Am. Sales Practice Litig. Actions, 278 F.3d 175, 202 (3d Cir. 2002) (J. Rosenn, dissenting with respect to the imposition of sanctions upon objector's counsel)("The objecting lawyer independently can monitor the proposed settlement, costs, and fees for Class Counsel and, thus, aid the court in arriving at a fair and just settlement for the members of the class who individually are largely unrepresented."); *see also* White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974) ("[I]t is well settled that objectors have a valuable and important role to perform in preventing collusive or otherwise unfavorable settlements.").

The Federal Rules of Civil Procedure contemplate the possibility of fees to objectors:

> [Rule 23(h)] provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, [and] not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the

30

> class, such as...attorneys who represented objectors to a
> proposed settlement under Rule 23(e) or to the fee motion of
> class counsel.

Fed. R. Civ. P. 23(h), Advisory Committee Notes to the 2003
Amendments. "An objector whose arguments result in a reduction
of attorney-fee and expense awards provides a benefit to the
class" and are thus entitled to attorneys' fees. UFCW Local
880-Retail Food v. Newmont Mining Corp., 352 Fed. Appx. 232, 236
(10th Cir. 2009). Objectors who do not benefit the class,
however, are not entitled to compensation. Id.; see In re
Cendant, 404 F.3d at 197 ("Only those attorneys who confer an
independent benefit upon the class will merit compensation.");
Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1156 (8th Cir. 1999)
("To recover fees from a common fund, attorneys must demonstrate
that their services were of some benefit to the fund or enhanced
the adversarial process.").

In the instant matter, Objectors request an award of 33⅓% of
the three million and fifty thousand dollars ($3,050,000) they
claimed to have secured for the Class Members. (Docket No. 951).
Alternatively, Objectors seek the same percentage of the
approximately three million dollars that the Court awarded to Lead
Counsel. In support of this request, Objectors filed motions and
affidavits certifying that, collectively, they expended 865.5

hours opposing Lead Counsel's requested attorneys fees.[18]  (Docket Nos. 992 and 993).

Objectors have played an instrumental role in reviewing Lead Counsel's fees request and creating a benefit of the Class. Objectors have also aided the Court in its inquiry into the fairness of the proposed settlement.  Most critically, Objectors opposed the method in which Lead Counsel had initially calculated the base rate freeze option.  Lead Counsel originally valued the base rate freeze option at $105 million by calculating all the Class Members that could potentially elect that option.  However, the Objectors persuasively argued that the value of the base rate freeze option should be calculated by including only the value of the base rate freeze option actually elected by Class Members (Docket Nos. 862 and 875).  The Objectors further requested that the Court order Lead Counsel to produce the identities of the Class Members that had elected for the base rate freeze option and the volume of their cabotage purchases in order to provide a more accurate estimate of the value base rate freeze option (Docket No. 880).

_____

[18]Specifically, Pan American states that their counsel expended 139.5 hours opposing Lead Counsel's request (Docket No. 992); V. Suarez assert that its counsel expended 272.5 hours (Docket No. 993-1); Carribean Produce's counsel alleges that it expended 247.5 hours (Docket No. 993-2); and Central Produce claims that its counsel expended 206 hours (Docket No. 993-3).  Thus, in total, Objectors billed 865.5 hours for opposing Lead Counsel's fee request.

The Objectors' informative motions are hereby **NOTED** (Docket Nos. 992 and 993).

In response to the Objectors' concerns, Lead Counsel recalculated the total value of the Settlements from $157,250,000 to $65,850,000. (Footnotes 8 and 12). With a lower settlement valuation, Lead Counsel lowered their fee request from 16% of $157,250,000, which is $25,000,000, to 33⅓% of $65,850,000, which is $21,950,000. Lead Counsel concedes that the lower fee request is "[b]ecause of the objections previously raised by the Objectors and the Court's reluctance to compute the award of attorney's fees on [the] basis of benefits not actually claimed by Class members." (Docket No. 910).

The Court recognizes Objectors' valiant efforts in scrutinizing Lead Counsel's proposed attorneys' fee and for clarifying that the actual value of the settlement is $65,850,000 and not the $157,250,000 as originally claimed by Lead Counsel. The Court determines that the Objector's direct efforts benefitted the Class Members by increasing the settlement fund by more than three million dollars. Therefore, the Court finds that Objectors are entitled to attorneys' fees. Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 288 (7th Cir. 2002) ("[O]bjectors [must] produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class."); see Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051 (9th Cir. 2002) ("Because objectors did not increase the fund or

otherwise substantially benefit the class members, they were not entitled to fees.").

Although the Objectors' efforts benefitted the Class, Objectors' requested award of 33⅓%, or alternatively a percentage award equal to Lead Counsel's award, 23%, is clearly excessive. The Court finds this request exorbitant for a variety of reasons. First, Objectors substantive participation in this litigation was for a much more limited scope and duration than Lead Counsel's. Objectors did not have the responsibility of organizing the Class or defending against motions to dismiss or a host of Lead Counsel's other obligations. Second, it was the Court, and not the Objectors, that originated the argument that Lead Counsel was engaged in double counting as Class Members were not able to select both the base rate freeze option and the cash settlement option. The Court appreciates Objectors further development of this argument; however, the Court notes that Objectors are merely expanding upon the Court's previously expressed skepticism. Third, Objectors request over a million dollars in fees for billing 865.5 hours (Docket Nos. 992 and 993) in opposing Lead Counsel's fee request. Were the Court to grant this request, Objectors would be compensated at more than $1100 per hour.[19]

---

[19]More precisely, Objectors would receive $1,162.91 per hour. The Court additionally concludes that the Objectors were overzealous in spending 865.5 hours for developing their arguments. As the Objectors made identical arguments common to all parties and sought an identical remedy, the Objectors should have pooled their

34

Accordingly, the Court finds that an award of 10% is reasonable and appropriate to reflect Objectors' time, effort, ingenuity and success in increasing the kitty for the benefit of the Class.

Thus, Objectors' request for attorneys' fees (Docket No. 951) is **GRANTED IN PART AND DENIED IN PART**.  In recognition of the valuable service the Objectors provided by enlarging the settlement fund by more than three million dollars to the direct benefit of the Class Members, the Court hereby awards the Objectors 10% of the recovered amount, which is three hundred and five thousand dollars ($305,000).  This sum shall be paid from the three settlements with the Horizon, Crowley and Sea Star Defendants.[20]

## IV. Incentive Awards

"Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."  In re Compact Disc Minimum Advertised Price Antitrust Litig., 292 F. Supp. 2d 184, 189 (D. Me. 2003).  In re Lupron, 2005 WL 2006833,

---

resources to craft a single, cogent filing as opposed to duplicating their efforts.

[20]The Objectors have reached an agreement amongst themselves to divide any fee award based upon the respective volume of cabotage purchased by the Objectors from Defendants during the relevant period (Docket Nos. 989 and 990).  Accordingly, the parties have agreed to that V. Suárez, Inc. will receive 57.41% of the award; Caribbean Produce Exchange, Inc. will receive 25.49%; Central Produce El Jibarito, Inc. will receive 11.37%; and Pan American will receive 5.36%. The Court will uphold this agreement and orders that the Objectors' award be distributed in accordance with these percentages.  Accordingly, the Court **GRANTS** the Objector's request (Docket Nos. 989 and 990) and now finds as **MOOT** the Objector's prior request (Docket No. 988).

at *7 ("Incentive awards are recognized as serving an important function in promoting class action settlements."). Courts "routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 400 (D.D.C. 2002)(internal citations and quotations omitted). Additionally, courts typically examine the following criteria when assessing incentive awards:

> 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

Swack v. Credit Suisse First Boston, LLC, 2006 U.S. Dist. LEXIS 75470, 11-12 (D. Mass. Oct. 4, 2006)(internal quotations omitted).

Lead Counsel requests that the Court approve incentive awards in the amount of $20,000 for each of the six Class Representatives, thereby totaling $120,000. Lead Counsel argues that Class Representatives played a vital role in gathering facts, reviewing the complaint and other filings and preparing critical affidavits. While the Court notes the named plaintiffs' involvement in advancing the present litigation, the Court finds that the amount of the incentive award requested is excessive and

unreasonable.[21]    The Class Representatives did not undertake substantial risk or suffer notoriety or personal hardships by acting as a named plaintiff.  There is "no indication that [the Class Representatives] assumed a risk or inconvenience not shared by the other class members which is of such magnitude to merit" an incentive award, and Plaintiffs "do not provide specific evidence of the purported risk's magnitude."  In re Laidlaw Sec. Litigation, 1992 U.S. Dist. LEXIS 13935, at *9 (E.D. Pa. Sept. 15, 1992); In re AOL Time Warner ERISA Litig., 2007 U.S. Dist. LEXIS 79545 (S.D.N.Y. Oct. 26, 2007).

Although the Class Representatives invested some amount of time to the instant suit by suppling documents, reviewing Court filings and executing affidavits, the Class Representatives were not subjected to hundreds of interrogatories and countless depositions; in fact, no Class Representative was ever deposed as the instant litigation did not proceed to a discovery phase.  See Weseley v. Spear, Leeds & Kellogg, 711 F. Supp. 713, 720 (E.D.N.Y. 1989)(denying incentive award to named plaintiff where plaintiff responded to document requests and was deposed, but did not

---

[21]The Court notes that Congress has expressed some skepticism about incentive awards.  Congress made the following finding in the Class Action Fairness Act: "Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where . . . (B) unjustified awards are made to certain plaintiffs at the expense of other class members." Pub. L. No. 109-2, § 2(a)(3), 119 Stat. 4.  Additionally, the Private Securities Litigation Reform Act of 1995 (PSLRA) prohibits granting incentive awards to class representatives in securities class actions. See 15 U.S.C. § 78u-4(a)(2)(A)(vi).

otherwise "perform any extraordinary services to the class"); <u>In re Residential Doors Antitrust Litig.</u>, 1998 U.S. Dist. LEXIS 4292 (D. Pa. 1998)(granting an incentive award of $ 10,000 to Class Representatives where Class Representatives cooperated in producing documents, answering interrogatories, and presenting representatives for depositions). Only the fifth factor, the lack of personal benefits obtained by the Class Representatives, support a higher incentive award for the Class Representatives.

Giving careful and deliberate consideration to all of these factors, the Class Representatives cannot be said to have been an active participant in the litigation to merit $20,000. Instead, the Court opines that a $8,000 incentive award per Class Representative is much more reasonable considering the level of involvement, time, effort and risk the Class Representative expended. Accordingly, the Court **DENIES** the request for $120,000 in incentive awards and **GRANTS** $8,000 in incentive awards per Class Representative, thereby totally $48,000. This sum shall be paid from the three settlements with the Horizon, Crowley and Sea Star Defendants.

### V. Costs & Expenses

Lead Counsel has filed itemized, detailed and voluminous supporting evidence relating to the costs allegedly incurred (Docket Nos. 960, 964-979, 985, and their supporting exhibits). The Court has carefully reviewed these filings as the Court has

"quasi-fiduciary" duty to Class Members while at the same time exercising its "wide latitude in shaping the contours" of an award of expenses. *See* <u>In re Fidelity/Micron Sec. Litig.</u>, 167 F.3d 735, 736 (1st Cir. 1999). Upon careful review, the Court finds that these costs are reasonable and justifiable in light of the scope and duration of the litigation. Therefore, the Court hereby **GRANTS** Lead Counsel's request for expenses, proportionate to the number of Class Members that elected the cash option of the Settlement, and awards Lead Counsel $1,004,631.83 in expenses (Docket Nos. 960 and 985).[22] This sum shall be paid from the three settlements with the Horizon, Crowley and Sea Star Defendants.

## VI. FAIRNESS, REASONABLENESS & ADEQUACY OF THE SETTLEMENTS

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court "may approve a settlement...that would bind class members only after a hearing and on finding that the settlement...is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(c).[23] Although the Court outlined the contours of the Settlements above, out of an abundance of caution, the Court makes

---

[22]There are 1660 Class Member who filed claims and fifty-eight of which elected the base-rate freeze option for at least one of the three main carriers, Horizon, Crowley or Sea Star (Docket No. 886-2). Hence, only three percent of those Class Members who filed claims elected the base-rate freeze option and ninety seven percent elected the cash option. Herein, the Court awards Lead Counsel' ninety seven percent of the total expenses, which is $1,004,631.83. The Court will apportion the remaining three percent of the total expense following the hearing on September 9, 2011.

This analysis excludes each Class Members' volume of commerce with the Defendants.

[23]The Court held a Final Fairness Hearing on November 18, 2010 (Docket No. 876).

additional   factual   findings   regarding   the   fairness,
reasonableness, and adequacy of the Settlements.

In providing notice to the Class, Lead Counsel mailed 61,854
Long-Form Notices and Claim Forms to Class Members identified from
Defendants' transactional records.  Additionally, a press release
was distributed to approximately 4,490 major press outlets in the
United States and 250 journalists in the maritime shipping
industry. Summary notices were also published in newspapers and
magazine in September of 2010.  Lead Counsel further established
a mailing address, a website, and a toll-free telephone number,
staffed with both English and Spanish speaking operators, where
Class Members could obtain further information regarding the
proposed Settlements.

In crafting the Horizon Settlement Agreement, Lead Counsel
received the Horizon Defendants' financial records and was thus
able to assess their ability or inability to pay a large sum or
judgment.  Upon close review of these records, in consultation
with a financial expert, Lead Counsel determined that Horizon
Defendants' market capitalization had dropped almost 90% since
2007 and that Horizon Defendants' were highly leveraged, having
almost no unencumbered assets.  Horizon Defendants also had to
obtain a costly amendment to an existing credit agreement in order
to be able to commit the $20,000,000 cash portion of the
Settlement.  Moreover, at the request of the DOJ, the Court

drastically lowered Horizon's criminal fine from $45,000,000 to $15,000,000 out of a concern for Horizon's continued viability and its ability to pay restitution to the Class Members in the instant matter.[24]

Similarly, Lead Counsel received confidential information from Crowley Defendants' concerning their market share. Lead Counsel engaged a financial expert to evaluate this information and assess Crowley Defendants' portion of any potential damages suffered by the Class. Furthermore, Lead Counsel and Crowley Defendants had two mediation sessions with an experienced mediator in complex litigation and antitrust matters.

Lead Counsel also held arm's length negotiations with Sea Star Defendants where they vigorously challenged the Class' damages claim. Lead Counsel engaged a financial expert and a forensic financial expert to analyze Sea Star Defendants' publicly available information as well as confidential internal information provided by Sea Star Defendants. Like Horizon Defendants, Sea Star Defendants are highly leveraged, with virtually no unencumbered assets. Lead Counsel also conducted two mediation

---

[24]On March 22, 2011, Horizon pled guilty to one count of violating the Sherman Antitrust Act and the Court imposed a criminal fine of $45,000,000 to be paid in gradually increasing installments over four years. United States v. Horizon Lines, LLC, No. 3:11-CR-0071, *Judgment* (D.P.R., Mar. 22, 2011)(Docket No. 29). The following month, however, the Court reduced Horizon's fine, at the request of the United States, by two-thirds to $15,000,000. The $15,000,000 fine is similarly payable in gradual installments over four years, in an effort ensure sufficient cash flow to continue operations and to ensure that Horizon would be able to compensate the Class. United States v. Horizon Lines, LLC, No. 3:11-CR-0071, *Second Amended Judgment* (D.P.R., Apr. 28, 2011)(Docket No. 37).

sessions with Sea Star Defendants where Sea Star Defendants indicated that there were significant limitations on their ability to a pay a substantial settlement amount.   Further, Sea Star Defendants are subject to liability from multiple other lawsuits. Moreover, Lead Counsel considered the Court's skepticism of Plaintiffs' ability to maintain a claim against one of the Sea Star Defendants, Saltchuck Resources, Inc., due to lack of evidence against this particular Defendant.

Regarding Chisholm, a personal, non-corporate co-defendant, Lead Counsel has agreed to dismiss all claims against Chisholm under the Chisholm Settlement Agreement.   In exchange, Chisholm has agreed to fully cooperate in aiding Lead Counsel in this, and other related, cabotage litigation.   Chisholm's participation significantly improved Plaintiffs' ability to prove the extent of the conspiracy.   Lead Counsel reviewed Chisholm's financial records and based upon his assets and loss of income upon being incarcerated, Lead Counsel concluded that he did not have the ability to pay any monetary amount.

The Court echos its previous analysis from when it granted the Settlements preliminary approval on August 25, 2010.   In re Puerto Rican Cabotage Antitrust Litig., 269 F.R.D. at 142 and (Docket Nos. 800 and 801).   Therein, the Court concluded that the settlement agreements were negotiated at arm's length as the negotiations were "long and arduous, spanning a considerable time-

period" and that a resolution was "reached after a great deal of dispute between the parties as to the terms of the agreements." (Docket No. 801).  The Court also concluded that the parties were sufficiently informed by the informal discovery that occurred.

The Final Fairness Hearing assuaged all of the Court's concerns regarding the Settlements themselves (Docket No. 876). The Court found that the Long-Form Notices sent to Class Members were sufficiently clear that Class Members had the option of selecting either the base rate freeze or the cash option when opting into the Settlements.  The Court also determined that the Putative Class Members were provided with adequate information to make an educated decision whether or not to opt in or out of the Settlements within allotted the time period.  The only remaining issue at the conclusion of the Final Fairness Hearing was Plaintiffs' counsel's utilization of a maximized potential value of the base-rate freeze option, in conjunction with the cash settlement, to determine the size of the fund from which the reasonable attorneys' fee amount could be calculated. (Footnotes 8 and 12).

## A. Grinnell/Tyco Analysis

The First Circuit has yet to espouse a set of determined factors for assessing the fairness, reasonableness, and adequacy of a proposed settlement.  Thus, the Court will follow other courts within this Circuit that have utilized a modified version

of the Grinnell factors set forth by the Second Circuit and
adopted by the Third Circuit. *See* In re Tyco, 535 F.Supp.2d at
259-60. The modified Grinnell factors are:

> (1) risk, complexity, expense and duration of the case;
> (2) comparison of the proposed settlement with the likely
> result of continued litigation; (3) reaction of the class
> to the settlement; (4) stage of the litigation and the
> amount of discovery completed; and (5) quality of counsel
> and conduct during litigation and settlement negotiations.

Id.

### (1) Risk, Complexity, Expense and Duration of the Case

As the Court has already stated, the present case is a
complex antitrust matter that has been pending for more than three
years; however, the Court notes that the parties have been in
settlement negotiations for two of those three years. While the
present case involved relatively low risk due to the DOJ's
investigation, the Defendants' credible "filed-rate" doctrine
defense, which may potentially shield Defendants from civil
liability, provides heightened risk for Lead Counsel.
Additionally, the parties' expenses to date have been reasonable,
but further litigation will result in an exponential rise in
litigation costs as the litigants enter into discovery. Following
discovery, if Plaintiffs survive motions for summary judgment, a
trial may take as long as a month, which will likely be followed
with a lengthy appellate review process. This factor is somewhat

mixed, but, on the whole, the furculum favors approval of the Settlements.

### (2) Comparison of the Proposed Settlement with the Likely Result of Continued Litigation

The actual value of the fund, $65,850,000, accounts for approximately 1.583%[25] of the total affected Puerto Rican cabotage sales for the relevant period. Other courts have approved settlements with similar percentages. *See* <u>In re Pressure Sensitive Labelstock Antitrust Litig.</u>, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) (approving the settlement where the cash portion of the settlement was approximately 1.5% of total sales); <u>In re Linerboard Antitrust Litig.</u>, 321 F. Supp. 2d at 627 (approving the settlement where the settlement represented 1.62% of total sales). However, the Court finds that the percentage of the settlement relative to the total sales is not a particularly prudent figure in assessing the adequacy of the proposed Settlements.

Other courts have examined proposed settlements as a percentage of the alleged damages, which is a more reliable analysis. *See* <u>In re Tyco</u>, 535 F. Supp. 2d at 261 (finding that the proposed settlement represented approximately 27% of the alleged damages which constituted an "outstanding recovery for the

---

[25]Plaintiffs estimated that Defendants' total volume of commerce of Puerto Rican cabotage to be $4,159,800,000 during the relevant period (Docket No. 886-2). The actual value of the Settlements, $65,850,000, divided by this sum is approximately 1.583%.

class"). In the instant case, Lead Counsel did not estimate the Class' actual damages (Docket No. 540-25), thus, the Court cannot calculate what this percentage may be.

As a general rule, the Court is loathe to analyze hypothetical situations such as this one and finds predicting the likely result of continued litigation a Sisyphean task. Nevertheless, it is likely that the parties would vigorously litigate class certification, liability and damages as well as summary judgment motions in preparation for a complex trial. To the best of our knowledge, there are no glaring deficiencies, or smoking guns, in the Plaintiffs' arsenal that may substantially inflate or deflate a potential jury verdict. Beyond these broad characterization applicable to most multi-district litigation, the Court's crystal ball is murky and unable to forecast the outcome of summary judgment motions not presently before the Court nor the precise result of a jury verdict for a trial that has not yet been conducted. Accordingly, this factor counsels slightly in favor of approving the Settlements as a means to ending what could be protracted and complex litigation with an uncertain result.

### (3) Reaction of the Class to the Settlement

The Class's reaction has been very positive. 61,854 notices were sent to the Class Members identified from the Defendants' transactional records and press releases were widely disseminated

in both English and Spanish.  There were only three objections to the Settlements and none of the objections challenged the adequacy of the proposed settlement amount itself.  Two of the objections related to the proposed attorneys' fees and incentive awards, while the third objection from INEOS only sought more information in order to decide whether or not to participate in the Settlements or opt-out.[26]  Three objections, with none of the three challenging the amount of the Settlements, out of a potential Class of 61,854, certainly weighs in favor of approval.  *See* Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 118 (2d Cir. 2005), 396 F.3d at 118 ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'" (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41, at 108 (4th ed. 2002)).  However, we note that while "silence constitutes tacit consent to the [settlement] agreement," Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993), courts have found that a lack of response from the class is typical.  *See* In re Traffic Exec. Ass'n—E. R.Rs., 627 F.2d 631 (2d Cir. 1980) ("A substantial lack of response from absentee class members appears to be the norm rather than the exception."); *see also* Bolger, 2 F.3d at 1313 n.15 ("[P]otential objectors...have an insufficient

---

[26]The Court notes that INEOS, and any other Class Member, retained the option to opt-out of the Class and separately litigate against, or settle with, with the Defendants.

incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit.").

### (4) Stage of the Litigation & the Amount of Discovery Completed

This case has passed the motion to dismiss phase, but has not yet entered into a formal discovery phase. Lead Counsel has, nevertheless, conducted substantial informal discovery which included scrutinizing the pleadings and filing in the DOJ's parallel criminal cases. Lead Counsel has also engaged an economic expert and a forensic financial analyst to ascertain potential damages. Additionally, Defendant Chisholm, a participant in the alleged conspiracy, cooperated with Lead Counsel and supplied valuable insider information. Although formal discovery did not occur, the Court can still conclude the parties had sufficient information to make a well informed decision about the Settlements. *See* In re Puerto Rican Cabotage Antitrust Litig., 269 F.R.D. at 141 (The Court previously found that the "parties were sufficiently informed by the limited discovery which has occurred in the instant case."). Thus, this factor favors approval of the Settlements.

### (5) Quality of Counsel & Conduct During Litigation & Settlement Negotiations

The Court previously addressed this issue when granting preliminary approval to the Settlements. The Court stated that:

48

> The negotiations for settlement in the instant case were long and arduous, spanning a considerable time-period. Further, the settlement agreements were reached after a great deal of dispute between parties as to the terms of the agreements. Accordingly, the Court finds that the negotiation of the settlement agreements indeed occurred at arm's length.

Id. at 141.  Based upon the Court's prior finding, this factor also supports approving the Settlements.

The Court will also briefly address Defendants' ability to withstand a greater judgment.  The evidence shows that Horizon and Sea Star Defendants are both experiencing serious financial hardships and are highly leveraged.  As the Court mentioned previously, Horizon Defendants' had to obtain a costly amendment to an existing credit agreement in order to fund the proposed settlement.  The Court also notes that as a result of the severity of Horizon's financial condition, the Court reduced Horizon's criminal fine, at the request of the United States, from $45,000,000 to $15,000,000.[27]  These Defendants' precarious financial situation counsel in favor of resolving this matter quickly and thus approving the Settlements.

With all of the above factors supporting approval, the Court concludes that the proposed Settlement Agreements are fair, reasonable, and adequate.

## VII. CONCLUSION

The Court has determined awarding Lead Counsel 23% of the total value of the cash portion of the Settlements, $12,017,500,

---

[27] See United States v. Horizon Lines, LLC, No. 3:11-CR-0071, Judgment (D.P.R., Mar. 22, 2011)(Docket No. 29) and Second Amended Judgment (D.P.R., Apr. 28, 2011)(Docket No. 37).

is reasonable and appropriate.  The Lodestar cross-check supports the Court's fee award.  The Objectors have performed a valuable service in assessing Lead Counsel's fee request resulting in compensation for each and every Class Member.  The Court has thus found that the Objectors are entitled to a fee of 10% of the $3,050,000 they have helped recover for the benefit of the Class. The Court has also approved incentive awards of $8,000 per Class Representative, for a total of $48,000, and approved Lead Counsel's request for expenses in the amount of $1,004,631.83. Lastly, in compliance with Rule 23 of the Federal Rules of Civil Procedure, the Court has concluded that the proposed Settlements are fair, reasonable, and adequate.

As the Court has determined that the attorneys' fees, costs and expenses are all reasonable for the reasons stated above, the Court is now satisfied that the Settlement Agreements are fair, reasonable, and adequate.  Thus, the Court hereby **GRANTS** final approval (Docket No. 840) to the pending Settlement Agreements for the reasons stated above.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of August, 2011.

/S/ DANIEL R. DOMÍNGUEZ

DANIEL R. DOMÍNGUEZ

U.S. District Judge